## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

MANUEL YSASI,

       Plaintiff,

vs.                                                                            No. CIV 13-0183 JB/CG

DEPUTY SHERIFF KELLY BROWN,
DEPUTY SHERIFF CHRIS RIDER,
individually and in their official capacities
as Deputy Sheriffs of Lea County, New Mexico
and the LEA COUNTY DETENTION CENTER,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the Defendants' Motion for Partial

Summary Judgment, filed December 16, 2013 (Doc. 43)("MSJ"); and (ii) the Defendants'

Objections to Plaintiff's Proposed Jury Instructions, filed February 14, 2014

(Doc. 68)("Objections").  The Court held a hearing on February 13, 2014.  The primary issues

are: (i) whether police officers may, under the Fourth Amendment to the Constitution of the

United States of America, legally enter a person's yard when they do not have probable cause

that the person has committed a crime or is destroying evidence, there are no exigent

circumstances, there is no consent, but there is reasonable suspicion; (ii) whether, if the New

Mexico Magistrate Judge, who is not a lawyer, determines that there is probable cause that a

person committed a crime, that determination collaterally estops re-litigation in federal court of

the issue of probable cause for that person's arrest, entitling Brown and Rider to summary

judgment on the unlawful arrest claim that Ysasi asserts comes under the Fourth and Fifth

Amendments to the Constitution; and (iii) whether Plaintiff Manuel Ysasi has a claim under the

Eighth Amendment to the Constitution if the undisputed evidence shows that he was arraigned four days after being arrested.  The Court will grant the MSJ in part and deny it in part.  The parties agree that the Court should dismiss all of Ysasi's state-law claims against the Defendants. The Court concludes that, on the facts presented and drawing all reasonable inferences in favor of Ysasi as the non-moving party, (i) Rider and Brown are not entitled to summary judgment on the unlawful entry claim, because there is a dispute regarding whether they had Ysasi's consent to enter his property and reasonable suspicion is not sufficient to enter property when consent has been denied; (ii) cases from the United States Court of Appeals for the Tenth Circuit indicate that the Court should apply collateral estoppel in this case and bar re-litigation of probable cause for Ysasi's arrest, because he had a full and fair opportunity to litigate that issue at his preliminary hearing for the criminal case; and (iii) the LCDC is entitled to summary judgment on the claims Ysasi has asserted against it, because Ysasi failed to set forth evidence to rebut the Defendants' summary judgment evidence that a Magistrate Judge made a probable cause determination one day after he was arrested, and that he was arraigned four days after he was arrested.  The Court will also sustain some and overrule some of the Defendants' objections to the jury instructions.

## FACTUAL BACKGROUND

This case arises from an incident that occurred on February 25, 2010.  See Complaint for Damages for Violation of Civil Rights and Jury Demand ¶ 5, at 2-3, filed February 25, 2013 (Doc. 1)("Complaint"); Memorandum in Support of Motion for Partial Summary Judgment ¶ 1, at 4, filed December 16, 2013 (Doc. 44)("MSJ Memo.")(setting forth this fact); Response to Memorandum in Support of Motion for Particial [sic] Summary Judgment ¶ 1, at 5, filed January 15, 2014 (Doc. 48)("Response")(not disputing this fact).  On that date, Brown was dispatched to

property located at North Evans Street in Hobbs, New Mexico, in response to a 911 call requesting assistance in recovering personal property.  See Affidavit of Kelly Brown ¶ 3, at 1, filed December 16, 2013 (Doc. 44-1)("Brown Aff."); Audio of 911 Call and Radio Traffic Recordings, filed December 16, 2013 (Doc. 45)(lodged in Records)("911 and Dispatch Audio"); MSJ Memo. ¶ 2, at 4 (setting forth this fact).[1]   Brown understood that "there had been an

---

[1] Ysasi disputes the portion of the Defendants' asserted fact that states that the personal property belonged to "a domestic violence victim."  MSJ Memo. ¶ 2, at 4.  See Response ¶ 2, at 5.  Ysasi contends that the 911 call was for "assistance in recovering personal property only. The request dispatch call to Deputy Kelly Brown was not in response to a domestic violence." Response ¶ 2, at 5 (citing 911 and Dispatch Audio.)  The Defendants argue that "the dispatch report clearly implicated a domestic violence scenario, and Defendant Brown so attested in his Affidavit," and that Ysasi's statement "that the deputies were not responding to 'a domestic violence' is overstating and mischaracterizing the evidence."  Reply at 3-4.

The Defendants cite the following portions of the Transcription of Digitally-Recorded Preliminary Hearing, taken April 27, 2010, filed December 16, 2013 (Doc. 53-1)("Preliminary Hearing Transcript"):

Q.    Okay, well, there was a crib there, correct?

A.    Yeah, it was pretty bad.

Q.    You are saying a two year old daughter, is that right? Did you see the child?

A.    No.

. . . .

Q.    All right but did you understand that she didn't want any of that property, and she was saying she was ready to leave?

A.    Ma'am, at that time, we didn't know what was going on, okay?

Q.    Okay.

A.    When we start, when we come onto a scene, we are as cops or deputies, advised that we investigate all incidents until we find out everything that's going on.  Just because it turns to be a stand by could turn into domestics, all other kinds of stuff.  So my initial thought was, where is that kid?

incident implicating possible domestic violence . . . ."  Brown Aff. ¶ 3, at 1.[2]  The caller was

Amber Vega, Thompson's sister; Vega reported to the 911 dispatcher that her sister and her

sister's boyfriend got into an argument, and the boyfriend "threw out all her stuff and her baby

stuff."  911 and Dispatch Audio.  <u>See</u> MSJ Memo. ¶ 3, at 4 (setting forth this fact).[3]  Vega

reported that she, her husband, and Thompson were going to the North Evans address to retrieve

the property, and that Vega was requesting a police escort.  <u>See</u> 911 and Dispatch Audio; MSJ

---

> Because she's not telling us nothing.  She's sitting there crying.  So I
> wanted to make contact with the second party.

Preliminary Hearing Transcript at 56:5-25 (Reese, Rider).

> I observed Mrs. Thompson to be crying.  Very evasive with questions . . . .  As I
> was looking at the property, you know, I asked her, I said, this is a crib, her, your
> kids?  And she's yeah.  It's our two year old daughter, so I'm sitting there,
> thinking, hum.  I better go, and try to find out from the other individual what
> happened at this, you, know, before we came, before we arrived.

Preliminary Hearing Transcript at 36:9-19 (Rider).  "The evidence of the non-movant is to be
believed, and all justifiable inferences are to be drawn in his favor."  <u>Anderson v. Liberty Lobby,
Inc.</u>, 477 U.S. 242, 255 (1986).  The Court finds that, after drawing all the justifiable inferences
in Ysasi's favor, the evidence, including the 911 Call and Dispatch Audio, do not support
characterizing Thompson as a domestic violence victim, or the Officers as responding to a
domestic violence incident.

  [2] Ysasi argues that Brown made the statements in the Brown Aff. -- that he understood
that there was a possible domestic violence incident -- "after the fact in support of the
Defendant's position."  Response ¶ 2, at 5.  Ysasi has presented evidence that disputes that
Thompson reported that she was a domestic violence victim, <u>see</u> Thompson Aff. ¶¶ 8-9, 12-13, at
2, but does not present evidence that disputes that Brown and Rider understood that Thompson
may be a domestic violence victim.  The Court will thus remove references that state as a fact
that Brown and Rider responded to a domestic violence incident or characterize Thompson as a
domestic violence victim, but will include facts that are undisputed that reveal Brown's and
Rider's understanding of the situation.

  [3] Ysasi asserts that Vega reported to 911 dispatch that Thompson's boyfriend "had placed
her sister's stuff and the baby's stuff in the trash."  Response ¶ 3, at 5.  In the 911 call, Vega said
that Thompson and Ysasi "got into a really big fight, and he threw out all of her stuff, her baby
stuff, her stuff, he threw it all in the trash."  911 and Dispatch Audio.

Memo. ¶ 3, at 4 (setting forth this fact).[4]  During the dispatch call, Thompson begged her sister

not to get the police involved and stating that the police would only make things worse; when the

dispatch operator asked to speak directly to Thompson, she got on the telephone and pleaded

with the dispatcher not to send police to the property, refused to give the dispatcher her

boyfriend's name, but told the dispatcher that she was seventeen years old.  See 911 and

Dispatch Audio; MSJ Memo. ¶ 4, at 4-5 (setting forth this fact).[5]  The 911 call was a request for

_____

[4] Ysasi states that "Amber Vega was not present for any communications by the Plaintiff, MANUEL YSASI, or Heather Thompson."  Response ¶ 3, at 5.  The Defendants argue that whether Vega was present for communications between Ysasi and Thompson "would be irrelevant.  The dispatcher was entitled to rely on the statements of Ms. Vega and to dispatch officers."  Reply at 4.  D.N.M.LR-Civ. 56.1(b) states in relevant part: "The Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion.  Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies." D.N.M.LR-Civ. 56. 1(b).  The additional fact -- that Vega was not present for Ysasi's and Thompson's communications -- does not "specifically controvert[]" the Defendants' statement of fact, but rather is an additional fact.  D.N.M.LR-Civ. 56. 1(b).  The Court will therefore deem the fact that Thompson told the 911 dispatcher that Ysasi and Thompson got into a fight admitted. Because the 911 and Dispatch Audio does not support Ysasi's additional fact that Vega was not present for the communications between Ysasi and Thompson, the Court will not include this additional fact.

[5] Ysasi responds to this fact by stating: "Defendant's Exhibit 6 of the 911 call specifically sets forth that this was just an assistance call to retrieve personal property and not a domestic violence call."  Response ¶ 4, at 6 (citing 911 and Dispatch Audio; Thompson Aff. ¶¶ 7-9, at 2). The Defendants reply:

> Plaintiff again asserts that the 911 call was not a domestic violence call.  To the extent the Plaintiff implies that the dispatcher specifically stated that this was not a domestic violence call, Plaintiff again mischaracterizes the evidence.  The dispatcher provided information with the dispatch report which certainly implicated a domestic dispute.

Reply at 4.  Ysasi's asserted fact in response -- that the 911 call was "just an assistance call to retrieve personal property and not a domestic violence call" -- does not "specifically controvert[]" the Defendants' statements of fact regarding what Thompson, Vega, or the dispatch operator said during the 911 call, but rather is an additional fact.  D.N.M.LR-Civ. 56.1(b).  The Court will therefore deem this fact admitted.

assistance to retrieve personal property; Thompson did not tell the dispatcher that it was a domestic violence call.  See Affidavit of Heather Thompson ¶¶ 7-9, at 2, filed January 16, 2014 (Doc. 51)("Thompson Aff."); Response ¶ 4, at 6 (setting forth this fact).  The dispatcher put out a call for officers to go to the North Evans address, and Brown responded to the dispatch.  See Brown Aff. ¶ 2, at 1; MSJ Memo. ¶ 5, at 5 (setting forth this fact); Response ¶ 5, at 6 (not disputing this fact).

Brown and Rider arrived at Ysasi's house to assist Thompson retrieve personal property; they did not know whether a crime had been committed and did not have any reports that a crime had occurred.  See Transcription of Digitally-Recorded Preliminary Hearing at 58:23-59:19 (Reese, Rider), taken April 27, 2010, filed December 16, 2013 (Doc. 44-5), filed January 16, 2014 (Doc. 51-1), filed January 28, 2014 (Doc. 53-1)[6]("Preliminary Hearing Transcript"); Response ¶ 7, at 6 (setting forth this fact).[7]  When Brown arrived, he encountered Thompson, Vega, and Vega's husband near a dumpster outside the fenced area of property located at 1502

---

[6] The Defendants and Ysasi submitted portions of the Preliminary Hearing Transcript. Each page of the Preliminary Hearing Transcript is split into four numbered pages of transcribed testimony, and the Court's references to the transcript refer to the quarter-pages' numbers.

[7] Ysasi sets forth as an additional fact:

Deputy Kelly Brown and Deputy Chris Rider had no predicate crime to investigate nor did they have any predicate crime of domestic violence to investigate but only to assist Heather Thompson in the retrieval of personal property outside of the property located at 1502 North Evans Drive, Hobbs, Lea County, New Mexico.

Response ¶ 7, at 6 (citing Brown Aff. ¶ 3, at 1; Preliminary Hearing Transcript).  The Defendants reply that "there was sufficient evidence to raise suspicion of domestic violence."  Reply at 4. All facts are to be construed in favor of Ysasi, but the evidence he cites does not go so far as to say that Brown and Rider were not investigating a crime; the evidence suggests that they did not know, but suspected, that there may have been an incident of domestic violence.

North Evans; a broken baby bed was by the dumpster.  A mobile home was located on the fenced-in property.  Rider arrived shortly thereafter to assist Brown.  See Brown Aff. ¶¶ 4-8, at 2; MSJ Memo. ¶ 6, at 5 (setting forth this fact); Response ¶ 8, at 6 (not disputing this fact). Thompson was fearful and reluctant to give any information to the Brown and Rider; she indicated that she did not want to get Ysasi into trouble and was worried that he would be upset by Brown's and Rider's presence.   After Brown's, Rider's, and Vega's persuasive efforts, Thompson revealed that the owner of the mobile home was her boyfriend -- later identified as the Ysasi -- with whom Thompson had a two-year old child.  See Brown Aff. ¶¶ 6-8, at 2; MSJ Memo. ¶ 7, at 5 (setting forth these facts); Response ¶ 9, at 6 (not disputing these facts).  Rider threatened to take away Thompson's child if she did not tell them her boyfriends' name.  See Thompson Aff. ¶¶ 15-17, at 2-3; Response ¶ 9, at 6 (setting forth this fact); Reply at 6 (not disputing this fact).  Brown and Rider, aware of the smashed crib, Thompson's fear, and the request for officer assistance, were assessing whether and to what extent any domestic violence had occurred.  See Brown Aff. ¶ 8, at 2; MSJ Memo. ¶ 8, at 5 (setting forth this fact).[8]  Brown

---

[8] The Defendants set forth as fact that Brown and Rider "were assessing the extent of the domestic abuse which had occurred."  MSJ Memo. ¶ 8, at 5.  Ysasi opposes this fact "as not factual," because he asserts that Brown and Rider were not there "to investigate domestic abuse whatsoever and never told Heather Thompson or Amber Vega that they were assessing a domestic violence situation."  Response ¶ 10, at 6-7 (citing Thompson Aff. ¶ 24, at 3).  The Defendants argue that there was sufficient evidence to raise a suspicion of domestic violence:

> The fact that the deputies did not specifically announce that they were investigating a domestic violence situation does not mean that they were not suspicious.  It was already clear that Heather Thompson was not cooperating. Moreover, the officers were questioning Ms. Thompson about her safety.  Such subject matter points to the officers' suspicion.

Reply at 5.  Ysasi's additional fact -- that Brown and Rider did not tell Thompson or Vega that they were assessing a domestic violence situation -- does not "specifically controvert[]" the Defendants' statement of fact.  The Court will therefore deem this fact admitted, but will modify

and Rider did not tell Thompson that they were assessing a domestic violence situation.  See

Thompson Aff. ¶ 24, at 3; Response ¶ 10, at 6-7 (setting forth this fact).[9]

Ysasi exited the mobile home and began yelling at Thompson, Brown, and Rider.  See

Brown Aff. ¶ 9, at 2; Audio/Video Recording of the Incident on 2/25/10, filed December 16,

2013 (Doc. 45)(lodged in Records)("Police Video"); MSJ Memo. ¶ 9, at 5 (setting forth this

fact); Response ¶ 11, at 7 (not disputing this fact).[10]  A heated verbal exchange ensued between

_____

it to reflect that Brown and Rider were not responding to a known domestic violence situation.
Because Ysasi refers the Court with particularity to the portion of the record upon which he
relies for the additional fact, and the Defendants did not dispute it, the Court will also add
Ysasi's additional fact.

[9] The Defendants argue that "[t]he fact that the deputies did not specifically announce that
they were investigating a domestic violence situation does not mean that they were not
suspicious."  Reply at 5.

> The Reply must contain a concise statement of those facts set forth in the
> Response which the movant disputes or to which the movant asserts an objection.
> Each fact must be lettered, must refer with particularity to those portions of the
> record upon which the movant relies, and must state the letter of the non-movant's
> fact.  All material facts set forth in the Response will be deemed undisputed
> unless specifically controverted.

D.N.M.LR–Civ. 56.1(b).  The Court understands the Defendants to be arguing that whether
Brown and Rider told Thompson they were investigating a domestic violence situation is
irrelevant.  Contending that a fact is irrelevant is not disputing a fact, nor is it specifically
controverting a fact by directing the Court with particularity to the record.  See D.N.M.LR-Civ.
56.1(b).  In O'Brien v. Mitchell, 883 F. Supp. 2d 1055 (D.N.M. 2012)(Browning, J.), the Court
explained that, because the proper course is to determine relevance of facts in the analysis
section, rather than in the factual background section, objecting to an asserted fact as immaterial
in response to an asserted fact effectively deems the fact undisputed.  See Wilson v. Jara, 866 F.
Supp. 2d 1270, 1276-79 (D.N.M. 2011)(Browning, J.)("Whether this fact is relevant is a legal
argument, and the Court will not address [the cited case] at this time, but will consider it in its
legal analysis.").  The Court thus deems these facts admitted and will, as necessary, determine
their relevance in the analysis section.

[10] Ysasi adds the fact that he was yelling at Thompson, Brown, and Rider "as to why Ms.
Thompson had asked the police to come over to the house."  Response ¶ 11, at 7 (citing 911 and
Dispatch Audio).  The Court believes Ysasi meant to cite the Police Video; although the Court

Ysasi, Brown, and Rider.  <u>See</u> Brown Aff. ¶ 10, at 2; Police Video; MSJ Memo. ¶ 10, at 5 (setting forth this fact); Response ¶ 12, at 7 (not disputing this fact).  Ysasi yelled obscenities, <u>see</u> Brown Aff. ¶ 10, at 2; Police Video; MSJ Memo. ¶ 10, at 5 (setting forth this fact); Response ¶ 12, at 7 (not disputing this fact); yelled at Thompson, Brown, and Rider, asking why Thompson had asked the police to come to the house, <u>see</u> Police Video; Response ¶ 11, at 7 (setting forth this fact); told Brown and Rider that they could come onto his property, <u>see</u> Police Video; Reply at 5 (setting forth this fact);[11] and also told Brown and Rider that they did not have a right to be on his property and that he did not want them on his property, <u>see</u> Police Video; Response ¶ 12, at 7 (setting forth this fact).  Rider wanted to question Ysasi as to what had occurred between Ysasi and Thompson.  <u>See</u> Brown Aff. ¶ 10, at 2; MSJ Memo. ¶ 10, at 5-6 (setting forth this fact); Response ¶ 12, at 7 (not disputing this fact).  Ysasi refused to come over to the location where Rider was standing.  <u>See</u> Brown Aff. ¶ 10, at 2; MSJ Memo. ¶ 10, at 5-6 (setting forth this fact); Response ¶ 12, at 7 (not disputing this fact).

could not hear this video clearly, the Court will add this fact, because "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 255.

[11] The Defendants cite this exchange between Rider and Ysasi:

Rider:          Why don't you come and step outside with me?

Ysasi:          No, no, no.  Why don't you come to my house.  You can come to my house.  You're already here.  C'mon.  You can see what bad house, I've got a bad house . . . .

Rider:          Step on out.  What, are you telling me I can't come on your property, or what?

Ysasi:          O.K.  You can come in here . . . .

Police Video.  <u>See</u> Reply at 5 (citing this exchange).

Rider climbed a gate to enter the property and approached Ysasi, who was standing on an elevated platform or porch adjacent to the mobile home's front door.  See Brown Aff. ¶ 11, at 3; MSJ Memo. ¶ 11, at 6 (setting forth this fact); Response ¶ 13, at 7 (not disputing this fact).[12] When Rider approached Ysasi, physical contact ensued; it is disputed how the physical contact occurred between Ysasi and Rider, but both men ended up on the ground with Ysasi on top of Rider.  See MSJ Memo. ¶¶ 11-12 (setting forth this fact); Response ¶¶ 13-14 (setting forth this fact).[13]  Brown entered the premises to assist Rider in handcuffing Ysasi.  See Brown Aff. ¶ 12, at 3; MSJ Memo. ¶ 12, at 6 (setting forth this fact); Response at 7 (not disputing this fact).  Rider deployed a Taser on Ysasi several times.[14]  See Brown Aff. ¶ 12, at 3; MSJ Memo. ¶ 12, at 6

---

[12] Ysasi states that "Deputy Rider climbed a gate to enter the property without permission of the Plaintiff and trespassed upon the property."  Response ¶ 13, at 7.  It is disputed whether Ysasi gave his permission to Brown and Rider to come onto his property; the Police Video reveals that Ysasi, at one point, told Brown and Rider that they could enter his property, but can also be heard telling Brown and Rider that they had no right to be on his property.  Ysasi's assertion that the Officers trespassed onto his property, however, is a legal argument, which is not properly included as a material fact.  See Ruiz v. City of Brush, 2006 WL 1816454, at *4 ("[T]he 'sole purpose' of the required statements of and responses to undisputed material facts is 'to establish facts and determine which of them are in dispute.  Legal argument . . . should be reserved for separate portions of the brief.'" (alterations in original)).

[13] The Defendants cite the Brown Aff., which states that, "[w]hen Deputy Rider approached the Plaintiff, the Plaintiff lunged at Deputy Rider, causing the two men to fall off the platform with the Plaintiff landing on top of Deputy Rider."  Brown Aff. ¶ 11, at 3.  Ysasi cites the Police Video, and sets forth as an asserted fact that "Deputy Rider pulled the Plaintiff from the porch on top of [Rider]," Response ¶ 13, at 7, and that "[t]he Plaintiff wrapped his arms around Deputy Rider in a defensive position while Deputy Rider was pummeling the Plaintiff with both fists," Response ¶ 14, at 7.  The Police Video does not show the encounter between Rider and Ysasi, but provides audio.  The Defendants acknowledge that "there is a dispute as to the way the physical contact occurred between the Plaintiff and the officers."  Reply at 6.

[14] Ysasi asserts that Rider tased him no less than four times.  See Response ¶ 15, at 7 (citing Police Video; Brown Aff.).  The Brown Aff. does not state the number of times Rider tased Ysasi, and it is not clear from the video the number of times he was tased.

- 10 -

(setting forth this fact); Response ¶ 14, at 7 (setting forth this fact).[15]   It is disputed whether

Ysasi was resisting Brown's and Rider's attempts to handcuff him.   See MSJ Memo. ¶ 12, at 6

(setting forth this fact); Response ¶ 14, at 7 (disputing this fact).[16]   Brown had requested

additional units; other deputies arrived, and paramedics arrived to check Ysasi.   See Brown Aff.

¶¶ 11-13, at 3; Police Video; MSJ Memo. ¶ 12, at 6 (setting forth this fact); Response ¶ 15, at 7

(not disputing this fact).

   Ysasi was arrested and transported to the LCDC, where he remained until March 1, 2010,

at which time he posted bail and was released.   See MSJ Memo. ¶ 13, at 6 (setting forth this

fact); Response ¶ 16, at 7-8 (not disputing this fact).[17]   During his incarceration, Ysasi was

---

[15] Ysasi asserts that Rider tased him "several times, unnecessarily and with unnecessary and unreasonable force upon the Plaintiff."  Response ¶ 14, at 7 (citing the Police Video).  Legal arguments should not be set forth in a party's asserted fact section during summary judgment. See Ruiz v. City of Brush, No. 05-897, 2006 WL 1816454, at *4 (D. Colo. June 30, 2006)(Nottingham, J.)("[T]he 'sole purpose' of the required statements of and responses to undisputed material facts is 'to establish facts and determine which of them are in dispute.  Legal argument . . . should be reserved for separate portions of the brief.'" (alterations in original)). The Court will not include Ysasi's asserted fact that Rider tased him "unnecessarily and with unnecessary and unreasonable force."  Response ¶ 14, at 7.

[16] The Defendants cite the Brown Aff., which states that, "[a]s the Plaintiff continued to resist the efforts to handcuff him, Deputy Rider deployed a taser several times on the Plaintiff. The Plaintiff was eventually subdued."  Brown Aff. ¶ 12, at 3.  Ysasi asserts that he "did not resist the efforts to handcuff him, but laid upon Deputy Rider in a defensive position."  Response ¶ 14, at 7 (citing the Police Video).  Although it is not clear from the Police Video what took place, the Court must make all reasonable inferences in favor of the non-moving party.

[17] Ysasi sets forth this fact in the Response, but omits "at which time he posted bail and was released."  Response ¶ 16, at 7-8.  He asserts that he "was kept at the Lea County Detention Center for a period of four (4) days without arraignment and without a bond whereby he could be released."  Response ¶ 16, at 7-8.  He cites the "deposition testimony of Manuel Ysasi, and Exhibit, Lea County Detention Center Records," but he did not attach these documents to the Response.  The additional facts -- that Ysasi was kept at the LCDC for four days without arraignment and without a bond -- do not "specifically controvert[]" the Defendants' statement of fact, but rather are additional facts.  The Court will therefore deem this fact -- that Ysasi posted bail and was released on March 1, 2010 -- undisputed.  Because Ysasi did not support his

allowed to make personal telephone calls. See Affidavit of Tyron Hassen ¶ 5, at 1, filed December 16, 2013 (Doc. 44-2); Lea County Detention Center Call Detail Report, filed December 16, 2013 (Doc. 44-3)("LCDC Call Log"); MSJ Memo. ¶ 13, at 6 (setting forth this fact); Response ¶ 16, at 7-8 (not disputing this fact).

A Criminal Complaint was filed in Lea County Magistrate Court with charges of Battery upon a Peace Officer, Resisting/Evading/Obstructing an Officer, and Concealing Identity.  See Criminal Complaint, filed January 28, 2014 (Doc. 53-2); MSJ Memo. ¶ 14, at 6 (setting forth this fact); Response ¶ 17, at 8 (not disputing this fact).  At the preliminary hearing, Rebecca Reese, a New Mexico Public Defender, represented Ysasi, and cross-examined Brown and Rider.  See Preliminary Hearing Transcript at 2; MSJ Memo. ¶ 14, at 6 (setting forth this fact); Response ¶ 18, at 8 (not disputing this fact).  Brown testified that, when he was dispatched, he was not dispatched to investigate a crime, see Preliminary Hearing Transcript at 14:23-15:1 (Reese, Brown), and Rider testified that, at the time he climbed over Ysasi's fence, he was not certain if a crime had been committed, but he wanted to get Ysasi's side of the story, see Preliminary Hearing Transcript at 58:20-59:19 (Reese, Rider).  See Response ¶ 18 (setting forth this fact); Reply at 6 (not disputing this fact).[18]  The Honorable Dwight Crenshaw, Magistrate Judge for

---

additional facts with evidence, the Court will not add his additional facts.

[18] Ysasi set forth the following asserted fact:

> Both of the Officers testified there was no predicate crime to investigate when dispatched by the 911 call.  They had no search warrant to enter to the premises.  Both officers testified at Preliminary hearing that there was no domestic violence or domestic abuse by and between the Plaintiff and Heather Thompson.

Response ¶ 18, at 8 (citing Preliminary Hearing Transcript).  The Defendants assert that "[w]hether there was a predicate crime or domestic abuse is irrelevant.  The Plaintiff's charges arose only from the altercation between the Plaintiff and the officers, not from any domestic

Lea County, State of New Mexico, concluded that there was probable cause to support the criminal charges:

> From the testimony and the evidence presented, I find that the state has presented evidence for me to believe there is probable cause that the defendant did commit the crimes of battery upon a police officer, resisting, evading and obstructing an officer, and concealing identity.  It is the court's decision to bind the defendant over to district court.

Preliminary Hearing Transcript at 97:8-14 (Judge Crenshaw).  See MSJ Memo. ¶ 14, at 6 (setting forth this fact); Response ¶ 18, at 8 (not disputing this fact).  On April 27, 2010, Judge Crenshaw bound the case over to the Fifth Judicial District Court, County of Lea, State of New Mexico, Cause No. D-506-CR-20100169.  See Bind-Over Order at 1; MSJ Memo. ¶ 15, at 6-7 (setting forth this fact); Response ¶ 19, at 8 (not disputing this fact).  Tara M. Wood, a New Mexico Assistant District Attorney, entered a *nolle prosequi*, and the case was dismissed on September 27, 2010.  See Nolle Prosequi, filed December 16, 2013 (Doc. 44-4 at 2); MSJ Memo. ¶ 15, at 6-7 (setting forth this fact); Response ¶ 19, at 8 (not disputing this fact).

## PROCEDURAL BACKGROUND

On February 25, 2013, Ysasi filed suit against Brown, Rider, and the LCDC for "false arrest, unreasonable and excessive use of force against the person of the Plaintiff, failure to provide necessary and adequate medical care while in custody, and abuse of process when

---

abuse that may have occurred." Reply at 6.  Contending that a fact is irrelevant is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record.  See D.N.M.LR-Civ. 56.1(b).  The proper course is to determine relevance of facts in the analysis section, rather than in the factual background section.  See O'Brien v. Mitchell, 883 F. Supp. 2d 1055.  The Court thus deems these facts admitted and will, as necessary, determine their relevance in the analysis section.

The Defendants also argue that Ysasi's asserted fact "overstates the testimony of the officers at the Preliminary Hearing."  Reply at 6.  The Court has modified Ysasi's asserted fact to reflect what Brown and Rider said at the Preliminary Hearing, rather than characterizing their testimony

Deputies of the Lea County Sheriff's Department took him into custody."  Complaint at 1.  In

Count I, Ysasi alleges that Brown and Rider violated his rights under the Constitution by using

excessive force and unreasonably seizing him, and that their actions constituted cruel and

unusual punishment.  See Complaint ¶ 32, at 7.  In Count II, Ysasi brings state law claims

against Brown and Rider for assault and battery.  See Complaint ¶ 35, at 8.  In Count III, Ysasi

alleges that the LCDC,

> through the acts of currently unknown employees and agents conspired with other
> named and unnamed persons to violate the rights of Mr. Ysasi by holding him
> incommunicado for a period of three days with[out] access to bail in an attempt to
> cover up the actions of Deputies Rider and Brown.

Complaint ¶ 40, at 9-10.

The Defendants move for summary judgment on all the claims except the claim against

Brown and Rider for using excessive force.  See MSJ at 1-2.  The Defendants contend that:

(i) Judge Crenshaw's finding of probable cause precludes the false arrest or unreasonable seizure

claim; (ii) the statute of limitations bars the state law claims; (iii) Brown's and Rider's entry onto

Ysasi's property to question him about a potential domestic abuse incident was not unreasonable;

and (iv) there is no factual support for the claim against the LCDC, because the evidence shows

that Ysasi was allowed to make personal calls while he was incarcerated.  See MSJ ¶¶ 1-3,[19] at 1-

2.

The Defendants argue that the state law claims "can be summarily dismissed because of

the statute of limitations," because Ysasi filed his case more than two years after the incident,

and the statute of limitations is two years.  MSJ Memo. at 7 (citing N.M. Stat. Ann. § 41-4-15).

The Defendants contend that the "claims against the LCDC can also be summarily dismissed,"

---

[19] The MSJ numbers the third and fourth paragraphs as "3."

because the LCDC Call Log shows that Ysasi was allowed to communicate with friends and relatives.  MSJ Memo. at 7.

The Defendants argue that, "[t]o the extent the unreasonable seizure claim is based on an absence of probable cause for the arrest," collateral estoppel precludes Ysasi from re-litigating the probable cause issue, because he had a full and fair opportunity to litigate probable cause at his preliminary hearing in April, 2010.  MSJ Memo. at 8 (citing Hubbert v. Moore, 923 F.2d 769 (10th Cir. 1991); Crudup v. Schulte, 12 F. App'x 682 (10th Cir. 2001)(unpublished)[20]).  "To the extent the unreasonable seizure claim is based on the deputies' entry" onto Ysasi's property, the Defendants contend that Brown and Rider "had a right, indeed an obligation," to question Ysasi regarding a potential domestic violence incident, making their entry onto his property reasonable.  MSJ Memo. at 9.  The Defendants point to a number of facts that would have prompted Brown and Rider to suspect domestic abuse, including that Ysasi was yelling obscenities at Thompson, Brown, and Rider; that a smashed baby crib was near the dumpster; that Thompson was underage and fearful of their presence; that Vega made the 911 call, and reported that Ysasi and

---

[20] Crudup v. Schulte is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court finds that Crudup v. Schulte, Rhoads v. Miller, 352 F. App'x 289 (10th Cir.2009)(unpublished); United States v. Reed, 195 F. App'x 815 (10th Cir. 2006)(unpublished); and Angel v. Torrance Cnty., 183 F. App'x 707 (10th Cir. 2006)(unpublished), have persuasive value with respect to material issues, and will assist the Court in its preparation of this Memorandum Opinion and Order.

Thompson had been in a fight, resulting in Ysasi throwing the baby crib and other personal property in the trash; and that Ysasi refused to come over to discuss the incident with the Officers.  See MSJ Memo. at 9.  The Defendants contend that the New Mexico Legislature "recognizes the complexity of domestic abuse incidents" and encourages police officers to be proactive.  MSJ Memo. at 9 (citing N.M. Stat. Ann. § 40-13-1.1 ("The legislature finds that domestic abuse incidents are complex and require special training on the part of law enforcement officers to respond appropriately to domestic abuse incidents."); N.M. Stat. Ann. § 40-13-7(D) ("Any law enforcement officer responding to a request for assistance under the Family Violence Protection Act is immune from civil liability to the extent allowed by law."); N.M. Stat. Ann. § 40-13-7(B)(5) ("A local law enforcement officer responding to the request for assistance shall be required to take whatever steps are reasonably necessary to protect the victim from further domestic abuse, including . . . arresting the alleged perpetrator . . . .")).  The Defendants contend that Brown and Rider were reasonable in their attempts to gather information while investigating a suspected domestic violence incident.  See MSJ Memo. at 10.

Ysasi abandons his state claims, because he agrees with the Defendants that the statute of limitations has passed on those claims.  See Response at 8.  Ysasi contends that Brown and Rider violated his constitutional rights by entering his property without probable cause, without an arrest warrant, and without a warrant to search the property.  See Response at 10.  In Ysasi's view, Brown and Rider did not have any factual circumstances to believe that he committed any crime, including domestic violence, because, he asserts, the information from Vega, Thompson, and the 911 Dispatch Officer did not indicate that there was a crime being committed or a domestic violence problem, and that Brown and Rider did not observe any evidence of domestic violence.  See Response at 10.  According to Ysasi, "[t]he officers simply should have left the

- 16 -

premises once the personal property was secured and in the hands of Heather Thompson."
Response at 10.

Ysasi further argues that, when Brown and Rider came onto his property, they confronted
him and arrested him without probable cause. See Response at 9. He contends that, although a
Magistrate Judge held a preliminary hearing, and found probable cause to bind him over for trial
on the charges of battery on a police officer and obstructing a police officer, the Magistrate
Judge's jurisdiction is limited, that Magistrate Courts in New Mexico do not decide guilt or
innocence, and that, because the district attorney chose to *nolle prosequi* the case, there was no
final adjudication for Ysasi on the charges. See Response at 11. He contends that, because
Hubbert v. Moore involves Oklahoma law, it does not apply in this case and that New Mexico
law would not preclude him from re-litigating the issue of probable cause in this subsequent civil
rights action. See Response at 11. In his view, Brown and Rider are not in privity with the State
of New Mexico from the underlying criminal case, and so they cannot rely on preclusion
principles in this case. See Response at 12 (citing Kinslow v. Ratzlaff, 158 F.3d 1104 (10th Cir.
1998)).

Regarding the claim against the LCDC, Ysasi contends that it conspired with Brown and
Rider to hold him for four days without arraignment and without bail, preventing anyone outside
the LCDC from seeing the injuries he received from Brown and Rider. See Response at 5. He
points to his deposition testimony to support his contention that he was held for four days
without an arraignment and without bail, but he did not attach to the Response the deposition
testimony. See Response at 12.

In the Reply, the Defendants argue that the Plaintiffs cannot support their contention that
collateral estoppel does not bar the unlawful arrest claim. See Reply at 7-8. The Defendants set

forth the elements of issue preclusion under New Mexico law:

> Issue preclusion bars re-litigation of the same issue if (1) the party to be estopped was a party to the prior proceeding, (2) the cause of action in the case presently before the court is different from the cause of action in the prior adjudication, (3) the issue was actually litigated in the prior adjudication, and (4) the issue was necessarily determined in the prior litigation.

Reply at 8 (quoting Ideal v. Burlington Res. Oil & Gas Co. LP, 2010-NMSC-022 ¶ 9, 148 N.M. 228, 233 P.3d 362. The Defendants contend that New Mexico courts apply issue preclusion to a Magistrate Court's decision. See Reply at 8 (citing State v. Orosco, 1982-NMCA-181, 99 N.M. 180, 655 P.2d 1024). In the Defendants' view, the Court should apply issue preclusion and dismiss the unlawful arrest claim; they argue that Ysasi had a full-and-fair opportunity to litigate probable cause at his preliminary hearing, because he was represented by counsel, cross-examined witnesses, and presented his own witness. See Reply at 8.

Regarding the unlawful entry claim, the Defendants disagree with Ysasi's contention that Brown and Rider were not investigating a predicate crime; the Defendants contend that "[t]he 911 call, the broken crib, Heather Thompson's fear, and the Plaintiff's behavior in yelling obscenities all support a suspicion of domestic abuse." Reply at 9. The Defendants argue that Brown and Rider were "entitled, even obligated, to gather information and hear both sides of the story." Reply at 9.

The Defendants argue that they are entitled to summary judgment on Ysasi's claim against the LCDC, because they produced evidence to show that Ysasi was able to make numerous personal telephone calls while he was incarcerated, and that Ysasi did not dispute this evidence or discuss his claim that the Defendants held him "incommunicado." Reply at 9-10. The Defendants contend that Ysasi abandoned his "'incommunicado' conspiracy claim," and that Ysasi's Response raises a new theory -- that the LCDC incarcerated him for four days without

arraignment and without a bond -- without explaining the legal theory upon which he bases liability.  Reply at 10.  The Defendants explain that they "will assume that Plaintiff's theory is that he did not receive a timely judicial determination of probable cause," and argue that, under County of Riverside v. McLaughlin, 500 U.S. 44, 57 (1991), a neutral judge must made a determination of probable cause within forty-eight hours of arrest, and in this case, a Magistrate Judge made a determination of probable cause to detain Ysasi on February 26, 2010, one day after Ysasi was booked into the LCDC.  Reply at 10.

At the hearing, the Court confirmed that Ysasi agreed that the Court should dismiss all the state claims against the Defendants.  See Transcript of Hearing at 23:18-24:10 (Court, Blenden, Childress), taken February 13, 2014 ("Tr.").[21]  Ysasi explained his remaining claims: (i) a Fourth Amendment violation for Brown's and Rider's alleged unlawful entry onto his property; (ii) a Fourth and Fifth Amendment violation for his unlawful arrest; (iii) a claim for excessive force; and (iv) an Eighth Amendment claim that he was not allowed to bond himself out and was held incommunicado in LCDC.  See Tr. at 24:17-27:14 (Blenden, Court).  The Defendants explained that they were able to discern some of Ysasi's claims, including the claims for unlawful entry, unlawful arrest, and excessive force, but that Ysasi changed his claim against the LCDC in the Response.  See Tr. at 29:1-30:23 (Childress, Court).  Had they understood the claims against the LCDC earlier, the Defendants asserted that they would have gotten affidavits from the LCDC to address the contention that the LCDC held him there for four days without bail.  See Tr. at 30:24-31:23 (Court, Childress).

Addressing the unlawful entry claim, the Defendants acknowledged that Brown and

---

[21] The Court's citations to the Transcript of Hearing and the Transcript of Trial, taken February 19, 2014 (Trial Tr."), refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

Rider were initially called to help Thompson get property from what may have been her property, but argued that their reasons for suspecting a more serious situation, such as domestic abuse, developed when they arrived at Ysasi's property, because they saw a broken baby bed and broken baby swing, and Thompson did not want to talk to Brown or Rider about what happened, and pleaded with them to leave. See Tr. at 37:9-38:12 (Childress). The Defendants argued that, after Ysasi came outside and started screaming obscenities, Brown and Rider could enter Ysasi's property to investigate the situation further. See Tr. at 38:12-16 (Childress). The Defendants conceded that Brown and Rider did not have probable cause to enter Ysasi's property based on the dispatch call and when they initially arrived at the scene, but argued that Brown and Rider did not need probable cause to enter Ysasi's property and go up to his house. See Tr. at 38:17-39:15 (Court, Childress). The Defendants pointed out that Ysasi's house was almost one-hundred yards away from his fence and argued that, when Ysasi refused to come over to the fence to talk to Brown and Rider, they could enter his property to talk to him. See Tr. at 40:18-41:3 (Childress). The Defendants cited United States v. Jones, 239 F.3d 716, and United States v. Tobin, 923 F.2d 1506 (11th Cir. 1991)(en banc), to support their argument that they could enter Ysasi's property and approach his house for a "knock and talk," and that officers may come onto someone's property to investigate. Tr. at 41:4-42:2 (Court, Childress). Further, the Defendants asserted that, on the Police Video, Ysasi can be heard telling the Brown and Rider that they could enter the property and, in effect, giving his consent for their entry onto his property. See Tr. at 42:15-25 (Childress).

Ysasi argued that Manzanares v. Higdon, 575 F.3d 1135 (10th Cir. 2009), and Buck v. City of Albuquerque, 549 F.3d 1269 (10th Cir. 2008), demonstrate that warrantless searches and seizures are presumptively unreasonable, that they must be based on probable cause and a

totality of the circumstances, and that Brown and Rider needed, but lacked, a reasonable belief that some crime had been committed or was about to be committed.  See Tr. at 44:2-45:2 (Blenden).  Ysasi argued that, once Thompson retrieved her property and left, the stand-by was over, and that Brown and Rider did not have a basis for staying to investigate.  See Tr. at 45:3-48:1 (Blenden).  In Ysasi's view, Rider made several statements that were inappropriate, such as threatening to take away Thompson's child if she did not tell him Ysasi' name, and other statements that indicated his intent to enter Ysasi's property without a basis, such as stating that he was going to jump the fence to fight Ysasi, and yelling at Ysasi "you want to bet" three times after Ysasi said that Rider could not come onto the property.  Tr. at 45:23-49:10 (Blenden, Court).  Ysasi argued that Brown and Rider did not have a right to be on his property, and urged the Court that to deny the MSJ, especially in light of the presumptions to which he is entitled at the summary judgment stage, and of his contention that Manzanares v. Higdon and Buck v. City of Albuquerque state that whether an officer had probable cause or a reasonable ground to enter his property is a jury question.  See Tr. at 49:17-25 (Blenden).  The Court noted that the Defendants conceded that they did not have probable cause to come onto the property, acknowledged that there is a factual issue regarding whether Ysasi gave his consent, and are requesting summary judgment on the legal basis that, according to the Defendants, police officers can, with some justification, enter a person's property to talk to the person.  See Tr. at 51:1-22 (Court, Childress).  Ysasi argued that, when a person has told police officers that they may not come onto his or her property, the police officers cannot enter the property in an attempt to talk to the person; he contended that there is factual question whether Ysasi gave consent or withdrew his consent if he did give it, that Brown and Rider did not have reasonable suspicion that a crime had occurred, and that, at most, Brown and Rider had an inchoate hunch of domestic

violence, which is not enough to justify them coming onto his property without his consent.  See Tr. at 51:23-56:7 (Blenden, Court).

The Defendants contended that, in some stand-by situations, officers would not have any reason to continue investigating after the person who requested the stand-by retrieved his or her property, but that, in this case, Thompson's uncooperativeness and Ysasi's yelling at Brown and Rider gave Brown and Rider reasonable justification to investigate further.  See Tr. at 56:13-57:3 (Childress).   The Defendants argued that, especially in situations that implicate potential domestic violence, officers need to investigate and, although they would not have probable cause to arrest someone without more information, they are justified in coming onto someone's property to talk to him or her about the situation, and that should not lead to a viable civil rights claim.  See Tr. at 57:3-17 (Childress).

Regarding the unlawful arrest claim, the Court noted that Ysasi asserted that Brown and Rider unlawfully arrested him in violation of the Fourth and Fifth Amendments; the Defendants argued that the Fifth Amendment would not apply to a false arrest claim, and the Court agreed.  See Tr. at 60:6-14 (Court, Childress).  The Defendants pointed out that Brown and Rider arrested Ysasi for battery of a police officer, based on the altercation between Ysasi and Rider, and for obstructing an officer, based on Ysasi refusing to tell Rider his name and other information after he was in the police car.  See Tr. at 60:20-61:6 (Childress).  The Defendants argued that, because a Magistrate Judge found probable cause for Ysasi's arrest at the bind-over hearing, at which counsel represented Ysasi, cross-examined Brown and Rider, and presented his witness, issue preclusion applies and precludes Ysasi from re-litigating probable cause in this case.  See Tr. at 61:7-24 (Childress).  The Defendants admitted that, if the Court disagrees that issue preclusion bars the unlawful arrest claim, a jury would need to determine whether there was probable cause

- 22 -

to arrest Ysasi on the charge of battery on a police officer, but argued that the Police Video reveals that Ysasi obstructed a police officer by refusing to give his name after he was sitting in the police car, and that there would only need to be probable cause for one of the charges to justify the arrest and bar the unlawful arrest claim.  See Tr. at 63:2-66:15 (Court, Childress).

Ysasi argued that his conduct leading to the obstruction of an officer charge -- refusing to tell Brown and Rider his name -- happened long after he was arrested following the altercation. See Tr. at 67:11-15 (Blenden).  He contended that, because Thompson gave Brown and Rider his name, his refusal to tell Rider his name did not obstruct them.  See Tr. at 69:2-6 (Blenden). Ysasi argued that one of the requirements for unlawful arrest described in Buck v. City of Albuquerque is a termination of the original action in favor of the plaintiff and that, in this case, the DA dismissed the charges against him.  See Tr. at 69:10-18 (Blenden).  Ysasi argued that issue preclusion should not bar the unlawful arrest claim and pointed the Court to the law he discussed in the Response.  See Tr. at 69:6-9 (Blenden).

Because Judge Crenshaw found probable cause to bind Ysasi over for battery on a police officer, the Court stated that, unless it determined that issue preclusion bars the claim, it would probably allow the claim for unlawful arrest to go to the jury, because the evidence for obstructing a police officer occurred after the altercation, and a jury would need to determine if Brown and Rider had probable cause to arrest Ysasi for battery on a police officer.  See Tr. at 71:8-20 (Court).

On Ysasi's claim against the LCDC for an alleged Eighth Amendment violation, the Defendants argued that the Complaint listed a claim against LCDC for conspiracy, that Ysasi did not develop that theory during discovery, and, when the Defendants attached to the MSJ Memo. telephone records to show that Ysasi was allowed to call people before he was released, Ysasi

did not respond, but then changed his claim to assert that he was held without bail or an arraignment for four days.  See Tr. at 72:3-73:5 (Childress).  The Defendants said it has been difficult to determine what Ysasi's claim is against the LCDC, but that they attached the Criminal Complaint, which shows that a Magistrate Judge made a probable cause finding the day after Ysasi was arrested and within the forty-eight hours that the Supreme Court requires.  See Tr. at 73:5-15 (Childress).  The Defendants argued that Ysasi did not explain his claim, did not cite any law to support it, and so, more than any of the other claims, have not had adequate notice of the claim.  See Tr. at 73:20-74:5 (Childress).  The Court asked Ysasi about his claim and whether the documents that the Defendants attached negate his claim; Ysasi stated that he was not allowed to bond out of jail for four days and that he did not think the fact that he was allowed to call his family related to the claim, but he admitted that he did not know if four days is an unreasonable time.  See 75:10-76:9 (Court, Blenden).  The Defendants explained that the notation at the bottom of the Criminal Complaint indicated that a Magistrate Judge made a determination of probable cause, which is different from a hearing on probable cause, the day after Ysasi was arrested.  See 76:20-77:6 (Childress).  The Defendants argued that it was "a pretty big leap" for Ysasi to initially allege conspiracy against the LCDC, and then to change his claim that he was not allowed to bond out within a three day period, that they would not have had a way to determine that was his claim, and that they did not receive any answers to interrogatories during discovery that revealed his claim  See Tr. at 77:6-24 (Childress, Court).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the

initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  Herrera v. Santa Fe Pub. Schs., No. CIV 11-0422 JB/KBM, 2013 WL 3462484, at *23 (D.N.M. June 28, 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial."  Celotex Corp v. Catrett, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[22]  Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to

---

[22] Although the Honorable William J. Brennan, Jr., Associate Justice of the Supreme Court of the United States, dissented in Celotex Corp. v. Catrett, this sentence is widely understood to be an accurate statement of the law.  See 10A C. Wright & A. Miller, Federal Practice & Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)). Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006); Fed. R. Civ. P. 56(e)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248). Rather, there must be sufficient evidence on which the factfinder could reasonably find for the nonmoving party. See Anderson v. Liberty Lobby, Inc.,

- 26 -

477 U.S. at 251 (quoting <u>Schuylkill & Dauphin Improvement Co. v. Munson</u>, 81 U.S. 442, 448 (1871)); <u>Vitkus v. Beatrice Co.</u>, 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the nonmoving party, there is no genuine issue for trial.  <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in favor of the nonmoving party, and construe all evidence in the light most favorable to the nonmoving party.  <u>See</u> <u>Hunt v. Cromartie</u>, 526 U.S. 541, 550-55 (1999); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").  Fourth, the court cannot decide any issues of credibility.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 255.

There are, however, limited circumstances in which the Court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified-immunity arena.  In <u>Scott v. Harris</u>, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment was

appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts.

550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 547, 586–587 (1986)(footnote omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–248 (1986).  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.
>
> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life.  Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him.  The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]"  York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir.2008)(quoting Scott [v. Harris], 550 U.S. at 380; see also Estate of Larsen ex. rel Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir.2008).

Thomson v. Salt Lake Cnty., 584 F.3d at 1312.  "The Tenth Circuit, in Rhoads v. Miller, [352 F.

App'x  289  (10th  Cir.2009)(Tymkovich,  J.)(unpublished),]  explained  that  the  blatant

contradictions of the record must be supported by more than other witnesses' testimony[.]"

Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M.2010)(Browning, J.)(citation

omitted).

> In evaluating a motion for summary judgment based on qualified immunity, we take the facts "in the light most favorable to the party asserting the injury." Scott v. Harris, 550 U.S. 372, 377 (2007).  "[T]his usually means adopting . . . the plaintiff's version of the facts," id. at 378, unless that version "is so utterly discredited by the record that no reasonable jury could have believed him," id. at 380.  In Scott, the plaintiff's testimony was discredited by a videotape that completely contradicted his version of the events.  550 U.S. at 379.  Here, there is no videotape or similar evidence in the record to blatantly contradict Mr. Rhoads' testimony.  There is only other witnesses' testimony to oppose his version of the facts, and our judicial system leaves credibility determinations to the jury.  And given the undisputed fact of injury, Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not its admissibility . . . Mr. Rhoads alleges that his injuries resulted from a beating rendered without resistance or provocation.  If believed by the jury, the events he describes are sufficient to support a claim of violation of clearly established law under Graham v. Connor, 490 U.S. 386, 395–96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F. App'x at 291–92 (internal quotation marks omitted).  See Lymon v.

Aramark Corp., 728 F. Supp. 2d at 1249-50 (quoting Rhoads v. Miller, 352 F. App'x at 291–92).

In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes,

United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal

question of qualified immunity and "determine whether plaintiff's factual allegations are

sufficiently grounded in the record such that they may permissibly comprise the universe of facts

that will serve as the foundation for answering the legal question before the court" before

inquiring into whether there are genuine issues of material fact for resolution by the jury.  584

F.3d at 1326–27 (Holmes, J. concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th Cir.

1988)(Johnson, J., dissenting))(observing that, even if factual disputes exist, "these disputes are

irrelevant to the qualified immunity analysis because that analysis assumes the validity of the

plaintiffs' facts").

## LAW REGARDING 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, . . . .

42 U.S.C. § 1983. Section 1983 creates only the right of action; it does not create any substantive rights; substantive rights must come from the Constitution or federal statute. See Spielman v. Hildebrand, 873 F.2d 1377, 1386 (10th Cir. 1989)("Section 1983 does not provide a remedy if federal law does not create enforceable rights."). Rather, 42 U.S.C. § 1983 authorizes an injured person to assert a claim for relief against a person who, acting under color of state law, violated the claimant's federally protected rights. To state a claim upon which relief can be granted under § 1983, a plaintiff must allege: (i) a deprivation of a federal right; and (ii) that the person who deprived the plaintiff of that right acted under color of state law. See West v. Aikins, 487 U.S. 42, 48 (1988). Broken down differently, a plaintiff

must establish (1) a violation of rights protected by the federal Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a "person" (4) who acted under color of any statute, ordinance, regulation, custom[,] or usage, of any State or Territory or the District of Columbia.

Martinez v. Martinez, No. CIV 09-0281 JB/KBM, 2010 WL 1608884, at *11 (D.N.M. Mar. 30, 2010)(Browning, J.)(quoting Summum v. City of Ogden, 297 F.3d 995, 1000 (10th Cir. 2002)). Neither the civil-rights statutes nor the Fourteenth Amendment, however, are a license to the federal judiciary to displace state law through the creation of a body of general federal tort law. See Paul v. Davis, 424 U.S. 693, 701 (1976)(Fourteenth Amendment); Griffin v. Breckenridge,

403 U.S. 88, 101-102 (1971)(civil-rights statute).

The Supreme Court of the United States has made clear that there is no respondeat superior liability under § 1983.  See Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)("Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor."  Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Monell v. City of New York City Dept. of Soc. Servs., 436 U.S. 658, 689 (1978)).  It can be held liable only for its own unconstitutional or illegal policies, and not for the tortious acts of their employees.

Liability requires a showing that such policies were a "deliberate or conscious choice." Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998)(citations and internal quotations omitted).  See Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.  The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." (emphasis in original)).  These standards apply for allegations of liability based on failure to train and for "official de facto policies" that arise from "failing to adopt various policies to adequately protect" a class of persons.  Barney v. Pulsipher, 143 F.3d at 1367, 1309 n.8.  "[W]hen the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm," it is liable.  Barney v. Pulsipher, 143 F.3d at 1307.

> In a "narrow range of circumstances," however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a "highly predictable" or "plainly obvious" consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.

Barney v. Pulsipher, 143 F.3d at 1307-08.  Most cases, however, will not fall within this "narrow range of circumstances" without "a pattern of violations."  Barney v. Pulsipher, 143 F.3d at 1308.

## RELEVANT LAW REGARDING FOURTH AMENDMENT SEARCHES

The Fourth Amendment to the Constitution of the United States of America protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  In determining whether a Fourth Amendment violation has occurred, courts must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted."  United States v. Jones, 132 S. Ct. 945, 950 (2012)(Scalia, J.)(alteration in original)(quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)(Scalia, J.)).

"Not all searches require a warrant.  The hallmark of the Fourth Amendment is reasonableness."  United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.).  See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting Brigham City, Utah v. Stuart, 547 U.S. 398 (1978)).  "In the criminal context, reasonableness usually requires a showing of probable cause."  Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d

1174, 1184 (D.N.M. 2011)(Browning, J.)(quoting <u>Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls</u>, 536 U.S. 822, 828 (2002)).   The Supreme Court of the United States has stated in the law enforcement context that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." <u>Katz v. United States</u>, 389 U.S. 347, 357 (1967)(footnotes omitted).

      **1.**    ***United States v. Jones*.**

      The defendant in <u>United States v. Jones</u> was suspected of drug trafficking, and a joint Federal Bureau of Investigation and District of Columbia Metropolitan Police Department task force obtained a warrant authorizing installation in Washington, D.C., within ten days, of a Global Positioning System device to the defendant's car.  <u>See</u> 132 S. Ct. at 948.  On the eleventh day, task force agents attached the GPS device to the bottom of the defendant's car while the car was in Maryland.  The agents then used the GPS device to track the defendant's movements over the next twenty-eight days, replacing the battery once, and collecting over two-thousand pages of data sent from the device.  <u>See</u> 132 S. Ct. at 948.

      The Honorable Antonin G. Scalia, Associate Justice of the Supreme Court, writing for the majority, in which Chief Justice Roberts and Justices Kennedy, Thomas, and Sotomayor joined, held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.'"  132 S. Ct. at 949.  Justice Scalia reasoned that the plaintiff United States of America's conduct was a Fourth Amendment search, because the government trespassed on a constitutionally protected area.  <u>See</u> 132 S. Ct. at 949 ("The Fourth Amendment provides . . . that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

violated.'   It is beyond dispute that a vehicle is an 'effect' as that term is used in the Amendment.").   Such a physical intrusion, Justice Scalia opined, would have come within the Framers' intended definition of a "search": "It is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information.   We have no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted."   132 S. Ct. at 949. Justice Scalia reconciled the Supreme Court's conclusion that attaching a GPS device to track a jeep in plain view was a Fourth Amendment search with New York v. Class, 475 U.S. 106 (1986), in which the Supreme Court concluded that a visual examination of the outside of a vehicle while in plain view does not constitute a search, by noting that "[i]n Class itself we suggested that this [physical invasion] would make a difference, for we concluded that an officer's momentary reaching into the interior of a vehicle did constitute a search."   132 S. Ct. at 952.

Justice Scalia reasoned that the Fourth Amendment's text supports taking a property law based approach to determine whether there is a search, but did not shy away from the fact that, in recent history, the Supreme Court had deviated from this approach:

> The text of the Fourth Amendment reflects its close connection to property, since otherwise it would have referred simply to "the right of the people to be secure against unreasonable searches and seizures"; the phrase "in their persons, houses, papers, and effects" would have been superfluous.
>
> Consistent with this understanding, our Fourth Amendment jurisprudence was tied to common-law trespass, at least until the latter half of the 20th century. Kyllo v. United States, 533 U.S. [at] 31 . . . .   Our later cases, of course, have deviated from that exclusively property-based approach. . . . [and] have applied the analysis of Justice Harlan's concurrence in [Katz v. United States], which said that a violation occurs when government officers violate a person's "reasonable expectation of privacy," id., at 464 . . . .

- 34 -

132 S. Ct. at 949-50.

The United States had contended that, under the "Harlan standard" -- i.e., the Katz v. United States reasonable-expectation-of-privacy approach -- "no search occurred here, since Jones had 'no reasonable expectation of privacy' in the area of the Jeep accessed by the Government agents (its underbody) and in the locations of the jeep on the public roads, which were visible to all."  132 S. Ct. at 950.  Justice Scalia concluded, however, that the Supreme Court "need not address the Government's contentions" in relation to the Katz v. United States reasonable-expectation-of-privacy test analysis, because the trespass-based search approach, which existed at the time of the Fourth Amendment's adoption, disposed of the issue:

> Jones's Fourth Amendment rights do not rise or fall with the Katz formulation. At bottom, we must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." Kyllo[ v. United States, 533 U.S. at 34].  As explained, for most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ("persons, houses, papers, and effects") it enumerates. Katz did not repudiate that understanding.  Less than two years later the Court upheld defendants' contention that the Government could not introduce against them conversations between other people obtained by warrantless placement of electronic surveillance devices in their homes.  The opinion rejected the dissent's contention that there was no Fourth Amendment violation "unless the conversational privacy of the homeowner himself is invaded."  Alderman v. United States, 394 U.S. 165, 176 . . . (1969).  "[W]e [do not] believe that Katz, by holding that the Fourth Amendment protects persons and their private conversations, was intended to withdraw any of the protection which the Amendment extends to the home . . . ." Id., at 180.

132 S. Ct. at 950-51 (some alteration in original)(footnotes omitted).

In her concurrence, Justice Sotomayor agreed that "the trespassory test applied in the majority's opinion reflects an irreducible constitutional minimum: When the Government physically invades personal property to gather information, a search occurs.  The reaffirmation of that principle suffices to decide this case."  132 S. Ct. at 955 (Sotomayor, J., concurring).  She

continued:

> Of course, the Fourth Amendment is not concerned only with trespassory intrusions on property.  See, e.g., Kyllo v. United States, 533 U.S. [at] 31-33 . . . .  Rather, even in the absence of a trespass, "a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." Id., at 33; see also Smith v. Maryland, 442 U.S. 735, 740-741 . . . (1979); Katz v. United States, 389 U.S. [at] 361 . . . (Harlan, J., concurring).

132 S. Ct. at 954-55 (Sotomayor, J., concurring).  Justice Sotomayor's concurrence focused on the reality, in her view, that,

> physical intrusion is now unnecessary to many forms of surveillance. . . .   In cases of electronic or other novel modes of surveillance that do not depend upon a physical invasion on property, the majority opinion's trespassory test may provide little guidance. But "[s]ituations involving merely the transmission of electronic signals without trespass would remain subject to Katz analysis."

132 S. Ct. at 955 (Sotomayor, J., concurring)(alteration in original)(quoting the majority opinion, 132 S. Ct. at 953).

The Honorable Samuel A. Alito, Associate Justice, joined by Justices Ginsburg, Breyer, and Kagan, concurred in the judgment only, reasoning that, although he agreed with the result, given the use of twenty-first century technology, he would have analyzed whether the government's long-term monitoring of the defendant violated the Katz v. United States reasonable-expectation-of-privacy test:

> This case requires us to apply the Fourth Amendment's prohibition of unreasonable searches and seizures to a 21st-century surveillance technique, the use of a Global Positioning System (GPS) device to monitor a vehicle's movements for an extended period of time.  Ironically, the Court has chosen to decide this case based on 18th-century tort law.  By attaching a small GPS device to the underside of the vehicle that respondent drove, the law enforcement officers in this case engaged in conduct that might have provided grounds in 1791 for a suit for trespass to chattels.  And for this reason, the Court concludes, the installation and use of the GPS device constituted a search.  [132 S. Ct.] at 948-949.

> This holding, in my judgment, is unwise.  It strains the language of the Fourth Amendment; it has little if any support in current Fourth Amendment case law; and it is highly artificial.
>
> I would analyze the question presented in this case by asking whether respondent's reasonable expectations of privacy were violated by the long-term monitoring of the movements of the vehicle he drove.

132 S. Ct. at 957-58 (Alito, J., concurring in the judgment).  Justice Alito first took issue with what he called the majority's "questionable proposition that the[] two procedures [of attaching and using a GPS device] cannot be separated for Fourth amendment purposes."  132 S. Ct. at 958.  Justice Alito submitted that, "[i]f these two procedures are analyzed separately, it is not at all clear from the Court's opinion why either should be regarded as a search."  132 S. Ct. at 958.

Justice Alito contended that the majority's opinion suggests that "the concept of a search, as originally understood, comprehended any technical trespass that led to the gathering of evidence," but disagreed with the majority, stating: "[W]e know this is incorrect."  132 S. Ct at 958.  Justice Alito pointed out that the open-fields doctrine grew out of the distinction between a physical intrusion of any private property and property that is part of a home: "At common law, any unauthorized intrusion on private property was actionable, but a trespass on open fields . . . does not fall within the scope of the Fourth Amendment because private property outside the curtilage is not part of a 'hous[e]' within the meaning of the Fourth Amendment."  132 S. Ct. at 958-959 (Alito, J., concurring in the judgment)(quoting Oliver v. United States, 466 U.S. 170 (1984)).

Justice Alito asserted that the trespass-based approach that the majority used was "repeatedly criticized" and ultimately "repudiated," based largely on its incompatibility with cases involving wiretapping and eavesdropping surveillance.  United States v. Jones, 132 S. Ct. at 959, 960 (Alito, J., concurring in the judgment).  Justice Alito contended that "the majority is

hard pressed to find support in post-Katz cases for its trespass-based" decision that, when the government attached the GPS device to Jones' Jeep, it trespassed on his effects and performed a Fourth Amendment search.  132 S. Ct. at 960-61.  Justice Alito pointed to multiple problems that he believes the majority's trespass-based approach creates.  First, he asserted that the majority's analysis is irreconcilable with the element of the government's conduct that he contends society would find offensive -- the GPS-monitoring and not the attachment of the device.  If the government could follow a car without physically trespassing on a person, home, paper, or effect, such as remotely monitoring a car via an internal GPS device, this monitoring would not constitute a Fourth Amendment search under the majority's analysis.  See 132 S. Ct. at 961.  Second, along the same lines, Justice Alito pointed out an "incongruous result[]" from the majority's opinion that a short-term tracking of a vehicle with a GPS device, merely tracking a vehicle down a single street, is a Fourth Amendment search, while, "if the police follow the same car for a much longer period using unmarked cars and aerial assistance, this tracking is not subject to any Fourth Amendment constraints."  132 S. Ct. at 961.  Justice Alito also asserted that, by tying Fourth Amendment searches to property law and trespass concepts, the Fourth Amendment's protections "may vary from State to State," based on different property and contract laws in the various states.  132 S. Ct. at 961-62.

> **2.** ***Florida v. Jardines.***

In Florida v. Jardines, 133 S. Ct. 1409 (2013), Justice Scalia, writing for the majority once again, held that using a drug-sniffing dog to sniff a person's "home and its immediate surroundings" is a Fourth Amendment search.  133 S. Ct. at 1417-18.  Justices Thomas, Ginsburg, Sotomayor, and Kagan joined Justice Scalia's majority opinion in Florida v. Jardines.  Justice Kagan filed a separate concurring opinion, in which Justices Ginsburg and Sotomayor

joined, adding "further thoughts, suggesting that a focus on Jardines' privacy interests would make 'an easy cas[e] easy' twice over," but "join[ing] the Court's opinion in full."  133 S. Ct. at 1420 (Kagan, J., concurring).   Justice Alito dissented, and Chief Justice Roberts, Justice Kennedy, and Justice Breyer joined his opinion.

In Florida v. Jardines, based on a tip that the defendant, Jardines, was growing marijuana in his home, the Miami-Dade, Florida, police department and the Drug Enforcement Administration sent a surveillance team to Jardines' home.  See 133 S. Ct. at 1413.  Observing nothing of note in the first fifteen minutes watching the home, two detectives approached the home accompanied by a dog trained to detect marijuana, cocaine, heroin, and several other drugs by alerting the detectives with behavioral changes.  See 133 S. Ct. at 1413.   As the dog approached Jardines' front porch, the dog "apparently sensed one of the odors he had been trained to detect," and after tracking back and forth, sat at the base of the front door, "which is the trained behavior upon discovering the odor's strongest point."  133 S. Ct. at 1413.  The dog's handler then immediately left the porch, and told the other agents and officers at the scene that there had been a positive alert for drugs, at which time the officers applied for and received a search warrant for the residence, the execution of which revealed marijuana plants.  See 133 S. Ct. at 1413.   Jardines was arrested for trafficking in marijuana and moved to suppress the evidence based on an illegal search.  See 133 S. Ct. at 1413.

Justice Scalia held that the use of a drug-sniffing dog was a Fourth Amendment search, reasoning:

> [T]his case [is] a straightforward one.  The officers were gathering information in an area belonging to Jardines and immediately surrounding his house -- in the curtilage of the house, which we have held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the

homeowner.

133 S. Ct. at 1414.  Justice Scalia noted that "[t]he Fourth Amendment 'indicates with some precision the places and things encompassed by its protections': persons, houses, papers, and effects." 133 S. Ct. at 1414 (quoting Oliver v. United States, 466 U.S. at 176).  Thus, the Fourth Amendment does not cover every "investigation[] on private property; for example, an officer may (subject to Katz) gather information in what we have called 'open fields' -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text." 133 S. Ct. at 1414.

Justice Scalia held that "the officers' investigation took place in a constitutionally protected area," the home, as the front porch is the home's curtilage.  See 133 S. Ct. at 1414-15. Justice Scalia then "turn[ed] to the question of whether it was accomplished through an unlicensed physical intrusion," 133 S. Ct. at 1415, and reasoned that it was:

> While law enforcement officers need not "shield their eyes" when passing by the home "on public thoroughfares," [California v. Ciraolo, 476 U.S. 207, 213 (1986)], an officer's leave to gather information is sharply circumscribed when he steps off those thoroughfares and enters the Fourth Amendment's protected areas. In permitting, for example, visual observation of the home from "public navigable airspace," we were careful to note that it was done "in a physically nonintrusive manner."  Id. Entick v. Carrington, 2 Wils. K.B. 275, 95 Eng. Rep. 807 (K.B. 1765), a case "undoubtedly familiar" to "every American statesman" at the time of the Founding, Boyd v. United States, 116 U.S. 616, 626 . . . (1886)[, abrogated by Warden, Md. Penitentiary v. Hayden, 387 U.S. 294 (1967)], states the general rule clearly: "[O]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave."  2 Wils. K.B., at 291.  As it is undisputed that the detectives had all four of their feet and all four of their companion's firmly planted on the constitutionally protected extension of Jardines' home, the only question is whether he had given his leave (even implicitly) for them to do so.  He had not.

133 S. Ct. at 1415.  Justice Scalia noted that, while society recognizes an implicit license which "typically permits the visitor to approach the home by the front path, knock promptly, wait

briefly to be received, and then (absent invitation to linger longer) leave," he concluded that

"introducing a trained police dog to explore the area around the home in hopes of discovering

incriminating evidence is something else. There is no customary invitation to do that."  133 S.

Ct. at 1415-16 (emphasis in original).  Justice Scalia explained:

> An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker.  To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to -- well, call the police.  The scope of a license -- express or implied -- is limited not only to a particular area but also to a specific purpose.  Consent at a traffic stop to an officer's checking out an anonymous tip that there is a body in the trunk does not permit the officer to rummage through the trunk for narcotics.   Here, the background social norms that invite a visitor to the front door do not invite him there to conduct a search.

133 S. Ct. at 1416.

The State of Florida argued "that investigation by a forensic narcotics dog by definition

cannot implicate any legitimate privacy interest."  133 S. Ct. at 1417.  The State of Florida cited

to United States v. Place, 462 U.S. 696 (1983), United States v. Jacobsen, 466 U.S. 109 (1984),

and Illinois v. Caballes, 543 U.S. 405 (2005), "which held, respectively, that canine inspection of

luggage in an airport, chemical testing of a substance that had fallen from a parcel in transit, and

canine inspection of an automobile during a lawful traffic stop, do not violate the 'reasonable

expectation of privacy' described in Katz."  133 S. Ct. at 1417.  Justice Scalia pointed out that, in

United States v. Jones, the Supreme Court had already concluded that "[t]he Katz reasonable-

expectations test 'has been added to, not substituted for,' the traditional property-based

understanding of the Fourth Amendment, and so it is unnecessary to consider [the test under

Katz v. United States] when the government gains evidence by physically intruding on

constitutionally protected areas."  133 S. Ct. at 1417 (quoting United States v. Jones, 132 S. Ct.

at 951-52).  Because the Supreme Court had already concluded that the conduct was a Fourth

Amendment search under the trespass-based analysis, therefore, it held that it was unnecessary to

consider whether the conduct amounts to a search under the Katz v. United States reasonable-

expectation-of-privacy analysis:

> Thus, we need not decide whether the officers' investigation of Jardines' home
> violated his expectation of privacy under Katz.  One virtue of the Fourth
> Amendment's property-rights baseline is that it keeps easy cases easy.  That the
> officers learned what they learned only by physically intruding on Jardines'
> property to gather evidence is enough to establish that a search occurred.

133 S. Ct. at 1417.

The Honorable Elena Kagan, Associate Justice, wrote a concurring opinion, noting: "The

Court today treats this case under a property rubric; I write separately to note that I could just as

happily have decided it by looking to Jardines' privacy interests."  133 S. Ct. at 1418 (Kagan, J.,

concurring).  Justice Kagan analogized the government's conduct in using a drug sniffing dog on

Jardines' porch to a stranger coming to the front door, who "doesn't knock or say hello," but

instead, peers through the windows "into your home's furthest corners" with "super-high-

powered binoculars," and "in just a couple of minutes, his uncommon behavior allows him to

learn details of your life you disclose to no one."  133 S. Ct. at 1418 (Kagan, J., concurring).

This conduct, she posited, is a trespass which exceeds any implied license and is also an invasion

of reasonable expectations of privacy; she argued that, like her analogy, the facts in Florida v.

Jardines likewise involved a trespass and a violation of privacy expectations:

> That case is this case in every way that matters.  Here, police officers came to
> Joelis Jardines' door with a super-sensitive instrument, which they deployed to
> detect things inside that they could not perceive unassisted.  The equipment they
> used was animal, not mineral.  But contra the dissent, see [133 S. Ct.] at 1420
> (opinion of Alito, J.)(noting the ubiquity of dogs in American households), that is
> of no significance in determining whether a search occurred.

133 S. Ct. at 1418 (Kagan, J., concurring).  According to Justice Kagan, had she written the

majority opinion based on the Katz v. United States reasonable-expectations-of-privacy search

test,

> [a] decision along those lines would have looked . . . well, much like this one.  It
> would have talked about "'the right of a man to retreat into his own home and
> there be free from unreasonable governmental intrusion.'"  [133 S. Ct.] at 1414
> (quoting Silverman v. United States, 365 U.S. 505, 511 . . . (1961)).  It would
> have insisted on maintaining the "practical value" of that right by preventing
> police officers from standing in an adjacent space and "trawl[ing] for evidence
> with impunity."  [133 S. Ct.] at 1414.  It would have explained that "'privacy
> expectations are most heightened'" in the home and the surrounding area.  [133 S.
> Ct.] at 1414-15 (quoting California v. Ciraolo, 476 U.S. [at] 213 . . . ).  And it
> would have determined that police officers invade those shared expectations when
> they use trained canine assistants to reveal within the confines of a home what
> they could not otherwise have found there.  See [133 S. Ct.] at 1415-16, and n. 2-
> 3.

133 S. Ct. 1409, 1418-19 (Kagan, J., concurring).

Justice Alito's dissenting opinion, in which Chief Justice Roberts, and Justices Kennedy

and Breyer, joined, submitted that "[t]he Court's decision in this important Fourth Amendment

case is based on a putative rule of trespass law that is nowhere to be found in the annals of

Anglo-American jurisprudence."  133 S. Ct. at 1420 (Alito, J., dissenting).  Justice Alito noted

that general trespass law permits a license to public members to use a walkway to approach a

house's door, including strangers such as mailmen and solicitors, and the majority's conclusion

that "the police officer in this case, Detective Bartelt, committed a trespass because he was

accompanied during his otherwise lawful visit to the front door of respondent's house by his dog,

Franky," is without a sound basis in trespass law.  133 S. Ct. at 1420-21 (Alito, J., dissenting).

Justice Alito also asserted that decision is inconsistent with the Katz v. United States'

reasonable-expectations-of-privacy test: "A reasonable person understands that odors emanating

from a house may be detected from locations that are open to the public, and a reasonable person

will not count on the strength of those odors remaining within the range that, while detectible by a dog, cannot be smelled by a human." _Florida v. Jardines_, 133 S. Ct. at 1421 (Alito, J., dissenting).

Justice Alito contended that the majority's opinion that the detective "exceeded the boundaries of the license to approach the house that is recognized by the law of trespass, . . . is unfounded." 133 S. Ct. at 1421 (Alito, J., dissenting). Justice Alito pointed out that the law of trespass does not distinguish between visitors or reasons for the visit in granting an implied license to approach a house's front door. _See_ 133 S. Ct. at 1421-22 (Alito, J., dissenting). He also asserted: "As I understand the law of trespass and the scope of the implied license, a visitor who adheres to these limitations is not necessarily required to ring the doorbell, knock on the door, or attempt to speak with an occupant," and uses mail carriers as an example of such a visitor. 133 S. Ct. at 1423 (Alito, J., dissenting). Justice Alito pointed out that the implied license also applies to law enforcement and cites to _Kentucky v. King_, 131 S. Ct. 1849 (2011), in which the Supreme Court held that law enforcement officers approaching the front door of a residence to conduct a "knock and talk" is not a Fourth Amendment search. _Florida v. Jardines_, 133 S. Ct. at 1423 (Alito, J., concurring). Given that "Detective Bartelt did not exceed the scope of the license to approach respondent's front door," Justice Alito took issue with the majority's conclusion "that Detective Bartelt went too far because he had the '_objectiv[e]_ . . . _purpose_ to conduct a search.'" 133 S. Ct. at 1423 (Alito, J., dissenting)(emphasis in original). According to Justice Alito, because approaching a house to conduct a knock and talk is not a search,

> [w]hat the Court must fall back on, then, is the particular instrument that Detective Bartelt used to detect the odor of marijuana, namely, his dog. But in the entire body of common-law decisions, the Court has not found a single case holding that a visitor to the front door of a home commits a trespass if the visitor

is accompanied by a dog on a leash.  On the contrary, the common law allowed
even unleashed dogs to wander on private property without committing a trespass.

> The Court responds that "[i]t is not the dog that is the problem, but the
> behavior that here involved use of the dog."  But where is the support in the law
> of trespass for this proposition? Dogs' keen sense of smell has been used in law
> enforcement for centuries. The antiquity of this practice is evidenced by a Scottish
> law from 1318 that made it a crime to "disturb a tracking dog or the men coming
> with it for pursuing thieves or seizing malefactors."  If bringing a tracking dog to
> the front door of a home constituted a trespass, one would expect at least one case
> to have arisen during the past 800 years.  But the Court has found none.

133 S. Ct. at 1424 (Alito, J., dissenting)(emphasis in original)(internal citations omitted).  Justice

Alito thus concluded: "For these reasons, the real law of trespass provides no support for the

Court's holding today.  While the Court claims that its reasoning has 'ancient and durable roots,'

its trespass rule is really a newly struck counterfeit."   133 S. Ct. at 1424 (Alito, J.,

dissenting)(internal citations omitted).

Justice Alito did not look any more favorably upon Justice Kagan's conclusion that

Bartelt's conduct violated Jardines' reasonable privacy expectations, asserting:

> [W]e have already rejected a very similar, if not identical argument, see Illinois v.
> Caballes, . . . and in any event I see no basis for concluding that the occupants of a
> dwelling have a reasonable expectation of privacy in odors that emanate from the
> dwelling and reach spots where members of the public may lawfully stand.

133 S. Ct. at 1424 (Alito, J., dissenting).  Justice Kagan asserted that Bartelt's use of Franky the

drug-sniffing dog was an invasion of Jardines' privacy in his home, because the government's

conduct was similar to the conduct in Kyllo v. United States, in which the Supreme Court held

that using a thermal imaging device to monitor movements in a home was a Fourth Amendment

search.  Justice Alito pointed out that "[t]his Court . . . has already rejected the argument that the

use of a drug-sniffing dog is the same as the use of a thermal imaging device.  The very

argument now advanced by the concurrence appears in Justice Souter's Caballes dissent.  But the

Court was not persuaded."   133 S. Ct. at 1425 (Alito, J., dissenting)(internal citations omitted)(citing Illinois v. Caballes, 543 U.S. at 409-10 and 413 n.3).   Justice Alito contended that "Kyllo is best understood as a decision about the use of new technology. . . .   A dog, however, is not a new form of 'technology' or a 'device.'   And, as noted, the use of dogs' acute sense of smell in law enforcement dates back many centuries."   133 S. Ct. at 1425 (Alito, J., dissenting).   Justice Alito therefore concluded that the government's conduct in Florida v. Jardines "did not constitute a trespass and did not violate respondent's reasonable expectations of privacy.   I would hold that this conduct was not a search, and I therefore respectfully dissent."   133 S. Ct. at 1426.

### 3.   Standing.

The Tenth Circuit has referred to the test whether a particular search implicates a defendant's Fourth Amendment interests -- whether the search violates the defendant's reasonable privacy expectation -- as one of "standing."   E.g., United States v. Creighton, 639 F.3d 1281, 1286 (10th Cir. 2011)("The Defendant has the burden of establishing . . . standing, or, in other words, a subjective expectation of privacy in the [item searched] that society is prepared to recognize as reasonable."); United States v. Poe, 556 F.3d 1113, 1121 (10th Cir. 2009)("[A] defendant raising a Fourth Amendment challenge must first demonstrate that he has standing to object to the search.")(citing United States v. Rubio-Rivera, 917 F.2d 1271, 1274 (10th Cir. 1990)); United States v. Shareef, 100 F.3d 1491, 1499 (10th Cir. 1996)("A Defendant has standing to challenge a search only if he or she has a reasonable expectation of privacy in the area being searched.").   Accordingly, the Court, tracing the Tenth Circuit's language has also referred to this test as one of standing.   See, e.g., United States v. Harmon, 785 F. Supp. 2d at 1157 ("Standing requires the defendant to show 'that he had a subjective expectation of privacy

in the premises searched and that society is prepared to recognize that expectation as reasonable.'")(quoting United States v. Poe, 556 F.3d at 1121).  The Supreme Court's decisions in United States v. Jones and Florida v. Jardines, however, suggest that this test has now expressly been designated a substantive Fourth Amendment analysis alongside the trespass-based Fourth Amendment analysis, rather than a distinct analysis under the rubric entitled standing.

     In Rakas v. Illinois, 439 U.S. 128 (1978), the Supreme Court disapproved of labeling the inquiry whether a search implicates a defendant's personal Fourth Amendment interests "as one of standing, rather than simply recognizing it as one involving the substantive question of whether or not the proponent of the motion to suppress had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge."  439 U.S. at 133.  Dispensing with this label, the Supreme Court noted:

>     Had we accepted petitioners' request to allow persons other than those whose own Fourth Amendment rights were violated by a challenged search and seizure to suppress evidence obtained in the course of such police activity, it would be appropriate to retain Jones[ v. United States, 362 U.S. 257 (1960, overruled by United States v. Salvucci, 448 U.S. 83 (1980)]' use of standing in Fourth Amendment analysis.  Under petitioners' target theory, a court could determine that a defendant had standing to invoke the exclusionary rule without having to inquire into the substantive question of whether the challenged search or seizure violated the Fourth Amendment rights of that particular defendant.  However, having rejected petitioners' target theory and reaffirmed the principle that the "rights assured by the Fourth Amendment are personal rights, [which] . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure," Simmons v. United States, 390 U.S. at 389 . . . , the question necessarily arises whether it serves any useful analytical purpose to consider this principle a matter of standing, distinct from the merits of a defendant's Fourth Amendment claim.  We can think of no decided cases of this Court that would have come out differently had we concluded, as we do now, that the type of standing requirement discussed in Jones and reaffirmed today is more properly subsumed under substantive Fourth Amendment doctrine.  Rigorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of "standing," will produce no additional

situations in which evidence must be excluded.   The inquiry under either
approach is the same.  But we think the better analysis forthrightly focuses on the
extent of a particular defendant's rights under the Fourth Amendment, rather than
on any theoretically separate, but invariably intertwined concept of standing.  The
Court in Jones also may have been aware that there was a certain artificiality in
analyzing this question in terms of standing because in at least three separate
places in its opinion the Court placed that term within quotation marks.  362 U.S.,
at 261, 263, 265 . . . .

439 U.S. at 138-39.  The Supreme Court emphasized:

[N]othing we say here casts the least doubt on cases which recognize . . . as a
general proposition, the issue of standing [generally.] . . .  But this Court's long
history of insistence that Fourth Amendment rights are personal in nature has
already answered many of these traditional standing inquiries, and we think that
definition of those rights is more properly placed within the purview of
substantive Fourth Amendment law than within that of standing.

439 U.S. at 139-40.  In Minnesota v. Carter, the Supreme Court recognized that Rakas v. Illinois

put an end to the Fourth Amendment standing analysis as separate from the substantive Fourth

Amendment search analysis:

The Minnesota courts analyzed whether respondents had a legitimate expectation
of privacy under the rubric of "standing" doctrine, an analysis that this Court
expressly rejected 20 years ago in Rakas . . . .  Central to our analysis [in Rakas v.
Illinois] was the idea that in determining whether a defendant is able to show the
violation of his (and not someone else's) Fourth Amendment rights, the
"definition of those rights is more properly placed within the purview of
substantive Fourth Amendment law than within that of standing."  Id., at 140 . . . .

525 U.S. at 87-88.  The Supreme Court has thus noted that the analysis under either approach --

the substantive Fourth Amendment doctrine that the rights that the Amendment secures are

personal versus the separate notion of "standing" -- is the same and that Katz v. United States'

reasonable-expectation-of-privacy analysis has now been classified as a substantive Fourth

Amendment test, as opposed to a standing test.  Rakas v. Illinois, 439 U.S. at 139.

Rigorous application of the principle that the rights secured by this Amendment
are personal, in place of a notion of "standing," will produce no additional
situations in which evidence must be excluded.  But we think the better analysis

forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing.

Rakas v. Illinois, 439 U.S. at 139 (footnote omitted).  This development is in line with the Supreme Court's guidance that the analysis "is more properly subsumed under substantive Fourth Amendment doctrine."  Rakas v. Illinois, 439 U.S. at 139.

4.      **Whether a Fourth Amendment Search Occurred**.

A Fourth Amendment search occurs either where the government, to obtain information, trespasses on a person's property or where the government violates a person's subjective expectation of privacy that society recognizes as reasonable to collect information.  See United States v. Jones, 132 S. Ct. at 947.  "[T]he Katz reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test."  United States v. Jones, 132 S. Ct. at 947 (emphasis in original)(citing Alderman v. United States, 394 U.S. 165, 176 (1969); Soldal v. Cook Cnty., 506 U.S. 56, 64 (1992)).  "When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'"  Florida v. Jardines, 133 S. Ct. at 1414 (quoting United States v. Jones, 132 S. Ct. at 950 n.3).

a.      **Trespass-Based Analysis**.

The Fourth Amendment "establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'"  Florida v. Jardines, 133 S. Ct. at 1414 (quoting United States v. Jones, 132 S. Ct. at 950 n.3 ("[A] 'search' within the original meaning of the Fourth Amendment" occurs "[w]here . . . the Government obtains information by

- 49 -

physically intruding on a constitutionally protected area.")).   "[A]n actual trespass," however, "is neither necessary nor sufficient to establish a constitutional violation."   United States v. Jones, 132 S. Ct. at 951 n.5 (Scalia, J.)(emphasis omitted)(quoting United States v. Karo, 468 U.S. 705, 713 (1984)).

In determining whether a search has occurred, "[t]resspass alone does not qualify, but there must be conjoined with that . . . an attempt to find something or to obtain information." United States v. Jones, 132 S. Ct. at 951 n.5.   The Supreme Court has also noted that "[p]hysically invasive inspection is simply more intrusive than purely visual inspection."   Bond v. United States, 529 U.S. 334, 337 (2000).   Moreover, the Supreme Court in Florida v. Jardines suggested that the trespass-based analysis applies only when the trespass occurs in one of the four places or things listed in the Fourth Amendment:

> The Fourth Amendment "indicates with some precision the places and things encompassed by its protections": persons, houses, papers, and effects. The Fourth Amendment does not, therefore, prevent all investigations conducted on private property; for example, an officer may (subject to Katz) gather information in what we have called "open fields" -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text. . . .   But when it comes to the Fourth Amendment, the home is first among equals.

133 S. Ct. at 1414.

In United States v. Alabi, 943 F. Supp. 2d 1201 (D.N.M. 2013)(Browning, J.), the Court analyzed whether the Secret Service's digital scan of electronic information contained in the defendants' credit and debit cards' magnetic strips was a Fourth Amendment search under a trespass-based analysis, concluding that it was not, because the Secret Service properly possessed the credit and debit cards, and the additional act of scanning the cards to read the virtual data contained on the strips did not involve a physical intrusion or physical penetration of space.   See 943 F. Supp. 2d at 1264-65.   The Court noted that, "[e]ven if the Supreme Court were

to extend the trespass-based analysis for Fourth Amendment searches to virtual invasions, the Secret Service's conduct scanning the thirty-one credit and debit cards still would not amount to a Fourth Amendment search," because the magnetic strip, as opposed to the credit or debit card separately, is not a constitutionally protected area.  943 F. Supp. 2d at 1267-68.

> When a law enforcement officer sees only the exterior of a credit or debit card, however, given that the financial institution which issues the card places the same information on the magnetic strip as embossed on the card's exterior, the only instances in which the information inside the credit or debit card is not information already seen by and known to the officer is when the information has been reencoded for unlawful purposes.  In these instances, not only does the person asserting his or her Fourth Amendment right not own or otherwise lawfully possess the information contained inside the card on the magnetic strip, but the person has stolen the information with the intent to use that information to steal further from the person whose information is on the magnetic strip. Protecting this area from law enforcement search and seizure would thus not further the Fourth Amendment's express purpose of protecting "[t]he right of the people to be secure in their persons, houses, papers, and effects . . . ."  U.S. Const. amend IV.

943 F. Supp. 2d at 1273 (alteration in original).

> ### b.   *Katz v. United States*' Reasonable-Expectations-of-Privacy Search Test Remains Good Law.

The Court has noted that, in light of the Supreme Court's recent decisions in Florida v. Jardines and United States v. Jones, both of which Justice Scalia wrote for the majority, and both of which analyze whether government conduct constituted a Fourth Amendment search using the trespass-based approach, "the question arises whether the Katz v. United States reasonable-expectation-of-privacy test is still good law."   United States v. Alabi, 943 F. Supp. 2d 1201 (D.N..M. 2013)(Browning, J.)(citing Minnesota v. Carter, 525 U.S. 83, 97-98 (1998)(Scalia, J. concurring)).  Justice Scalia has consistently criticized this "notoriously unhelpful test":

> In my view, the only thing the past three decades have established about the Katz test (which has come to mean the test enunciated by Justice Harlan's separate

concurrence in <u>Katz</u> . . .) is that, unsurprisingly, those "actual (subjective) expectation[s] of privacy" "that society is prepared to recognize as 'reasonable,'" bear an uncanny resemblance to those expectations of privacy that this Court considers reasonable.  When that self-indulgent test is employed (as the dissent would employ it here) to determine whether a "search or seizure" within the meaning of the Constitution has <u>occurred</u> (as opposed to whether that "search or seizure" is an "unreasonable" one), it has no plausible foundation in the text of the Fourth Amendment.  That provision did not guarantee some generalized "right of privacy" and leave it to this Court to determine which particular manifestations of the value of privacy "society is prepared to recognize as 'reasonable.'"  Rather, it enumerated ("persons, houses, papers, and effects") the objects of privacy protection to which the <u>Constitution</u> would extend, leaving further expansion to the good judgment, not of this Court, but of the people through their representatives in the legislature.

<u>Minnesota v. Carter</u>, 525 U.S. at 97-98 (Scalia, J., concurring)(emphasis in original)(internal citations omitted).[23]  In both <u>United States v. Jones</u> and <u>Florida v. Jardines</u>, however, Justice Scalia, writing for the majority, never stated that the Supreme Court was substituting the trespass-based analysis for <u>Katz v. United States</u>' reasonable-expectation-of-privacy analysis. Rather, his majority opinions asserted that the <u>Katz v. United States</u> reasonable-expectation-of-privacy analysis added to the trespass-based analysis.  See <u>Florida v. Jardines</u>, 133 S. Ct. at 1417 ("The <u>Katz</u> reasonable-expectations test 'has been <u>added to</u>, not <u>substituted for</u>,' the traditional property-based understanding of the Fourth Amendment." (emphasis in original))(quoting <u>United States v. Jones</u>, 132 S. Ct. at 952).  The Court concluded in <u>United States v. Alabi</u> that, "as the Supreme Court now stands, Justices Alito, Breyer, Kagan, Ginsburg, and Sotomayor still adhere to application of the <u>Katz v. United States</u> reasonable-expectation-of-privacy Fourth Amendment analysis, at least as a possible approach alongside of the trespass-based approach."  2013 WL 1876791, at *35.

In June, 2013, Justice Scalia dissented from the Supreme Court's decision in <u>Maryland v.</u>

---

[23] The Honorable Clarence Thomas, Associate Justice, was the only other Justice to join Justice Scalia's <u>Minnesota v. Carter</u> concurrence.

<u>King</u>, 133 S. Ct. 1958 (2013), in which the Supreme Court held that "DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure," 133 S. Ct. at 1980.  Justice Scalia criticized the majority's opinion for analogizing DNA testing to taking an arrestee's photograph by citing to <u>Katz v. United States</u> and pointing out that "we have never held that merely taking a person's photograph invades any recognized 'expectation of privacy.'"  <u>Maryland v. King</u>, 133 S. Ct. at 1986 (Scalia, J., dissenting).  Justice Scalia also pointed out that a person's "privacy-related concerns" in their body are weighty:

> We are told that the "privacy-related concerns" in the search of a home "are weighty enough that the search may require a warrant, notwithstanding the diminished expectations of privacy of the arrestee." But why are the "privacy-related concerns" not also "weighty" when an intrusion into the <u>body</u> is at stake? (The Fourth Amendment lists "persons" <u>first</u> among the entities protected against unreasonable searches and seizures.)

<u>Maryland v. King</u>, 133 S. Ct. at 1982 (Scalia J., dissenting)(emphasis in original).  Justice Scalia also suggested that the Founders would have shared these privacy-related concerns:

> Today's judgment will, to be sure, have the beneficial effect of solving more crimes; then again, so would the taking of DNA samples from anyone who flies on an airplane (surely the Transportation Security Administration needs to know the "identity" of the flying public), applies for a driver's license, or attends a public school.  Perhaps the construction of such a genetic panopticon is wise.  But I doubt that the proud men who wrote the charter of our liberties would have been so eager to open their mouths for royal inspection.

<u>Maryland v. King</u>, 133 S. Ct. at 1989 (Scalia J., dissenting).  The Court therefore concludes that Justice Scalia and the Supreme Court may still rely on a person's privacy expectation when determining whether a search is reasonable for Fourth Amendment purposes, although Justice Scalia may not turn to the expectations prong until he runs the facts through the trespass prong.

c. ***Katz v. United States*** **Reasonable-Expectations-of-Privacy Analysis.**

"'Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.'"   Rakas v. Illinois, 439 U.S. at 133-34 (quoting Alderman v. United States, 394 U.S. at 174).  "A district court cannot suppress evidence unless the movant proves that a search implicates personal Fourth Amendment interests."  United States v. Jones, 44 F.3d 860, 871 (10th Cir. 1995)(emphasis in original).  "'[N]o interest legitimately protected by the Fourth Amendment' is implicated by governmental investigative activities unless there is an intrusion into a zone of privacy, into 'the security a man relies upon when he places himself or his property within a constitutionally protected area.'"  United States v. Miller, 425 U.S. 435, 440 (1976)(Hoffa v. United States, 385 U.S. 293, 301-02 (1966)).[24]  The Tenth

---

[24] The Court has previously stated: "[T]he Supreme Court has vigorously asserted that the proper analysis under the Fourth Amendment is not whether the place searched is a 'constitutionally protected area.'"  Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d 1176, 1219 (D.N.M. 2012)(Browning, J.)(quoting Katz. V. United States, 389 U.S. at 351).  In support for this proposition, the Court relied on the majority's decision in Katz v. United States, where the Supreme Court stated that focusing on whether the area is a "constitutionally protected area . . . . deflects attention from the problem," as it focuses attention on the place, rather than the person:

> Because of the misleading way the issues have been formulated, the parties have attached great significance to the characterization of the telephone booth from which the petitioner placed his calls.  The petitioner has strenuously argued that the booth was a "constitutionally protected area."   The Government has maintained with equal vigor that it was not.  But this effort to decide whether or not a given "area," viewed in the abstract, is "constitutionally protected" deflects attention from the problem presented by this case.  For the Fourth Amendment protects people, not places.  What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.  See Lewis v. United States, 385 U.S. 206, 210 [1966]; United States v. Lee, 274 U.S. 559, 563 . . . (1927).  But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.  See Rios v. United States, 364 U.S. 253 . . . [1960]; Ex parte Jackson, 96 U.S. 727, 733 . . . [1877].

Katz v. United States, 389 U.S. at 351-52.  The Supreme Court appears to have changed course

Circuit has thus noted that "[a]n illegal search or seizure only harms those with legitimate expectations of privacy in the premises searched." United States v. Jones, 44 F.3d at 871 (citing United States v. Roper, 918 F.2d 885, 886-87 (10th Cir. 1990)). Thus, "[t]he proper inquiry" to determine whether a search implicates a defendant's Fourth Amendment interests still depends, after conducting a trespass-based analysis, on "whether the defendant had an expectation of privacy in the place searched and whether that expectation was objectively reasonable." Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d 1176, 1219 (D.N.M. 2012).

"Official conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment." Illinois v. Caballes, 543 U.S. at 409 (quoting United States v. Jacobsen, 466 U.S. at 123). The Supreme Court has thus recognized that, rather than determining whether law enforcement conduct was a search, it sometimes proves easier to "assess[] when a search is not a search." Kyllo v. United States, 533 U.S. at 32.

> In assessing when a search is not a search, we have applied somewhat in reverse the principle first enunciated in Katz v. United States. Katz involved eavesdropping by means of an electronic listening device placed on the outside of a telephone booth -- a location not within the catalog ("persons, houses, papers, and effects") that the Fourth Amendment protects against unreasonable searches.

---

in its two most recent opinions on Fourth Amendment searches. In Florida v. Jardines, the particular place at which the search occurred weighs heavily on the Supreme Court's holding, reasoning that "[t]he [Fourth] Amendment establishes [as] a simple baseline . . . . protections 'when the Government does engage in a physical intrusion of a constitutionally protected area.'" 133 S. Ct. at 1414 (original alterations and original emphasis omitted)(emphasis added)(quoting United States v. Knotts, 460 U.S. 276, 286 (1983)(Brennan, J., concurring)). See United States v. Jones, 132 S. Ct. at 951 ("Katz did not erode the principle 'that, when the Government does engage in physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment. . . . Katz did not narrow the Fourth Amendment's scope.'" (emphasis added)). The Court thus concludes that, while it may be true that the analysis does not turn on the place searched, the Court's prior statement -- "the Supreme Court has vigorously asserted that the proper analysis under the Fourth Amendment is not whether the place searched is a 'constitutionally protected area,'" Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d at 1219 -- may no longer accurately reflect the Supreme Court's recent reversion to property-based analysis as a Fourth Amendment analysis baseline.

> We held that the Fourth Amendment nonetheless protected Katz from the warrantless eavesdropping because he "justifiably relied" upon the privacy of the telephone booth.  As Justice Harlan's oft-quoted concurrence described it, a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.

Kyllo v. United States, 533 U.S. at 32-33.  The Supreme Court thus articulated the Katz v. United States rule -- which Professor Wayne R. LaFave has noted is "somewhat inaccurately stated as the 'reasonable expectation of privacy' test," Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.1(b), at 435 (4th ed., 2004) --  which posits: "[A] Fourth Amendment search does not occur . . . unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable.'" Kyllo v. United States, 533 U.S. at 33 (emphasis in original)(quoting California v. Ciraolo, 476 U.S. at 211).

A "reasonable expectation of privacy" is "said to be an expectation 'that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'"  United States v. Jones, 132 S. Ct. at 951.  See United States v. Harmon, 785 F. Supp. 2d at 1157 ("To decide whether a reasonable expectation of privacy exists, courts consider concepts of real or personal property law . . . .").  In analyzing whether an expectation of privacy is reasonable in the Fourth Amendment context based on property law, "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control." Rakas v. Illinois, 439 U.S. at 143 & n.12.  While ownership or lawful possession is not determinative under the Katz v. United States reasonable-expectation-of-privacy test, it is often a dispositive factor; because the Fourth Amendment is a personal right, a defendant bears the burden of demonstrating "that he gained possession [of the area searched] from the owner or someone with the authority to grant

possession." United States v. Arango, 912 F.2d 441, 445-46 (10th Cir. 1990).

### i. Subjective Expectation of Privacy.

A defendant maintains a subjective expectation of privacy when the defendant "has shown that 'he sought to preserve something as private.'"  Bond v. United States, 529 U.S. at 338 (internal alterations omitted)(quoting Smith v. Maryland, 442 U.S. 735, 740 (1979)).  Thus, there is no reasonable expectation of privacy in otherwise private information disclosed to a third party.  "[T]he Fourth Amendment protects people, not places.  What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection."  Katz v. United States, 389 U.S. at 351.  The Supreme Court has noted:

> This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.

United States v. Miller, 425 U.S. at 443.

The Supreme Court has recognized, however, that subjective expectations of privacy do not always coincide with the interests that the Fourth Amendment is universally thought to protect.  In Smith v. Maryland, for instance, the Supreme Court identified situations in which it would not follow the subjective approach:

> Situations can be imagined, of course, in which Katz' two-pronged inquiry would provide an inadequate index of Fourth Amendment protection.  For example, if the Government were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry, individuals thereafter might not in fact entertain any actual expectation or [sic] privacy regarding their homes, papers, and effects.  Similarly, if a refugee from a totalitarian country, unaware of this Nation's traditions, erroneously assumed that police were continuously monitoring his telephone conversations, a subjective expectation of privacy regarding the contents of his calls might be lacking as well. In such circumstances, where an individual's subjective expectations had been "conditioned" by influences alien to well-recognized Fourth Amendment

freedoms, those subjective expectations obviously could play no meaningful role in ascertaining what the scope of Fourth Amendment protection was.   In determining whether a "legitimate expectation of privacy" existed in such cases, a normative inquiry would be proper.

442 U.S. at 740 n.5.  Most recently, in <u>Jones v. United States</u>, Justice Sotomayor commented that, given the reality of technology in the twenty-first century, it may no longer be sound to universally hold to the third-party disclosure rule to determine whether a subjective expectation of privacy exists:

> [I]t may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties.  This approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks.  People disclose the phone numbers that they dial or text to their cellular providers; the URLs that they visit and the e-mail addresses with which they correspond to their Internet service providers; and the books, groceries, and medications they purchase to online retailers.[25]  Perhaps, as Justice Alito notes, some people may find the "tradeoff" of privacy for convenience "worthwhile," or come to accept this "diminution of privacy" as "inevitable," and perhaps not.  I for one doubt that people would accept without complaint the warrantless disclosure to the Government of a list of every Web site they had visited in the last week, or month, or year. But whatever the societal expectations, they can attain constitutionally protected status only if our Fourth Amendment jurisprudence ceases to treat secrecy as a prerequisite for privacy.  I would not assume that all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to Fourth Amendment protection.

132 S. Ct. at 957 (Sotomayor, J., concurring)(internal citations omitted).  Regardless what the Supreme Court decides to do with social media on the internet, only the most ignorant or gullible think what they post on the internet is or remains private.  <u>See</u> United States v. Meregildo, 883 F. Supp. 2d 523, 526 (S.D.N.Y. 2012)(Pauley, J.)(holding that a person posting to his Facebook

---

[25] URL is the abbreviation for a "uniform resource locator, . . . also known as web address, [which] is a specific character string that constitutes a reference to a[n internet] resource."   <u>Uniform Resource Locator</u>, Wikipedia.org,   http://en.wikipedia.org/wiki/ Uniform_resource_locator (last visited Apr. 23, 2013).

profile had "no justifiable expectation that his 'friends' would keep his profile private").

> ii.     **Privacy Expectation that Society is Prepared to Recognize as Reasonable.**

Under the second step of <u>Katz v. United States</u>' reasonable-expectation-of-privacy approach, courts must determine "whether society is prepared to recognize that [subjective privacy] expectation as objectively reasonable." <u>United States v. Ruiz</u>, 664 F.3d at 838 (<u>United States v. Allen</u>, 235 F.3d at 489). The Supreme Court has cautioned: "The concept of an interest in privacy that society is prepared to recognize as reasonable is, by its very nature, critically different from the mere expectation, however well justified, that certain facts will not come to the attention of the authorities." <u>United States v. Jacobsen</u>, 466 U.S. 109, 122 (1984). Determining whether society would view the expectation as objectively reasonable turns on whether the government's intrusion infringes on a legitimate interest, based on the values which the Fourth Amendment protects. <u>See</u> <u>California v. Ciraolo</u>, 476 U.S. at 212 (explaining that "[t]he test of legitimacy is not whether the individual chooses to conceal assertedly 'private' activity," but instead "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment")(quoting <u>Oliver v. United States</u>, 466 U.S. at 181-83). This second factor of the <u>Katz v. United States</u> reasonable-expectation-of-privacy analysis developed from Justice Harlan's "attempt to give content to the word 'justifiably' in the majority's assertion that eavesdropping on Katz was a search because it 'violated the privacy upon which he justifiably relied while using the telephone booth.'" LaFave, <u>supra</u>, §2.1(d), at 439 (quoting <u>Katz v. United States</u>, 389 U.S. at 353). Thus, whether society will recognize a certain expectation of privacy does not turn on whether the hypothetical reasonable person would hold the same expectation of privacy, but rather whether the expectation of privacy is justified or

legitimate.  The Supreme Court has provided that, while no single factor determines legitimacy, whether society recognizes a privacy interest as reasonable is determined based on our societal understanding regarding what deserves protection from government invasion:

> No single factor determines whether an individual legitimately may claim under the Fourth Amendment that a place should be free of government intrusion not authorized by warrant.  In assessing the degree to which a search infringes upon individual privacy, the Court has given weight to such factors as the intention of the Framers of the Fourth Amendment, the uses to which the individual has put a location, and our societal understanding that certain areas deserve the most scrupulous protection from government invasion.

Oliver v. United States, 466 U.S. at 177-78 (internal citations omitted).

The Supreme Court has held that "[o]fficial conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment."  Illinois v. Caballes, 543 U.S. at 409 (quoting United States v. Jacobsen, 466 U.S. at 123).  In United States v. Place, the Supreme Court held that the "canine sniff" of a drug-sniffing dog does "not constitute a 'search' within the meaning of the Fourth Amendment."  United States v. Place, 462 U.S. at 707.  The case arose when law enforcement seized the luggage of an airline passenger and transported it to another location, where a drug-sniffing dog could sniff it.  See 462 U.S. at 699.  The drug sniffing dog alerted the officers that drugs were in the luggage, the officers obtained a search warrant, and, upon opening the bags, the officers found over one-thousand grams of cocaine.  See 462 U.S. at 699.  While recognizing that a person has a reasonable expectation of privacy in the contents of his or her luggage, the Supreme Court held that the dog's sniff test was not a Fourth Amendment search and emphasized the unique nature of the investigative technique, which could disclose only criminal activity:

> We have affirmed that a person possesses a privacy interest in the contents of personal luggage that is protected by the Fourth Amendment.  A "canine sniff" by a well-trained narcotics detection dog, however, does not require opening the

luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.

In these respects, the canine sniff is *sui generis*. We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore, we conclude that the particular course of investigation that the agents intended to pursue here -- exposure of respondent's luggage, which was located in a public place, to a trained canine -- did not constitute a "search" within the meaning of the Fourth Amendment.

462 U.S. at 707.

In United States v. Jacobsen, the Supreme Court extended this holding to the chemical field test of a white powdery substance to reveal that the substance was cocaine. See 466 U.S. at 122-24. A Federal Express employee and supervisor had opened a damaged package, and exposed four zip-lock plastic bags containing six and one-half ounces of white powder. See 466 U.S. at 111. They then called the DEA and repacked the contents in the original packaging before they provided the package to the DEA officers. See 466 U.S. at 111. When the agents arrived, the agents removed the exposed plastic bags from the broken package, opened each of the four bags, and field-tested the white powder, identifying the powder as cocaine. See 466 U.S. at 111-12. The Supreme Court first held that removal of the plastic bags from the tubes and the agent's visual inspection were not Fourth Amendment searches:

The removal of the plastic bags from the tube and the agent's visual inspection of their contents enabled the agent to learn nothing that had not previously been learned during the private search. It infringed no legitimate expectation of

privacy and hence was not a "search" within the meaning of the Fourth
Amendment.

466 U.S. at 120 (footnote omitted).  The Supreme Court noted: "The question remains whether

the additional intrusion occasioned by the field test, which had not been conducted by the

Federal Express agents and therefore exceeded the scope of the private search, was an unlawful

'search' or 'seizure' within the meaning of the Fourth Amendment."  United States v. Jacobsen,

466 U.S. at 122.  The Supreme Court, relying on United States v. Place, held that the additional

digital scan of the white substance was not a Fourth Amendment search, because the test

discloses only whether the substance is cocaine and "nothing [else] of special interest":

> The field test at issue could disclose only one fact previously unknown to
> the agent -- whether or not a suspicious white powder was cocaine.  It could tell
> him nothing more, not even whether the substance was sugar or talcum powder.
> We must first determine whether this can be considered a "search" subject to the
> Fourth Amendment -- did it infringe an expectation of privacy that society is
> prepared to consider reasonable?
>
> . . . .
>
> A chemical test that merely discloses whether or not a particular substance
> is cocaine does not compromise any legitimate interest in privacy.  This
> conclusion is not dependent on the result of any particular test.  It is probably safe
> to assume that virtually all of the tests conducted under circumstances comparable
> to those disclosed by this record would result in a positive finding; in such cases,
> no legitimate interest has been compromised.  But even if the results are negative
> -- merely disclosing that the substance is something other than cocaine -- such a
> result reveals nothing of special interest.  Congress has decided -- and there is no
> question about its power to do so -- to treat the interest in "privately" possessing
> cocaine as illegitimate; thus governmental conduct that can reveal whether a
> substance is cocaine, and no other arguably "private" fact, compromises no
> legitimate privacy interest.
>
> . . . .
>
> Here, as in Place, the likelihood that official conduct of the kind disclosed
> by the record will actually compromise any legitimate interest in privacy seems
> much too remote to characterize the testing as a search subject to the Fourth
> Amendment.

United States v. Jacobsen, 466 U.S. at 122-24.

Most recently, where a "dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation," the Supreme Court, again relying on United States v. Place and also on United States v. Jacobsen, held that "[a]ny intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement." Illinois v. Caballes, 543 U.S. at 409.[26]  The Supreme Court reasoned that the dog sniff in Illinois v. Caballes fell squarely in line with the line of cases holding "that any interest in possessing contraband cannot be deemed 'legitimate,' and th[at], governmental conduct that only reveals the possession of contraband 'compromises no legitimate privacy interests.'"  543 U.S. at 408 (quoting United States v. Jacobsen, 466 U.S. at 123)(emphasis in original).  The Supreme Court explained: "This is because the expectation 'that certain facts will not come to the attention of the authorities' is not the same as an interest in 'privacy that society is prepared to consider reasonable,'"  543 U.S. at 408-09 (quoting United States v. Jacobsen, 466 U.S. at 122).  The Supreme Court in Illinois v. Caballes noted that its decision was consistent with Kyllo v. United States, as the thermal imaging device in Kyllo v. United States could detect lawful, "intimate details" in a home:

> This conclusion is entirely consistent with our recent decision that the use of a thermal-imaging device to detect the growth of marijuana in a home constituted an unlawful search.  Kyllo v. United States, 533 U.S. 27 . . . .  Critical to that decision was the fact that the device was capable of detecting lawful activity -- in that case, intimate details in a home, such as "at what hour each night the lady of the house takes her daily sauna and bath."  Id., at 38 . . . .  The legitimate expectation that information about perfectly lawful activity will remain private is

---

[26] The Honorable John Paul Stevens, former Associate Justice of the Supreme Court, penned the majority's opinion in Illinois v. Caballes.  Out of the current Supreme Court Justices, Justices Scalia, Kennedy, Thomas, and Breyer joined Justice Stevens' majority opinion, while Justice Ginsburg dissented.  See 543 U.S. at 405.

categorically distinguishable from respondent's hopes or expectations concerning the nondetection of contraband in the trunk of his car. A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment.

Illinois v. Caballes, 543 U.S. at 409-10.

In United States v. Alabi, the defendants possessed thirty-one credit and debit cards, "many of them in their own names, several of which had information on the magnetic strips that related to persons other than the Defendants." 943 F. Supp. 2d at 1275. The Court reluctantly accepted the defendants' assertion that they "subjectively intended not to disclose this information to a third party -- i.e., intended not to use the cards," 943 F. Supp. 2d at 1275, but determined that "a privacy expectation in the account information stored on credit and debit cards' magnetic strips -- separate and beyond the credit and debit cards themselves -- is not objectively reasonable." 943 F. Supp. 2d at 1280. The Court explained that the Secret Service's scan of the cards' magnetic strips "reveals only the same information revealed in a private search when the card is used as intended," and, further, that, even if the cards had never been used, the scan "discloses only information known by viewing the outside of the card, or information that the cards and account information are possessed unlawfully . . . ." 943 F. Supp. 2d at 1281. Noting the Supreme Court's decision in Rakas v. Illinois, in which the Supreme Court "reasoned that society is not prepared to recognize as reasonable an expectation of privacy in a burglar robbing a summer cabin during the offseason," the Court concluded that society would not recognize "as reasonable a privacy expectation which, at least in contemporary society, would benefit only criminals." 943 F. Supp. 2d at 1287.

## 5. Reasonable Government Searches.

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when

a search implicating the Fourth Amendment has occurred, the district court must determine whether the search is reasonable.  Kentucky v. King, 131 S. Ct. at 1856 (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)).   See Samson v. California, 547 U.S. 843, 848 (2006)("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment.")(quoting United States v. Knights, 534 U.S. 112, 118 (2001)).   "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable."  United States v. Knights, 534 U.S. at 121 (citing, as an e.g. cite, Terry v. Ohio, 392 U.S. 1 (1968)).  The Supreme Court has justified this balancing test with the recognition that "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'"  Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995)(quoting New Jersey v. T.L.O., 649 U.S. 325, 338 (1985)).

"Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'"  Samson v. California, 547 U.S. at 848 (quoting United States v. Knights, 534 U.S. at 118).  See Banks v. United States, 490 F.3d 1178, 1184 (10th Cir. 2007)(stating that the Supreme Court "described the totality-of-the-circumstances test as one where 'the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and on the other, the degree to which it is needed for the promotion of legitimate governmental interests'").

As the text of the Fourth Amendment indicates, the ultimate measure of the

> constitutionality of a governmental search is "reasonableness."   At least in a case . . . where there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted, whether a particular search meets the reasonableness standard "'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'"

Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 652-53 (1995)(quoting Skinner v. Ry. Labor

Executives' Ass'n, 489 U.S. 602, 617 (1989)).   The Supreme Court has held that the test of

reasonableness under the Fourth Amendment is not a concrete test:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.   In each case [determining reasonableness] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.   Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- courts and the

Tenth Circuit look to the individual's privacy expectations.  See, e.g., United States v. Knights,

534 U.S. 112, 119-120 (2001)(noting that the petitioner had a "significantly diminished . . .

reasonable expectation of privacy," because a condition of his probation was to consent to search

of his apartment without notice or probable cause, and because he was clearly notified and

informed of the provision); Banks v. United States, 490 F.3d at 1186-87 (noting that the

plaintiffs, convicted felons on probation, have a more limited expectation of privacy than the

ordinary citizen, noting: "Those who have never been convicted of a felony are the last distinct

category. What is 'reasonable' under the fourth amendment for a person on conditional release,

or a felon, may be unreasonable for the general population."); Boling v. Romer, 101 F.3d 1336,

1340 (10th Cir. 1999)("[W]hile obtaining and analyzing the DNA or saliva of an inmate

convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns, it is

a reasonable search and seizure.  This is so in light of an inmate's diminished privacy rights . . . .")

As Justice Kagan has noted, property law informs society's expectations about what government intrusions are reasonable: "It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align.  The law of property 'naturally enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions."  Florida v. Jardines, 133 S. Ct. at 1419 (Kagan, J., concurring)(quoting Georgia v. Randolph, 547 U.S. 103, 111 (2006)).  Similarly, in Vernonia Sch. Dist. 47J v. Acton, Justice Scalia writing for the majority noted: "What expectations are legitimate varies, of course, with context, depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park."  515 U.S. at 654 (internal citations omitted).

### 6.    Consensual Searches.

Searches conducted pursuant to consent constitute one exception to the Fourth Amendment's search-warrant and probable-cause requirements.  See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  When an individual consents to a police search, and the consent is "freely and voluntarily given," the search does not implicate the Fourth Amendment.  United States v. Peña, 143 F.3d 1363, 1366 (10th Cir. 1998)(quoting Schneckloth v. Bustamonte, 412 U.S. at 219).  The Tenth Circuit has provided a two-part test for determining voluntariness, which requires that the government (i) "'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given,'" and (ii) "the officers must have used no 'implied or express duress or coercion.'"  United States v. Sanchez, 608 F.3d 685, 690 (10th Cir. 2010)(quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).

Determining whether a party's consent was free and voluntary is a question of fact to be determined from the totality of the circumstances.  See United States v. Peña, 143 F.3d at 1366. The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts should consider when trying to determine whether a defendant's consent was voluntarily given:

> (i) the "threatening presence of several officers;" (ii) the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory," or, conversely, the "officer's pleasant manner and [ ] tone of voice;" (iii) the "prolonged retention of a person's personal effects such as identification," or, conversely, "the prompt return of the defendant's identification and papers;" (iv) the "absence of other members of the public," or, conversely, whether the stop occurs in "a public location such as 'the shoulder of an interstate highway, in public view;'" (v) the "officer's failure to advise the defendant that [he or] she is free to leave."  United States v. Ledesma, 447 F.3d [1307,] 1314 [10th Cir. 1997)](citing and quoting numerous sources).  Other factors include: (vi) "the display of a weapon, [and (vii)] physical touching by the officer."  United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12 (D.N.M. Feb. 19, 2010) (Browning, J)(some alterations in original).  See United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010).

Because courts are required to look at the totality of the circumstances in determining whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no one factor is dispositive in a court's inquiry into the circumstances.  For example, although an officer's failure to advise a defendant that he or she is free to leave might suggest that coercive law enforcement conduct caused the defendant's consent to search, the Supreme Court has ruled that officers do not need to advise an individual of his or her right to refuse to consent to a search for that individual's consent to be voluntary.  See Schneckloth v. Bustamonte, 412 U.S. at 232. Moreover, the mere presence of officers by exits to a building, threatening no more than to

question individuals if they seek to leave, "should not [result] in any reasonable apprehension by any [individual] that they would be seized or detained in any meaningful way." United States v. Drayton, 536 U.S. 194, 205 (2002)(internal citations omitted). Additionally, an officer's display of a weapon may contribute to the coercive nature of a situation, but "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon." United States v. Drayton, 536 U.S. at 205. As such, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced. It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches." Schneckloth v. Bustamonte, 412 U.S. at 232.

**7.      Legal Standard for Probable Cause in an Affidavit in Support of a Warrant.**

Probable cause must support a search warrant, which requires "more than mere suspicion but less evidence than is necessary to convict." United States v. Burns, 624 F.2d 95, 99 (10th Cir. 1980). To establish probable cause to justify a search of a home, an affidavit in support of a search warrant "must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity." United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000). "Probable cause undoubtedly requires a nexus between suspected criminal activity and the place to be searched." United States v. Corral-Corral, 899 F.2d 927, 937 (10th Cir. 1990). The task of the magistrate judge issuing the search warrant

> is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

United States v. Reed, 195 F. App'x 815, 821 (10th Cir. 2006)(unpublished)(quoting Illinois v.

Gates, 462 U.S.213, 238 (1983)).   See United States v. Glover, 104 F.3d 1570, 1578 (10th Cir. 1997)(finding that, in determining whether an affidavit supports a finding of probable cause, the court must review the affidavit as a whole and look to the totality of the information contained therein), abrogated on other grounds by Corley v. United States, 556 U.S. 303 (2009). In making his or her determination, the magistrate judge "may draw reasonable inferences from the material provided in the warrant application."   United States v. Rowland, 145 F.3d 1194, 1205 (10th Cir. 1998).

"A reviewing court should accord great deference to a magistrate's determination of probable cause."   United States v. Reed, 195 F. App'x at 822. The court's duty is "simply to ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable cause existed."   Illinois v. Gates, 462 U.S. at 236, 238-39.   This deference is appropriate to further the Fourth Amendment's strong preference for warrants. See Massachusetts v. Upton, 466 U.S. 727, 733 (1984); United States v. Ventresca, 380 U.S. 102, 105-06 (1965)("An evaluation of the constitutionality of a search warrant should begin with the rule that the informed and deliberate determinations of magistrates empowered to issue warrants . . . are to be preferred over the hurried action of office[r]s . . . .").   Because of the strong preference for warrants, "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." United States v. Ventresca, 380 U.S. at 106.

The deference accorded a magistrate judge's probable cause determination, however, is not boundless.  See United States v. Leon, 468 U.S. 897, 914 (1984).  The Court should not defer to a magistrate judge's probable-cause determination where there is no substantial basis for concluding that the affidavit in support of the warrant established probable cause.  See United States v. Danhauer, 229 F.3d at 1006.  Specifically, the Court should not defer to a magistrate

judge's probable-cause determination if it "is a mere ratification of the bare conclusions or 'hunches' of others or where it involves an improper analysis of the totality of the circumstances." United States v. Reed, 195 F. App'x at 822 (citing United States v. Leon, 468 U.S. at 915; Massachusetts v. Upton, 466 U.S. 727, 734 (1984); Illinois v. Gates, 462 U.S. at 239).

### 8.    The Particularity Requirement for Search Warrants.

The Supreme Court has stated that "those searches deemed necessary should be as limited as possible." Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971). The Tenth Circuit has explained that "the Fourth Amendment requires that the government describe the items to be seized with as much specificity as the government's knowledge and circumstances allow, and warrants are conclusively invalidated by their substantial failure to specify as nearly as possible the distinguishing characteristics of the goods to be seized." Cassady v. Goering, 567 F.3d 628, 635 (10th Cir. 2009)(quoting United States v. Leary, 846 F.2d 592, 600 (10th Cir. 1988)). The particularity requirement prevents general searches and strictly limits the discretion of the officer executing the warrant. See Voss v. Bergsgaard, 774 F.2d 402, 404 (10th Cir. 1985)("The particularity requirement ensures that a search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause."); United States v. Janus Indus., 48 F.3d 1548, 1553 (10th Cir. 1995)("As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.")(quoting Stanford v. Texas, 379 U.S. 476, 485 (1965))). "A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized." United States v. Janus Indus., 48 F.3d at 1553 ("The test applied to the description of the items to be seized is a practical one.").

In <u>Cassady v. Goering</u>, the search warrant authorized the search of the plaintiff's entire farm, including his house, and the seizure of "[a]ny & all narcotics," "[a]ny and all illegal contraband," and various specific items mostly related to a narcotics operation, as well as the search and seizure of "all other evidence of criminal activity" and all personal property that was stolen, embezzled, or otherwise illegal.  567 F.3d at 635.  The Tenth Circuit found that the warrant violated the plaintiff's Fourth Amendment rights, because "[t]he warrant[] allowed precisely the kind of rummaging through a person's belongings, in search of evidence of even previously unsuspected crimes or of no crime at all, that the Fourth Amendment proscribes." 567 F.3d at 635 (quoting <u>Voss v. Bergsgaard</u>, 774 F.2d at 405).  The Tenth Circuit explained that it had previously "applied a blanket suppression where officers *conducted a general search for evidence* of crimes not specifically listed in the warrant," 567 F.3d at 643 (emphasis in original)(citing <u>United States v. Foster</u>, 100 F.3d 846, 851-52 (10th Cir. 1996); <u>United States v. Medlin</u>, 842 F.2d 1194, 1199-1200 (10th Cir. 1988)); given that line of cases, the Tenth Circuit said "it would be an odd result not to suppress *warrants that expressly authorize* a general search and seizure," 567 F.3d at 643 (emphasis in original).

### 9.     <u>Warrantless Searches of Homes.</u>

"[T]he warrantless entry of the home is 'the chief evil against which . . . the Fourth Amendment is directed.'"  <u>United States v. Lowe</u>, 999 F.2d 448, 451 (10th Cir. 1993)(quoting <u>United States v. United States District Court</u>, 407 U.S. 297, 313 (1972)).  "A warrantless search of a defendant's home is unreasonable absent exigent circumstances or consent."  <u>United States v. Pikyavit</u>, 527 F.3d 1126, 1130 (10th Cir. 2008).  The Fourth Amendment's protection of the home against warrantless searches extends to a home's curtilage.  <u>See</u> <u>United States v. Dunn</u>, 480 U.S. 294 (1987); <u>Oliver v. United States</u>, 466 U.S. 170 (1984).

### a.    Curtilage.

In United States v. Dunn, the Supreme Court articulated four factors that should be used when determining whether an area is within the curtilage of a house for Fourth Amendment purposes.  These factors are

> the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

480 U.S. at 301.  Backyards that are enclosed and adjacent to a house are generally considered to be part of the curtilage.  See United States v. Hatfield, 333 F.3d 1189, 1196 (10th Cir. 2003); United States v. Jenkins, 124 F.3d 768, 772-73 (6th Cir. 1997).   Even partially enclosed backyards have been found to be part of a home's curtilage.  See, e.g., United States v. Swepston, 987 F.2d 1510, 1515 (10th Cir. 1993)(holding partial enclosure consistent with area being curtilage), overruled in part on other grounds by United States v. Cousins, 455 F.3d 1116 (10th Cir. 2006); United States v. Jenkins, 124 F.3d at 773 (same).

### b.    Consent.

A warrantless search is constitutional if consent is given for the search.  Consent to a search must be unequivocal, specific, and freely given.  See United States v. Guerrero, 472 F.3d 784, 789 (10th Cir. 2007); United States v. Davis, 197 F.3d 1048, 1052 (10th Cir. 1999); United States v. Butler, 966 F.2d 559, 562 (10th Cir. 1992).  Consent does not need to be spoken, but "may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer."  United States v. Guerrero, 472 F.3d at 789-90.  "Non-verbal conduct, considered with other factors, can constitute voluntary consent to search."  United States v. Gordon, 173 F.3d 761, 766 (10th Cir. 1999).  In United States v.

Gordon, for example, the Tenth Circuit found implied consent when, in response to an officer's question whether the defendant could open a locked bag, the defendant handed the officer the key.  See 173 F.3d at 766.

One strategy to gain consent to a search is a knock and talk, and the knock and talk itself is not a search.  "[P]olice officers do not engage in a search when they approach the front door of a residence and seek to engage in what is termed a 'knock and talk,' *i.e.*, knocking on the door and seeking to speak to an occupant for the purpose of gathering evidence."  Florida v. Jardines, 133 S. Ct. at 1423 (Alito, J., dissenting).

> When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do.  And whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak.

Kentucky v. King, 131 S. Ct. 1849, 1862 (2011).   The Tenth Circuit has explained that reasonable suspicion is unnecessary for a knock-and-talk investigation, because, "[a]s commonly understood, a 'knock and talk' is a consensual encounter and therefore does not contravene the Fourth Amendment, even absent reasonable suspicion."  United States v. Cruz-Mendez, 467 F.3d 1260, 1264 (10th Cir. 2006).  Police officers may approach a home, entering the curtilage surrounding that home that would be the normal route of access to the home, and knock, "precisely because that is 'no more than any private citizen might do,'" United States v. Shuck, 713 F.3d 563, 568 (10th Cir. 2013)(quoting Florida v. Jardines, 133 S. Ct. at 1416)).

### c.     Exigent Circumstances.

A warrantless search of a home can also be constitutional when there are exigent circumstances.  For exigent circumstances regarding safety to justify a warrantless search of a home: "(1) the officers [must have] had an objectively reasonable basis to believe that there was

- 74 -

an immediate need to enter to protect the safety of themselves or others, and (2) the conduct of the entry [must have been] reasonable." United States v. Reeves, 524 F.3d 1161, 1169 (10th Cir. 2008).  See United States v. Smith, 797 F.2d 836, 840 (10th Cir. 1986).  While officers do not need probable cause to establish that exigent circumstances existed, "there must be some reasonable basis, approaching probable cause," supporting the search of the area.  United States v. Smith, 797 F.2d at 840 (internal quotation marks omitted).

## LAW REGARDING UNLAWFUL ARREST

"A police officer violates an arrestee's clearly established Fourth Amendment right to be free of unreasonable seizure if the officer makes a warrantless arrest without probable cause." Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002)(citing Tennessee v. Garner, 471 U.S. 1, 7 (1985)).  "The law . . . is unambiguous: a government official must have probable cause to arrest an individual."  Cortez v. McCauley, 478 F.3d 1108, 1117 (10th Cir. 2007)(citing Tennessee v. Garner, 471 U.S. at 7).  See Michigan v. DeFillippo, 443 U.S. 31, 36 (1979)("[T]he Constitution permits an officer to arrest a suspect without a warrant if there is probable cause to believe that the suspect has committed or is committing an offense.").  "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she had reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense."  Keylon v. City of Albuquerque, 535 F.3d 1210, 1216 (10th Cir. 2008)(quoting Romero v. Fay, 45 F.3d 1472, 1476 (10th Cir. 1995)).  The Supreme Court has stated that the existence of probable cause for an arrest depends on whether, based on historical facts leading up to the arrest, an objectively reasonable police officer would find probable cause:

The principal components of a determination of reasonable suspicion or probable

cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause. The first part of the analysis involves only a determination of historical facts, but the second is a mixed question of law and fact: "[T]he historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant] statutory [or constitutional] standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated."

Ornelas v. United States, 517 U.S. 690, 696-97 (1996)(quoting Pullman-Standard v. Swint, 456 U.S. 273, 289 n.19 (1982))(alterations in original).

The Tenth Circuit has explained that a plaintiff alleging that the "government has unconstitutionally imprisoned him has at least two potential constitutional claims: 'The initial seizure is governed by the Fourth Amendment, but at some point after arrest, and certainly by the time of trial, constitutional analysis shifts to the Due Process Clause.'"  Mondragon v. Thompson, 519 F.3d 1078, 1082 (10th Cir. 2008)(quoting Pierce v. Gilchrist, 359 F.3d 1279, 1285-86 (10th Cir. 2004)).  If the plaintiff was imprisoned without legal process, his Fourth Amendment claim[27] is analogous to false arrest or false imprisonment; if he was imprisoned "pursuant to legal but wrongful process, he has a claim under the procedural component of the Fourteenth Amendment's Due Process Clause analogous to a tort claim for malicious prosecution."  519 F.3d at 1082.  More recently, the Tenth Circuit has explained that the Fourteenth Amendment claim analogous to a malicious prosecution claim would not be available if an adequate state remedy exists, but a plaintiff may have the option of bringing a Fourth

_____

[27] The Tenth Circuit clarified that, because the Fourteenth Amendment incorporates the Fourth Amendment's protections against the states, a Fourth Amendment claim against state actors is also a Fourteenth Amendment claim.  See Mondragon v. Thompson, 519 F.3d at 1082 n.3.  The Court will likewise "avoid this terminology here to reduce confusion," opting instead to refer to the Fourth Amendment in reference to the right to be free from unlawful seizures, and the Fourteenth Amendment in reference to the right to due process.  Mondragon v. Thompson, 519 F.3d at 1082 n.3.

Amendment claim using a similar malicious prosecution theory.  See Myers v. Koopman, 738 F.3d 1190, 1192 (10th Cir. 2013).  In Myers v. Koopman, the plaintiff alleged that a detective fabricated facts to create the illusion of probable cause and, as a result, the plaintiff spent three days in custody.  See 738 F.3d at 1192.  The plaintiff brought a claim under § 1983 for malicious prosecution, alleging that the detective violated his Fourth and Fourteenth Amendment rights. See 738 F.3d at 1192.  The plaintiff brought the Fourteenth Amendment malicious prosecution claim based on the detective's conduct in "conjur[ing] up facts to create the illusion of probable cause for an arrest warrant and subsequent prosecution."  738 F.3d at 1193.  The Tenth Circuit explained that "[t]he Fourteenth Amendment protects individuals against deprivations of liberty without due process of law.  If a state actor's harmful conduct is unauthorized and thus could not be anticipated pre-deprivation, then an adequate post-deprivation remedy -- such as a state tort claim -- will satisfy due process requirements."  738 F.3d at 1193 (citations omitted).  Because a malicious prosecution claim under Colorado law was available, the Tenth Circuit affirmed the district court's dismissal: "The existence of the state remedy flattens the Fourteenth Amendment peg on which [the plaintiff] now tries to hang his § 1983 malicious-prosecution claim."  738 F.3d at 1193.  The plaintiff also brought a malicious prosecution claim under the Fourth Amendment; the district court analogized the claim to a false imprisonment claim, but the Tenth Circuit said that the plaintiff was correct in casting his claim as malicious prosecution, "because he was seized after the institution of legal process."  738 F.3d at 1194.  The Tenth Circuit described the difference between a § 1983 claim for false imprisonment and malicious prosecution under the Fourth Amendment:

> What separates the two claims? -- the institution of legal process.  Unreasonable seizures imposed without legal process precipitate Fourth Amendment false imprisonment claims.  See Wallace[ v. Kato], 549 U.S. [384,] 389 [(2007)]

(concluding that false imprisonment was the proper analogy where defendants did not have a warrant for the plaintiff's arrest and thus detention occurred without legal process).  Unreasonable seizures imposed with legal process precipitate Fourth Amendment malicious-prosecution claims.  See Heck[ v. Humphrey], 512 U.S. [477,] 484 [(1994)] (where detention occurs with legal process the "common-law cause of action for malicious prosecution provides the closest analogy").  Like rain and snow, the claims emanate from the same source, but under different conditions.

738 F.3d at 1194 (footnote omitted).  The Tenth Circuit explained that the plaintiff was "arrested pursuant to a validly issued -- if not validly supported -- arrest warrant" and that the plaintiff's suit "challenges the probable-cause determination that generated the legal process."  738 F.3d at 1195.

## LAW REGARDING COLLATERAL ESTOPPEL AND
## STATE CRIMINAL JUDGMENTS

In Allen v. McCurry, 449 U.S. 90 (1980), the Supreme Court held that defendants in a 42 U.S.C. § 1983 action could invoke criminal proceedings as collateral estoppel.  See 449 U.S. at 103-05.  Section 1738 of Title 28 of the United States Code generally requires "federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so."  Allen v. McCurry, 449 U.S. at 96.  Under New Mexico law, "collateral estoppel, also called issue preclusion, prevents a party from re-litigating 'ultimate facts or issues actually and necessarily decided in a prior suit.'"  Ullrich v. Blanchard, 2007-NMCA-145, ¶ 19, 142 N.M. 835, 171 P.3d 774 (quoting Deflon v. Sawyers, 2006-NMSC-015, ¶ 13, 139 N.M. 637, 137 P.3d 577 (2006); Adams v. United Steelworkers of Am., 1982-NMSC-014, 97 N.M. 369, 373, 640 P.2d 475, 479.  For collateral estoppel to apply, four elements must be met: "(1) the parties in the current action were the same or in privity with the parties in the prior action, (2) the subject matter of the two actions is different, (3) the ultimate fact or issue was actually litigated, and (4) the issue was necessarily determined."  Ullrich v. Blanchard,

2007-NMCA-145, ¶ 19 (quoting <u>City of Sunland Park v. Macias</u>, 2003-NMCA-098, ¶ 10, 134 N.M. 216, 75 P.3d 816.  If the party invoking the doctrine establishes a prima-facie case, then the burden shifts to the party opposing collateral estoppel to show that he or she was not afforded a fair opportunity to litigate the issue in the prior proceeding.  <u>See</u> <u>Padilla v. Intel Corp.</u>, 1998-NMCA-125, 125 N.M. 698, 701, 964 P.2d 862, 865; <u>State v. Bishop</u>, 1992-NMCA-034, 113 N.M. 732, 734, 832 P.2d 793, 795.

Whether the doctrine of collateral estoppel should be applied is within the trial court's discretion, and the exercise of discretion is reviewed for an abuse of discretion on appeal.  <u>See</u> <u>Shovelin v. Cent. N.M. Elec. Coop.</u>, 1993-NMSC-015, 115 N.M. 293, 299, 850 P.2d 996, 1002. Even when all the elements of collateral estoppel are present, the trial court must consider whether countervailing equities militate against application of the doctrine.  <u>See</u> <u>Hyden v. Law Firm of McCormick, Forbes, Caraway & Tabor</u>, 1993-NMCA-008, 115 N.M. 159, 164, 848 P.2d 1086, 1091.  Collateral estoppel should be applied only where the judge determines that its application would not be fundamentally unfair.  <u>See</u> <u>Reeves v. Wimberly</u>, 1988-NMCA-038, 107 N.M. 231, 234, 755 P.2d 75, 78.  New Mexico courts have held that "[c]ollateral estoppel may bar the relitigation of ultimate facts or issues decided in a prior criminal action."  <u>City of Roswell v. Hancock</u>, 1998-NMCA-130, 126 N.M. 109, 112, 967 P.2d 449, 452.

## LAW REGARDING POST-ARREST DETENTION

In the context of a warrantless arrest, "a policeman's on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of crime, and for a brief period of detention to take the administrative steps incident to arrest."  <u>Gerstein v. Pugh</u>, 420 U.S. 103, 113-14 (1975).  In <u>County of Riverside v. McLaughlin</u>, 500 U.S. 44 (1991), the Supreme Court held that law enforcement may detain an individual after a lawful arrest pending a neutral

probable-cause determination up to forty-eight hours without violating the Constitution unless the delay is unreasonable.  See 500 U.S. at 56.  The Supreme Court in County of Riverside v. McLaughlin stated: "[A] jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of Gerstein.  For this reason, such jurisdictions will be immune from systemic challenges."  500 U.S. at 56.  While provision for a determination of probable cause within forty-eight hours will withstand a systematic challenge, in individual cases, a delay of forty hours or less might result in a violation if the delay is unreasonable, see 500 U.S. at 56, or if "conditions or restrictions of pretrial detention . . . amount to punishment of the detainee," Bell v. Wolfish, 441 U.S. 520, 535 (1979).

In Gerstein v. Pugh, the plaintiffs challenged Florida's procedures whereby "a person arrested without a warrant and charged by information may be jailed or subjected to other restraints pending trial without any opportunity for a probable cause determination."  420 U.S. at 116.  The Honorable Lewis Powell, Associate Justice of the Supreme Court, noted that arrest and detention procedures derive from the Fourth Amendment, see 420 U.S. at 111, and explained that, "while the Court has expressed a preference for the use of arrest warrants when feasible, it has never invalidated an arrest supported by probable cause solely because the officers failed to secure a warrant."  420 U.S. at 113.  Justice Powell stated that a police officer's "on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of crime, and for a brief period of detention to take the administrative steps incident to arrest," but that, after the suspect is in custody, "the reasons that justify dispensing with the magistrate's neutral judgment [in reviewing the factual justification prior to any arrest] evaporate."  420 U.S. at 113-14.

There no longer is any danger that the suspect will escape or commit further crimes while the police submit their evidence to a magistrate. And, while the State's reasons for taking summary action subside, the suspect's need for a neutral determination of probable cause increases significantly. The consequences of prolonged detention may be more serious than the interference occasioned by arrest. Pretrial confinement may imperil the suspect's job, interrupt his source of income, and impair his family relationships. Even pretrial release may be accompanied by burdensome conditions that effect a significant restraint of liberty. When the stakes are this high, the detached judgment of a neutral magistrate is essential if the Fourth Amendment is to furnish meaningful protection from unfounded interference with liberty.

420 U.S. at 114 (internal citations omitted). The Supreme Court held that "the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest," 420 U.S. at 114, but explained that the probable cause determination can be made without an adversary hearing using the same standard as that for arrest – "probable cause to believe the suspect has committed a crime," which is traditionally "decided by a magistrate in a nonadversary proceeding on hearsay and written testimony," 420 U.S. at 120. Recognizing that state systems vary, Justice Powell explained that states may incorporate the probable-cause determination into other procedures, such as for setting bail or fixing other conditions of pretrial release, or may make the probable-cause determination when the suspect first appears before a judicial officer; "[w]hatever procedure a State may adopt, it must provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty, and this determination must be made by a judicial officer either before or promptly after arrest." 420 U.S. at 124-25 (footnotes omitted).

In County of Riverside v. McLaughlin, the Supreme Court determined what constituted a "prompt" determination of probable cause. 500 U.S. at 47. The County of Riverside, California, had combined the probable-cause determination with its arraignment procedures; although the county's policy required conducting arraignments "without unnecessary delay and, in any event,

within two days of arrest," the rule excluded weekends and holidays from the two-day computation, meaning that "an individual arrested without a warrant late in the week may in some cases be held for as long as five days before receiving a probable cause determination. Over the Thanksgiving holiday, a 7-day delay is possible." 500 U.S. at 47. The Honorable Sandra Day O'Connor, Associate Justice, explained a split among the Courts of Appeals after Gerstein, in which the Fourth, Seventh, and Ninth Circuits required the probable-cause determination to be made "immediately following completion of the administrative procedures incident to arrest," while the Second Circuit understood "Gerstein to stress the need for flexibility and to permit States to combine probable cause determinations with other pretrial proceedings." 500 U.S. at 50 (internal citations, quotation marks, and alterations omitted). Justice O'Connor stated that the Second Circuit had the better view of Gerstein and, although hesitant to announce that the Constitution compels a specific time limit, held that "a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of Gerstein." 500 U.S. at 56. Justice O'Connor warned that a hearing within the forty-eight hours could nonetheless violate the rule in Gerstein v. Pugh "if the arrested individual can prove that his or her probable cause determination was delayed unreasonably," such as when there are "delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake." 500 U.S. at 56. She said that courts must "allow a substantial degree of flexibility," however, and that courts should not "ignore the often unavoidable delays in transporting arrested persons from one facility to another, handling late-night bookings where no magistrate is readily available, obtaining the presence of an arresting officer who may be busy processing other suspects or securing the premises of an arrest, and

other practical realities."  500 U.S. at 56-57.  After the forty-eight-hour mark, Justice O'Connor explained, "the calculus changes," and "the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance."  500 U.S. at 57.  In response to the County of Riverside's procedures, Justice O'Connor said that consolidating pretrial proceedings, and intervening weekends and holidays, do not qualify as extraordinary circumstances.  See 500 U.S. at 57.

    In Vondrak v. City of Las Cruces, No. CIV-05-0172 JB/LFG, 2009 WL 1300946 (D.N.M. March 26, 2009)(Browning, J.), the plaintiff moved the Court to allow him to amend his complaint so that he could "plead that he suffered a violation of his Fifth, Fourteenth, and Eighth Amendment rights for the two-hour detention to which the police subjected him after his arrest." 2009 WL 1300946, at *1.  The Court denied the motion, because the amendment was untimely, and also because the Court determined that the claim that the plaintiff wanted to add "is not a cognizable claim," and, thus, "an amendment would be futile."  2009 WL 1300946, at *6.  The Court concluded that the officers had probable cause to arrest the plaintiff after he failed three field sobriety tests and that the two-hour detention did not amount to an unreasonable delay under McLaughlin v. County of Riverside, because during that time, the police performed basic administrative tasks and administered multiple breath tests, which the plaintiff requested, with time in between each test.  See 2009 WL 1300946, at *7-8.  The Court said that the "police were relatively prompt in deciding, in the end, to release [the plaintiff] after only a few hours of detention," and that it was "unwilling to find, as a matter of law, that a person under such circumstances, having been arrested based on probable cause of driving under the influence, and having been held for only two hours, has a cause of action for illegal detention."  2009 WL 1300946, at *9.

## LAW REGARDING JURY INSTRUCTIONS

With regard to jury instructions, the Tenth Circuit has held: "We do not require perfection, but we must be satisfied that, upon hearing the instructions, the jury understood the issues to be resolved and its duty to resolve them." Gonzales v. Duran, 590 F.3d 855, 859 (10th Cir. 2009). "An erroneous jury instruction requires reversal 'only if the error is determined to have been prejudicial, based on a review of the record as a whole.'" Sherouse v. Ratchner, 573 F.3d 1055, 1059-60 (10th Cir. 2009)(quoting Durflinger v. Artiles, 727 F.2d 888, 895 (10th Cir. 1984)). See Townsend v. Lumbermens Mut. Cas. Co., 294 F.3d 1232, 1242 (10th Cir. 2002)("A faulty jury instruction requires reversal when (1) we have substantial doubt whether the instructions, considered as a whole, properly guided the jury in its deliberations; and (2) when a deficient jury instruction is prejudicial." (citations omitted)(internal quotation marks omitted)). The inquiry is "not whether the instruction was completely faultless, but whether the jury was misled in any way." Coleman v. B-G Maint. Mgmt. of Colo., Inc., 108 F.3d 1199, 1202 (10th Cir. 1997).

In cases where the district court has given a legally erroneous jury instruction, and where the jury might have based its verdict thereon, prejudice exists, and reversal is required. See Adams-Arapahoe Joint Sch. Dist. No. 28-J v. Cont'l Ins. Co., 891 F.2d 772, 779-80 (10th Cir. 1989)(finding prejudice that required reversal where (a) a jury instruction incorrectly placed the burden of proof on the defendant rather than on the plaintiff and (b) the jury might have based its verdict thereon); Guidance Endodontics, LLC v. Dentsply Int'l, Inc., No. 08-1101, 2011 WL 1330781, at *10-11 (D.N.M. Mar. 30, 2011)(Browning, J.). Since Adams-Arapahoe Joint School District No. 28-J v. Continental Insurance Co., the Tenth Circuit has repeatedly restated this formulation. See, e.g., Level 3 Commc'ns, LLC v. Liebert Corp., 535 F.3d 1146, 1159 (10th

Cir. 2008)("Where an appellate court determines that the district court has given a legally erroneous jury instruction, the judgment must be reversed if the jury <u>might</u> <u>have</u> based its verdict on the erroneously given instruction." (emphasis added)(internal quotation marks omitted)); <u>Wankier v. Crown Equip. Corp.</u>, 353 F.3d 862, 867 (10th Cir. 2003)("Where an appellate court determines that the district court has given a legally erroneous jury instruction, the judgment must be reversed 'if the jury might have based its verdict on the erroneously given instruction.'"); <u>Townsend v. Lumbermens Mut. Cas. Co.</u>, 294 F.3d at 1242 ("Thus, where a jury instruction is legally erroneous, we reverse if the jury might have based its verdict on the erroneously given instruction."); <u>Coleman v. B-G Maint. Mgmt. of Colo., Inc.</u>, 108 F.3d at 1202 ("Thus, '[w]here a jury instruction is legally erroneous, we must reverse if the jury might have based its verdict on the erroneously given instruction.'" (alteration in original)); <u>City of Wichita v. U.S. Gypsum Co.</u>, 72 F.3d 1491, 1495 (10th Cir. 1996)("Where a jury instruction is legally erroneous, we must reverse if the jury might have based its verdict on the erroneously given instruction."); <u>SEC v. Peters</u>, 978 F.2d 1162, 1167 (10th Cir. 1992)("Where a jury instruction is legally erroneous, we must reverse if the jury might have based its verdict on the erroneously given instruction.").

Most recently, the Tenth Circuit explained further that "[t]he might have threshold, as its language suggests, requires reversal even if that possibility is <u>very</u> <u>unlikely</u>. Only when the erroneous instruction could not have changed the result of the case can we say the error is harmless and does not require reversal." <u>Level 3 Commc'ns, LLC v. Liebert Corp.</u>, 535 F.3d at 1158 (emphasis in original)(citations omitted)(internal quotation marks omitted). In <u>Wankier v. Crown Equipment Corp.</u>, for example, the district court declined to instruct the jury that the plaintiff in a products liability action bore the burden of showing that an alternative, safer design

was available.  See 353 F.3d at 868.  The Tenth Circuit found that "there is no doubt that the erroneous instruction regarding Plaintiff's burden to show a safer alternative design may have misled the jury."  353 F.3d at 868.  Accordingly, the Tenth Circuit vacated the judgment entered on the jury verdict in Wankier v. Crown Equipment Corp.  See 353 F.3d at 868.

Level 3 Communications, LLC v. Liebert Corp. involved a contract dispute where the district court instructed the jury that the contract at issue was not ambiguous as a matter of law.  See 535 F.3d at 1153.  After reaching the opposite conclusion -- that the contract was ambiguous as a matter of law -- on appeal, the Tenth Circuit recognized that the district court had given a legally erroneous instruction and held: "To conclude the error is not harmless, we must determine the error might have affected the jury's verdict."  535 F.3d at 1158-59.  The Tenth Circuit held that, with its erroneous instruction, "the district court virtually assured that the jury would find for Level 3 on the breach of contract claim."  535 F.3d at 1159.  The Tenth Circuit therefore reversed and remanded the case for a new trial.  See 535 F.3d at 1161.

In contrast to both Wankier v. Crown Equipment Corp. and Level 3 Communications, LLC v. Liebert Corp., the Tenth Circuit has found reversal was not required despite erroneous instructions.  In Sherouse v. Ratchner, 573 F.3d 1055 (10th Cir. 2009), a case involving claims that police officers violated the civil rights of two young women suspected of robbery, the district court instructed the jury that "[a] police officer's probable cause determination is not negated if the officer reasonably but mistakenly believed that probable cause existed at the time of arrest."  573 F.3d at 1059.  The Tenth Circuit found this instruction to be legally incorrect, because, "[w]hile an officer's reasonable but mistaken understanding of the facts justifying a search or seizure does not negate the legitimacy of a probable cause determination, an officer's reasonable but mistaken understanding of the applicable law he is enforcing does."  573 F.3d at

1059.  Despite the erroneous instruction, the Tenth Circuit found no prejudice, because the only evidence as to any mistake in the case was the officer's misidentification of the plaintiffs -- a mistake of fact -- and "the plaintiffs [did] not identif[y] any misinterpretation of law that could have been pertinent to the officers' actions."  573 F.3d at 1060.

The Tenth Circuit similarly declined to reverse the district court's judgment despite a legally erroneous jury instruction in Gonzales v. Lopez, 590 F.3d 855 (10th Cir. 2009).  In that case, the Tenth Circuit found the district court's instructions on qualified immunity were incorrect, but deemed the error harmless, because the special interrogatories to the jury revealed that the jury intended to find for the defendants on the merits of the case, without the need to consider the affirmative defense of qualified immunity.  See 590 F.3d at 862.

## ANALYSIS

The Defendants move for summary judgment on all of Ysasi's claims, except for the claim for excessive force.[28]  Ysasi agrees that the statute of limitations bars his state law claims;

---

[28] The Defendants objected to several of Ysasi's proposed jury instructions related to the excessive force claim, including Instruction No. 13 "as being an inaccurate description of the law and the evidence," to Instruction No. 14 "as it is cumulative to the excessive force instruction that is agreed upon by the parties," and to Instruction No. 16 "as being an inaccurate description of the law and the evidence."  Objections at 2.  The Court modified the excessive force instructions based on the Fifth Circuit Pattern Jury Instructions.  See Fifth Circuit Pattern Jury Instructions (Civil Cases)  10.1, at 122-127 (2009)(42 USC Section 1983 (Unlawful Arrest -- Unlawful Search -- Excessive Force) Qualified Immunity -- Good Faith Defense); Fifth Circuit Pattern Jury Instruction (Civil Cases) 10.2, at 128-131 (2009)(Alternative -- Excessive Force Section 1983 Jury Charge).  The Court is always reluctant to just toss a lot of legal principles at the jury, even if they are correct, because they begin to put the Court's thumb on the scale and suggest its preference for one party.  Rather, it prefers to give the jury the tools it needs to decide the issues and leave the rest to closing arguments.

The Court concludes that these instructions give the jury the tools they need to decide the excessive force claim in a straightforward, easy to understand manner.  The parties did not object to the Court's modifications.  Because the Defendants also relied on the Fifth Circuit Pattern Jury Instructions, the Court will sustain the Objections to the extent they are consistent with the Fifth Circuit Pattern Jury Instructions.

the Court will thus dismiss all of the state law claims.  The remaining claims, from Ysasi's perspective, include a Fourth Amendment unlawful entry claim, a Fourth and Fifth Amendment unlawful arrest claim, a Fourth Amendment excessive force claim, and an Eighth Amendment claim against the LCDC for detaining him for four days without an arraignment and bail.  The Court will grant the MSJ in part and deny it in part.  The Court will not grant the MSJ on the unlawful entry claim, but will grant the MSJ on the unlawful arrest claim and the claim against the LCDC.

I.     **THE COURT WILL NOT GRANT THE MSJ ON THE UNLAWFUL ENTRY CLAIM, BECAUSE THE KNOCK-AND-TALK INVESTIGATIVE STRATEGY DID NOT JUSTIFY THE OFFICERS' PRESENCE ON YSASI'S PROPERTY, BECAUSE IT IS DISPUTED WHETHER YSASI GAVE THE OFFICERS CONSENT TO ENTER AND REMAIN ON HIS PROPERTY.**

Ysasi asserts that the Defendants violated his Fourth Amendment rights when they unlawfully entered his property, without probable cause and without his consent; the Defendants contend that they did not need probable cause to enter his property to investigate a potential domestic violence situation.  In support of their position, the Defendants rely primarily on United States v. Jones and United States v. Tobin; the Defendants acknowledge that there is a factual dispute whether Ysasi gave his consent to be on his property.  Because the Court must construe the disputed facts in favor of the nonmoving party, the Court finds that Ysasi told the officers that he did not consent to them entering and remaining on his property.  Under these circumstances, the Court finds that the knock-and-talk strategy does not justify the officers' presence on Ysasi's property and denies the MSJ on the unlawful entry claim.

The first issue is whether the area inside Ysasi's fence is within the curtilage of his home and, thus, subject to the same protections as his house.  If the area is not within the curtilage of

Ysasi's home, then the officers could enter without the property without a warrant.  See United States v. Jones, 132 S. Ct. at 953 ("Quite simply, an open field, unlike the curtilage of a home, is not one of those protected areas enumerated in the Fourth Amendment.  The Government's physical intrusion on such an area . . . is of no Fourth Amendment significance." (internal citations and footnote omitted)); Rieck v. Jensen, 651 F.3d 1188, 1189 (10th Cir. 2011)("The area of Rieck's property that Jensen entered was not within the curtilage of Rieck's home, and Jensen therefore could enter without violating Rieck's constitutional rights.").  United States v. Dunn sets out four factors to determine whether property is within the curtilage of a person's home:

> the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

480 U.S.at 301.  The parties did not provide much information regarding these factors, but the evidence shows that: (i) there was a six-foot high chain-linked fence that surrounded the property, see Preliminary Hearing Transcript at 16:22-24 (Reese, Brown); (ii) the chain link fence was approximately one hundred yards away from the mobile home, see id. at 16:18-21 (Reese, Brown); id. at 60:7-13 (Reese, Rider); (iii) the gates on the fence were locked and there were no open entrances, see id. at 18:10-11 (Reese, Brown); id. at 57:16-24 (Reese, Rider); (iv) the driveway on the property had a double swing gate, and the gate was chained shut, see id. at 54:1-11 (Reese, Rider); and (v) the dumpster was located outside the fence, see id. at 16:22-24 (Reese, Brown); Brown Aff. ¶ 5, at 2; Thompson Aff. ¶ 10, at 2.  After the Officers entered Ysasi's property by climbing over the fence, they approached Ysasi when he was standing on the porch, which was a simple, wooden plank on a wrought iron frame with two or three wooden

steps and some hand rails.  See Preliminary Hearing Transcript at 18:12-19:12 (Reese, Brown).
The Court is not aware how Ysasi used the area inside the fence and whether he took steps to
shield the area from people passing by.  Although the Court has limited information, the Court
concludes that the area inside the fence was part of the curtilage of Ysasi's home, particularly
because the fence completely enclosed the home, the gate was locked, and the dumpster was
outside the fence, indicating that the property inside the fence was not open to members of the
public.  One factor that gives the Court a little concern is that the fence was about one hundred
yards away from the mobile home, but even if the area immediately by the fence was not
curtilage, Brown and Rider entered onto the curtilage of Ysasi's home by the time they arrived at
his porch, which was attached to the mobile home.  The porch's close proximity to the home is a
factor leading the Court to conclude that it was part of the curtilage.  The Court concludes that
Brown and Rider entered the curtilage of Ysasi's house.

     The next issue is whether the Officers were justified in entering the curtilage without a
warrant and without probable cause.  The Defendants conceded at the Hearing that the Officers
lacked probable cause to enter the property.  See Tr. at 38:17-39:15 (Court, Childress).  The
cases on which the Defendants primarily rely -- United States v. Jones and United States v.
Tobin -- discuss the knock-and-talk investigative strategy.  In United States v. Jones, the Fifth
Circuit reviewed a trial court's denial of the criminal defendant Raymond Lee Jones' motion to
suppress evidence.  See 239 F.3d at 718.  Police officers arrived at an apartment house to
investigate complaints of illegal drug sales; the lead officer in the investigation did not believe he
had probable cause to obtain a search warrant, but "decided to knock on the apartment's door in
order to identify the occupants and further investigate the complaints."  239 F.3d at 718-19.  The
door to the apartment was open, but the screen door was shut, and as the officer approached the

door, knocked, and announced his presence, he saw a handgun on a table, Jones standing near the table, and another man sitting on a nearby couch.  See 239 F.3d at 719.  "During the seconds that followed," Jones unlocked the screen door and began talking to the officer; the officer entered the apartment, secured the handgun, and asked Jones if he had been convicted of a felony; Jones answered that he had, and the officer placed Jones under arrest before searching the apartment. 239 F.3d at 719.  The Fifth Circuit stated that "[a] warrantless intrusion into an individual's home is presumptively unreasonable unless the person consents or probable cause and exigent circumstances justify the encroachment," but said that the "exigencies supporting a warrantless search may not . . . consist of the likely consequences of the government's own actions or inaction."  239 F.3d at 719 (internal quotation marks omitted).  Jones argued that the officer created the exigent circumstances by approaching the apartment; the Fifth Circuit, in analyzing the reasonableness of the officers' investigative tactics, explained that the "knock and talk" strategy is a "reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity."  239 F.3d at 720 (citing United States v. Tobin, 923 F.2d at 1511 ("Reasonable suspicion cannot justify the warrantless search of a house, but it can justify the agents' approaching the house to question the occupants."); United States v. Hardeman, 36 F. Supp. 2d 770, 777 (E.D. Mich. 1999)(discussing the "knock and talk" procedure to obtain a suspect's consent to search)).  The Fifth Circuit concluded that the "knock and talk" procedure was a reasonable investigative tactic, because the officers "were not convinced that criminal activity was taking place and did not have any reason to believe that the occupants were armed."  239 F.3d at 721.  "Because the occupants of Apartment No. 3 created the safety risk to the officers by leaving the door open to the apartment and placing a handgun in

plain view of anyone who appeared at the door, we do not think the officer's reasonable investigation created the exigency."  239 F.3d at 722.

In United States v. Tobin, United States Customs agents and Drug Enforcement Administration agents were conducting surveillance in a residential neighborhood when one of the agents noticed a car drive up to defendant Clifford Ackerson's house and stop abruptly; defendant Ronald Tobin got out of the car, looked around, ran up to the front door, knocked, and went inside.  See 923 F.2d at 1508.  Ackerson then lifted the garage door three-quarters of the way up, and looked up and down the street as he held the door; Tobin unlocked the trunk of the car, removed three clear plastic tubular bags containing smaller bundles, and put the bags inside the garage.  See 923 F.2d at 1508.  The agents believed the bags contained cocaine, and decided to go to the door and talk to the occupants of the house.  See 923 F.2d at 1508.  One agent knocked for three to four minutes, calling out in English and Spanish, before Ackerson opened the door; the agent smelled marijuana coming from inside the house while Ackerson and the agent spoke.  See 923 F.2d at 1508.  Ackerson denied that anyone had recently driven into his driveway and denied that anyone else was in the home; eventually, the agent called Tobin to the door, and Tobin denied having driven the car to the house, even after the agent explained what he had observed.  See 923 F.2d at 1508.  After Ackerson suggested that they all go to the garage to see what was there, Ackerson walked inside the house toward the garage, and the agent followed; in the garage, the agent saw that the bags contained cocaine, arrested Ackerson and Tobin, and discovered marijuana inside the house during a protective sweep.  See 923 F.2d at 1508.  The defendants moved to suppress the evidence from the agents' search, and the district court denied the motion to suppress.  See 923 F.2d at 1509.  On appeal, the Eleventh Circuit noted that "[t]he warrantless search of a home is presumptively unreasonable," but that "a

warrantless search is allowed . . . where both probable cause and exigent circumstances exist." 923 F.2d at 1510.  The Eleventh Circuit concluded that the agents had probable cause to believe that they would find cocaine in the garage, and that exigent circumstances existed, because the defendants' conduct indicated that the defendants either knew or were afraid that someone was watching them, posing a threat that the narcotics would be destroyed or removed.  See 923 F.2d at 1511.  The Eleventh Circuit noted, however, that even if the agents' observations "did not give rise to the necessary level of probable cause and exigent circumstances, the warrantless search should still be deemed justifiable."  923 F.2d at 1511.

> Reasonable suspicion cannot justify the warrantless search of a house, see Arizona v. Hicks, 480 U.S. 321, 328 . . . (1987), but it can justify the agents' approaching the house to question the occupants.  Knight, 451 F.2d at 278; Davis v. United States, 327 F.2d 301, 303 (9th Cir. 1964)(stating "[a]bsent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof -- whether the questioner be a pollster, a salesman, or an officer of the law.")[, overruled on other grounds by United States v. Perea-Rey, 680 F.3d 1179 (9th Cir. 2012)].

923 F.2d at 1511.  The Eleventh Circuit, noting that probable cause existed once the agent could smell the marijuana, determined that Ackerson opened the door voluntarily, because when the agent knocked on the door and called to the occupants, "he phrased his words in the form of a request," and the "occupants were free to deny that request or alternatively talk to the agent through the closed door.  The decision to open the door was therefore voluntary."  923 F.2d at 1512.

Although the Defendants cite United States v. Jones and United States v. Tobin to support their argument that an officer may enter a person's property to conduct a "knock and talk," the Court does not agree that this investigative tactic justifies Brown's and Rider's entry

onto Ysasi's property.   Unlike United States v. Jones and United States v. Tobin, where the officers approached the suspects' doors to determine if the suspect would give consent to talk with the officers or consent to a search, viewing the facts in the light most favorable to Ysasi, Ysasi told Brown and Rider that he did not consent to them being on his property.   The Court believes that the Ninth Circuit's decision in United States v. Perea-Rey, 680 F.3d 1179 (9th Cir. 2012), is instructive in this case in analyzing the use of the knock-and-talk investigative strategy; the case also helps to understand an unlawful entry claim under the Supreme Court's recent re-affirmation of traditional trespass-based Fourth Amendment analysis.

In United States v. Perea-Rey, Border Patrol agents watched a man climb over the Mexico-United States border fence, followed him to the defendant's home, watched him walk through the gated entrance and knock on the defendant's front door, and followed him through the front yard, around the side of the house, and into the carport.   See 280 F.3d at 1182.   Once in the carport, the defendant refused to allow the agent enter his house, and after other agents arrived, the agents pointed their guns at the house and ordered everyone outside.   See 280 F.3d at 1182.   Four aliens exited the house, and police found an additional three in the house.   See 280 F.3d at 1182-83.   The defendant was charged with harboring undocumented aliens and moved to suppress the evidence of the undocumented aliens at his house.   See 280 F.3d at 1183.   The district court determined that the carport was within the curtilage of the defendant's home, but that the defendant did not have a reasonable expectation of privacy in the carport, because it could be seen from the sidewalk.   See 280 F.3d at 1183.   The district court thus held that the agent did not violate the defendant's "Fourth Amendment rights by entering the carport, knocking on the side door and ordering people in the house to come out."  280 F.3d at 1183.   The district court denied the motion to suppress for the four aliens who initially emerged from the

house in response to the agent's command, but granted the motion regarding the aliens that the

agents found after entering the defendant's home.  See 280 F.3d at 1183.  The Ninth Circuit

noted:

> Where the government "physically occupie[s] private property for the purpose of
> obtaining information," that is a "'search' within the meaning of the Fourth
> Amendment."   United States v. Jones, . . . 132 S. Ct. 945, 949 . . . (2012).
> "[S]earches and seizures inside a home without a warrant are presumptively
> unreasonable." Payton v. New York, 445 U.S. 573, 586 . . . (1980).  Because the
> curtilage is part of the home, searches and seizures in the curtilage without a
> warrant are also presumptively unreasonable.  See Oliver v. United States, 466
> U.S. 170, 180 . . . (1984).

680 F.3d at 1184 (footnote omitted).  The Ninth Circuit concluded that the carport was part of

the curtilage of the defendant's home, because it satisfied each of the factors in United States v.

Dunn -- the proximity to the home, it was included within an enclosure surrounding the home, it

was used to store personal items, and the defendant took steps to protect the area from

observation by people passing by.  See 680 F.3d at 1184-85.  "The carport is an area so closely

connected to his home that it falls under the same umbrella of the Fourth Amendment's

protections as his home."  680 F.3d at 1185 (internal quotation marks and alterations omitted).

Next, the Ninth Circuit stated that "[w]arrantless trespasses by the government into the

home or its curtilage are Fourth Amendment searches."  680 F.3d at 1185.  The Ninth Circuit

noted the confusion regarding the traditional pre-Katz v. United States interpretation of the

Fourth Amendment, which was tied to common-law trespass, and the post-Katz v. United States

reasonable expectation of privacy test, and cited the Supreme Court's explanation that "'the Katz

reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law

trespassory test.'"  680 F.3d at 1185-86 (emphasis omitted).  The Ninth Circuit held that, because

the agents entered a constitutionally protected area -- the carport, which was part of the curtilage

of the defendant's home -- "[n]o further showing was required" to determine that the warrantless

entry, search and seizure violated the defendant's Fourth Amendment rights.  680 F.3d at 1186.

In reviewing the district court's determination that the agent's entry into the carport did

not violate the defendant's Fourth Amendment rights, the Ninth Circuit said that the district court

"conflated the ability to observe inside the curtilage with the right to enter the curtilage without a

warrant."  680 F.3d at 1186.  "The ability to observe part of the curtilage or the interior of a

home does not authorize law enforcement, without a warrant, to then enter those areas to conduct

searches or seizures."  680 F.3d at 1186.  Although the officers could see the carport from the

sidewalk, the Ninth Circuit held that they could not enter the carport, absent an exception to the

warrant requirement.  See 680 F.3d at 1186.  Turning to the "'two general exceptions to the

warrant requirement for home searches: exigency and emergency,'" the Ninth Circuit determined

that the district court did not clearly err when it found that there were no exigent circumstances

justifying the search.  680 F.3d at 1187 (quoting United States v. Martinez, 406 F.3d 1160, 1164

(9th Cir. 2005)).   The government "invoke[d] the so-called 'knock and talk' exception to the

warrant requirement to justify" the agent's entry into the curtilage.  680 F.3d at 1187.  The Ninth

Circuit explained the origins of the knock-and-talk rule, stating that law enforcement officers

may enter the curtilage of a home to contact the occupants, but that "[t]he constitutionality of

such entries into the curtilage hinges on whether the officer's actions are consistent with an

attempt to initiate consensual contact with the occupants of the home."  680 F.3d at 1187-88.

> An officer [initiating] a 'knock and talk' visit may approach any part of the
> building . . . where uninvited visitors could be expected."   United States v.
> Titemore, 335 F. Supp. 2d 502, 505-06 (D. Vt. 2004), aff'd, 437 F.3d 251 (2d Cir.
> 2006).   However, once an attempt to initiate a consensual encounter with the
> occupants of a home fails, "the officers should end the knock and talk and change
> their strategy by retreating cautiously, seeking a search warrant, or conducting
> further surveillance."   United States v. Troop, 514 F.3d 405, 410 (5th Cir. 2008)

> (holding that border patrol agents violated the Fourth Amendment when they conducted a warrantless search of the curtilage after there was no response to a knock and talk attempt)(internal quotation omitted).

680 F.3d at 1188.  The Ninth Circuit then analyzed the circumstances in which the agent entered the carport, concluding that the agent did not engage in a consensual knock and talk, and that the defendant "never had an opportunity to simply ignore a knock on the door to his home by police."  680 F.3d at 1188.  The Ninth Circuit concluded:

> At most, the knock and talk exception authorizes officers to enter the curtilage to initiate a consensual conversation with the residents of the home.  If we were to construe the knock and talk exception to allow officers to meander around the curtilage and engage in warrantless detentions and seizures of residents, the exception would swallow the rule that the curtilage is the home for Fourth Amendment purposes.  We hold that the warrantless incursion into the curtilage of Perea-Rey's home by border patrol agents and the resulting searches and seizures violated Perea-Rey's Fourth Amendment rights.

680 F.3d at 1189.

First, United States v. Perea-Rey is instructive and persuasive in understanding Ysasi's claim against Brown and Rider for unlawfully entering his property.  As the Ninth Circuit said, quoting United States v. Jones, "[w]here the government 'physically occupies private property for the purpose of obtaining information," that is a "'search' within the meaning of the Fourth Amendment."  680 F.3d at 1184 (alteration omitted)(quoting United States v. Jones, 132 S. Ct. at 949).  Because the curtilage is part of a person's home, it receives the same protections as the home.  See 680 F.3d at 1184.  In this case, Brown and Rider entered the curtilage surrounding Ysasi's home -- when they climbed over the fence, and more clearly when they came up to Ysasi when he was standing on his porch -- for the purpose of obtaining information --to get Ysasi's side of the story -- for what looked like, at least to them, a potential domestic violence incident.  Their entrance onto the property and intent to obtain information was a search under the Fourth

- 97 -

Amendment.  Brown and Rider did not have a search warrant, and they conceded that they did not have probable cause.  They rely on the knock-and-talk investigative strategy, arguing that they could enter Ysasi's property and walk up to his home to engage in the knock-and-talk strategy, but, as the Ninth Circuit discussed in United States v. Perea-Rey, whether the knock-and-talk strategy is permissible "hinges on whether the officer's actions are consistent with an attempt to initiate consensual contact with the occupants of the home."  680 F.3d at 1188.  Like the defendant in United States v. Perea-Rey, Ysasi "never had an opportunity to simply ignore a knock on the door to his home by police."  680 F.3d at 1188.  Ysasi, even if he initially told Brown and Rider that they could come onto his property, later told Brown and Rider to get off his property, and at that point, Brown's and Rider's attempted knock-and-talk strategy was no longer consistent with attempting to initiate consensual contact with Ysasi.  "[O]nce an attempt to initiate a consensual encounter with the occupants of a home fails, the officers should end the knock and talk and change their strategy by retreating cautiously, seeking a search warrant, or conducting further surveillance."  United States v. Perea-Rey, 680 F.3d at 1188 (internal quotation marks omitted).

Tenth Circuit precedent also supports the Court's conclusion that the knock-and-talk strategy was not appropriate after Ysasi told the Officers they could not be on his property.  The Tenth Circuit has explained that reasonable suspicion is unnecessary for a knock-and-talk investigation, because, "[a]s commonly understood, a 'knock and talk' is a consensual encounter and therefore does not contravene the Fourth Amendment, even absent reasonable suspicion."  United States v. Cruz-Mendez, 467 F.3d at 1264.  The Tenth Circuit has noted that officers may approach a home and knock "precisely because that is 'no more than any private citizen might

do.'"  United States v. Shuck, 713 F.3d at 568 (quoting Florida v. Jardines, 133 S. Ct. at 1416)).

But when, as here, consent is lacking, the knock-and-talk strategy is not appropriate.[29]

      Although there is some dispute whether Ysasi gave Brown and Rider his permission to

come onto the property, the facts, when viewed in the light most favorable to Ysasi, show that,

even if he did at one point invite Brown and Rider onto his property, he later told Brown and

Rider to get off his property.  The Defendants contend that, once Ysasi gave his consent, he

could not revoke it.  Manzanares v. Higdon, which Ysasi cited to the Court, addresses this issue

and states that consent can be revoked.  In Manzanares v. Higdon, two officers arrived at the

plaintiff's home, and the plaintiff Danny Manzanares invited officers Sean Higdon and David

Saladin inside, answered several questions, and then "decided to end the interview and asked the

---

[29] Ysasi's proposed Jury Instruction No. 7 states that one of Ysasi's claims against Rider and Brown is for unlawfully entering his property "without probable cause, and without a warrant . . . ."  Instruction No. 7, at 7.  Ysasi's Instruction No. 10 repeats this standard.  The Defendants object to Ysasi's Jury Instruction No. 7 and Instruction No. 10, because they argue that probable cause is not the proper standard for the unlawful entry claim.  See Objections at 1-2.  The Defendants argue that reasonable suspicion of criminal activity can justify an officer's approach to a house to question the occupants.  The Court overrules this objection to the extent that the Defendants are arguing that reasonable suspicion can support entry onto Ysasi's property; although the Defendants argue that the knock-and-talk investigative tool permits an officer to enter property without probable cause, the Court concludes that the knock and talk strategy may be used only to the extent it is consistent with attempting to gain the occupants' consent, and thus, the knock-and-talk strategy on which the Defendants rely is part of the question whether Ysasi consented to Brown's and Rider's entry onto his property.  The Court will, however, sustain the objection to the extent that the Defendants are arguing that there are other circumstances that may justify Brown's and Rider's entry onto the property, such as consent or exigent circumstances.  The Court will modify the instruction to explain that one of Ysasi's claims against Brown and Rider is the violation of "[t]he right not to have police officers enter his land without a warrant, his consent, probable cause that he committed a crime, or probable cause that he was destroying evidence of a crime, or exigent circumstances."  Court's Final Jury Instructions (with citations) at 14, filed February 19, 2014 (Doc. 85)("Final Jury Instructions").

     The Defendants also object to Instruction No. 10, because they "disagree that the jury should be instructed that the Plaintiff was 'peaceable.'"  Objections at 2.  The Court sustains this objection and will remove the reference to whether Ysasi was "peaceable" on his property.  The issue for the jury is probable cause, not whether Ysasi was "peaceable."

officers to leave his home," but the officers refused.  575 F.3d at 1140.  After Manzanares

became agitated, the officers put him in handcuffs.  See 575 F.3d at 1140.  Manzanares brought

§ 1983 claims against the officers, claiming that the officer "violated the Fourth Amendment by

refusing to exit the Manzanares home."  575 F.3d at 1142.  In analyzing consent as an exception

to the warrant requirement, the Tenth Circuit explained that "[s]uch encounters are limited by the

scope of consent given."  575 F.3d at 1143.  The Tenth Circuit said that "[t]here is no question

that Higdon's original entry into the Manzanares home was consensual.  Nor can there be a

legitimate dispute that consent was later withdrawn.  Manzanares unequivocally asked Higdon

and Saladin to leave."  575 F.3d at 1143.  The Tenth Circuit cited a number of cases supporting

the principle that, once a person revokes the consent that permitted officers to enter the home or

conduct a search, the officers should promptly leave, unless the officers have independent legal

authority to remain.  See 575 F.3d at 1143 (citing Gates v. Texas Dept. of Protective and

Regulatory Services, 537 F.3d 404, 426 (5th Cir. 2008)("[C]onsent which waives Fourth

Amendment rights may be limited, qualified, or withdrawn." (quotation omitted)); Painter v.

Robertson, 185 F.3d 557, 567 (6th Cir. 1999)("Th[e] search should have terminated instantly

upon Painter's revocation of consent, and the officers should have promptly departed the

premises (assuming they possessed no independent legal authority to remain).").  Based on the

Tenth Circuit's decision in Manzanares v. Higdon, the Court concludes that Ysasi could

withdraw his consent, and that, once he withdrew that consent, Brown and Rider needed an

independent legal basis for remaining on Ysasi's property.[30]  The Defendants have not relied on

---

[30] The Court included in the jury instructions an explanation of consent based on Manzanares v. Higdon: "Consent which waives a Fourth Amendment right may be limited, qualified, or withdrawn.  If consent is withdrawn, some other independent legal authority to remain -- such as a warrant, probable cause, or exigent circumstances -- must exist."  Final Jury

any other legal basis that entitles them to summary judgment on the unlawful entry claim, such as exigent circumstances, and the Court does not see any other basis that would justify the Officers' continued presence on Ysasi's property after he withdrew his consent. The Court will deny the MSJ on the unlawful entry claim.[31]

## II.   THE COURT WILL GRANT THE MSJ IN PART AND DISMISS THE UNLAWFUL ARREST CLAIM, BECAUSE TENTH CIRCUIT PRECEDENT INDICATES THAT ISSUE PRECLUSION BARS RE-LITIGATION OF PROBABLE CAUSE.

Ysasi asserts that the Defendants unlawfully seized and arrested him, in violation of the Fourth and Fifth Amendments. The Defendants contend that only the Fourth Amendment governs the unlawful arrest claim; the Court agrees that the Fifth Amendment is inapplicable in this context. See Taylor v. Meacham, 82 F.3d 1556, 1560 (10th Cir. 1996)(stating that, when the plaintiff alleged that his wrongful arrest and detention "constituted an unreasonable seizure and

_____

Instructions at 15.

[31] In the Answer to Complaint for Damages for Violation of Civil Rights and Jury Demand, filed April 22, 2013 (Doc. 4)("Answer"), the Defendants asserted that they "are entitled to qualified immunity from the claims asserted in the Complaint." Answer ¶ 7, at 7. The Defendants did not raise the qualified immunity defense -- or, specifically, the clearly established prong of qualified immunity -- in the MSJ briefing or at the hearing. Further, the Defendants did not mention qualified immunity -- of, specifically, the clearly established prong of qualified immunity -- in the Pretrial Order, filed February 18, 2014 (Doc. 78). The Pretrial Order states that it "will control the course of trial and may only be amended *sua sponte* by the Court or by consent of the parties and Court approval. The pleadings will be deemed merged herein." Pretrial Order at 23. Thus, the Defendants have effectively abandoned the qualified immunity defense or, specifically, the clearly established prong of qualified immunity. Further, they did not raise the defense or the clearly established prong of qualified immunity when they moved the Court for a directed verdict. See Transcript of Trial at 133:2-14 (Childress), taken February 19, 2014 (Trial Tr."). "The Defendants' failure to make a pre-verdict motion for judgment as a matter of law under Rule 50(a) on the grounds of qualified immunity precluded them from making a post-verdict motion under Rule 50(b) on that ground." Sykes v. Anderson, 625 F.3d 294, 304 (6th Cir. 2010). The Court concludes that the Defendants waived the qualified immunity defense, which, as far as the Court can see, they raised only in the Answer and never again, and never specifically raised or argued the clearly established prong. Thus, the Court should not decide the issue or raise it sua sponte, when the Defendants have not raised the issue.

deprivation of his liberty, in violation of the Fourth, Fifth and Fourteenth Amendments," the Tenth Circuit would address the claim "only in a Fourth Amendment context").  The Court will thus address the alleged unlawful arrest only under the Fourth Amendment.[32]

The Defendants argue that the magistrate judge's determination of probable cause at the preliminary hearing precludes Ysasi from re-litigating probable cause in this case.  The Court must give preclusive effect to a state court judgment to the same extent a court in that state would.  See Hubbert v. City of Moore, 923 F.2d at 772-73.  In Hubbert v. City of Moore, an Oklahoma court determined at a preliminary hearing, at which five people testified and were cross-examined, that there was probable cause for Hubbert's arrest and bound Hubbert over for trial.  See 923 F.2d at 771.  At trial, Hubbert was acquitted.  See 923 F.2d at 771.  Hubbert filed a civil action under § 1983, alleging that she was arrested without probable cause.  See 923 F.2d at 771.  The defendants filed for summary judgment, but the trial court concluded that a material issue of fact existed regarding whether the officers had probable cause to arrest Hubbert.  See 923 F.2d at 771.  The defendants argued that Hubbert was collaterally estopped from arguing that the officers arrested Hubbert without probable cause, because the question had already been

---

[32] The Defendants object to Ysasi's Instruction No. 7, because "[t]here is no basis for any 5th or 8th Amendment claim.  As to the conduct of the deputies, claims of unlawful arrest and/or excessive force are properly analyzed under the Fourth Amendment only."  Objections at 1.  The Defendants object to Instruction No. 9, because "there is no basis for any 5th Amendment or 8th Amendment claim and the Fourth Amendment language duplicates Instruction No. 10." Objections at 2.  The Defendants object to Instruction No. 17, because "there is no basis for any 5th or 8th Amendment claims."  Objections at 2.  The Court agrees that Ysasi's claim for unlawful arrest and excessive force implicate the Fourth Amendment only, and not the Fifth or Eighth Amendments.  See Graham v. Connor, 490 U.S. 386, 395 (1989)(analyzing excessive force during arrest under the Fourth Amendment).  Further, the Court is dismissing the unlawful arrest claim altogether.  The Court thus sustains the Defendants' Objections on these points and will not include in the jury instructions the unlawful arrest claim, or any reference to the Fifth or Eighth Amendments for the excessive force claim.

decided at her preliminary hearing.  See 923 F.2d at 771.  The Tenth Circuit reviewed de novo "the legal question whether collateral estoppel bars relitigation of the issue of probable cause in a subsequent civil action."  923 F.2d at 772.  The Tenth Circuit, citing Allen v. McCurry, 449 U.S. 90, 96 (1980), stated that "a federal court considering a section 1983 action must give preclusive effect to a state court judgment to the same extent a court in that state would."  923 F.2d at 772. The Tenth Circuit turned to Oklahoma law to determine "whether a probable cause finding in a criminal proceeding resulting in an acquittal collaterally estops consideration of that issue in a civil case," concluding that the determination at a preliminary hearing of probable cause precludes subsequent litigation of that issue in a civil rights action when the plaintiff had a "full and fair opportunity to litigate that issue," even if the criminal case did not culminate in a conviction.  923 F.2d at 773.

In Angel v. Torrance County Sheriff's Department, No. CIV 04-195 BB/WPL, slip op. (D.N.M. Aug. 23, 2005)(Black, J.), plaintiff Michael Angel was arrested in Torrance County, New Mexico, and after the Magistrate Court held a preliminary hearing and bound him over for trial, the district attorney filed a *nolle prosequi* and dismissed the charges.  See No. CIV 04-195 BB/WPL, slip op. at 3.  Angel filed a § 1983 claim for unlawful arrest and imprisonment, and arrest without probable cause, see at 3, and the defendants moved for summary judgment, see No. CIV 04-195 BB/WPL, slip op. at 1.  The Honorable Bruce Black, United States District Judge for the District of New Mexico, stated that, under federal law, "collateral estoppel bars the relitigation in a § 1983 civil action of any issue previously determined in a state-court criminal case, as long as the plaintiff had a 'full and fair opportunity' to litigate the issue in the state-court proceeding."  No. CIV 04-195 BB/WPL, slip op. at 6 (citing Allen v. McCurry, 449 U.S. 90; Allen v. Cunningham, 51 F.3d 285 (10th Cir. 1995)).  Judge Black noted that the Tenth Circuit

"applied this rule to virtually identical facts," citing <u>Hubbert v. City of Moore</u>.  He said that the "undisputed evidence" showed that the Magistrate Court held an evidentiary hearing, that six people testified under oath at the hearing, that Angel was able to cross-examine the witnesses and introduce exhibits, and that the New Mexico Magistrate Court found probable cause that Angel had committed the crime.   No. CIV 04-195 BB/WPL, slip op. at 6.   Judge Black concluded that Angel "clearly had a 'full and fair opportunity' to litigate the issue of probable cause" at the preliminary hearing, because the Magistrate Court held an evidentiary hearing at which several people testified, and Angel was able to cross-examine the witnesses and introduce exhibits.  No. CIV 04-195 BB/WPL, slip op. at 6.  Judge Black granted the defendants' motion for summary judgment, stating that "both Tenth Circuit and New Mexico precedent support the issuance of a summary judgment based on issue preclusion."  No. CIV 04-195 BB/WPL, slip op. at 7 (citing <u>Franklin v. Thompson</u>, 981 F.2d 1168 (10th Cir. 1992); <u>Oldfield v. Benavidez</u>, 1994-NMSC-006, 116 N.M. 785, 867 P.2d 1167).  Although Angel challenged several statements that the Magistrate Judge made at the evidentiary hearing as inconsistent with the Magistrate Judge's finding of probable cause, Judge Black said that "it is well established in New Mexico that oral statements by a judge cannot impeach a subsequent written judgment and may not serve as a basis for error," and, thus, "any oral statements attributed to Magistrate Jones do not diminish the preclusive effect of his order finding probable cause."  No. CIV 04-195 BB/WPL, slip op. at 7.

Angel appealed pro se, and the Tenth Circuit reviewed Judge Black's decision to grant summary judgment de novo.  See <u>Angel v. Torrance Cnty.</u>, 183 F. App'x 707, 709 (10th Cir. 2006)(unpublished).  In describing Judge Black's ruling, the Tenth Circuit said that

> the district court carefully analyzed Mr. Angel's § 1983 claims.   The court determined that (1) collateral estoppel barred the re-litigation of his arrest claim, see <u>Hubbert v. City of Moore</u>, 923 F.2d 769, 772-73 (10th Cir. 1991)(holding

that, where a criminal defendant had full and fair opportunity to litigate the issue, probable cause finding in pretrial criminal proceedings is binding in later civil rights action) . . . .

183 F. App'x at 708.  Angel's argument on appeal primarily attacked "the factual basis of [the] state court's probable cause determination"; he asserted that "the federal district court should have been able to put collateral estoppel aside."  183 F. App'x at 709 (internal alteration and quotation marks omitted).  The Tenth Circuit affirmed Judge Black without much discussion:

> After carefully reviewing the parties' briefs, the district court's order, and the record on appeal, we conclude that Mr. Angel has failed to raise a genuine issue of material fact relevant to his § 1983 claims.  For substantially the same reasons set out in the district court's order of August 23, 2005, we AFFIRM.

183 F. App'x at 709.

The Court has some concerns regarding Judge Black's and the Tenth Circuit's opinion applying collateral estoppel to bar the re-litigation of probable cause in a subsequent civil action.  Hubbert v. City of Moore requires the Court to give preclusive effect to a New Mexico state court judgment to the same extent a New Mexico court would, but the Court is not convinced that Angel v. Torrance County Sheriff's Department reflects what a New Mexico court would do.  Judge Black asserted that his decision to apply collateral estoppel was in line with New Mexico law, and cited Oldfield v. Benavidez, but the Court does not agree with Judge Black that Oldfield v. Benavidez supports granting summary judgment based on issue preclusion.

In Oldfield v. Benavidez, two children were removed from their home for one week and then returned to their parents' custody; the children and parents sued the defendants – the Cibola County, New Mexico, sheriff, a social worker, and a supervisor in the New Mexico Human Services Department -- for violating the plaintiffs' right to familial integrity under the Fourth and Fourteenth Amendments.  See 1994-NMSC-006 ¶ 1.  The defendants challenged the district

- 105 -

court's denial of summary judgment, and the Supreme Court of New Mexico reversed and remanded the case.  At the custody hearing, the district court found probable cause to believe that the children would be subject to injury if not placed in the HSD's custody.  See 1994-NMSC-006 ¶ 7.  After the step-father went to counseling, HSD moved to dismiss the action, and the district court granted the motion.  See 1994-NMSC-006 ¶ 7.  In reviewing the defendants' qualified immunity defense, the Supreme Court of New Mexico reviewed the reasonableness of the defendants' "belief that a sufficient emergency existed to warrant taking [the children] into temporary custody."  1994-NMSC-006 ¶ 17.  The Supreme Court of New Mexico noted that the "ex parte custody order was ordered by a neutral judge," 1994-NMSC-006 ¶ 19, reviewed the circumstances and evidence that prompted the defendants to apply for the ex parte order, 1994-NMSC-006 ¶ 20, and analyzed the circumstances that gave the defendants probable cause to believe that the children were being abused or neglected, 1994-NMSC-006 ¶ 21.  The Supreme Court of New Mexico did not discuss collateral estoppel or issue preclusion in relation to the determination of probable cause or any other issue in the case, and did not otherwise state that the judge's determination of probable cause in the ex parte custody order conclusively established probable cause for the subsequent civil case.

The Court does not see how Oldfield v. Benavidez answers the question whether New Mexico courts would apply collateral estoppel in a subsequent civil case to a Magistrate Judge's determination of probable cause at a preliminary hearing.  On the other hand, there is at least some evidence that New Mexico courts might do what Judge Black did.  "At the preliminary hearing, the state is required to establish, to the satisfaction of the examining judge, two components: (1) that a crime has been committed; and (2) probable cause exists to believe that the person charged committed it."  State v. White, 2010-NMCA-043, 148 N.M. 214, 218, 232

P.3d 450, 454 (citing State v. Vallejos, 1979-NMCA-089, 93 N.M. 387, 388, 600 P.2d 839).  The Defendants point to State v. Orosco for the proposition that New Mexico courts would apply collateral estoppel to a Magistrate Judge's decisions.  See Reply at 8.  In State v. Orosco, the defendant was charged in Magistrate Court with resisting and obstructing an officer, and was charged in the district court with the felony of battery on a police officer; all the charges arose from the same event.  1982-NMCA-181 ¶ 2.  The Magistrate Judge found the defendant not guilty of the misdemeanor charges, and the defendant was bound over to the district court on the felony charge.  See 1982-NMCA-181 ¶ 3.  The Court of Appeals of New Mexico framed the question as "whether, after a magistrate's determination that defendant was not guilty because he was acting in defense of another, the State could constitutionally bring him before a new fact finder to relitigate that issue" and answered the question "no."  1982-NMCA-181 ¶ 5.  The Court of Appeals of New Mexico noted that the "relevant inquiry is what was the basis for the acquittal in the magistrate court," and determined that, because the "trial court found as a fact that defendant's acquittal was based on defendant's action in protecting his father, and that this identical defense would be used in the battery upon a police officer charge," the trial could should have applied collateral estoppel and dismissed the battery charges:

> Once the State sought a determination in magistrate court and was given an adverse ruling, it cannot seek a redetermination of the same fact anticipating a favorable ruling.  The relationship between the State and the magistrate system is not one between sovereigns.  See Robert E. McKee, Gen. Con., Inc. v. Bureau of Revenue, 80 N.M. 453, 457 P.2d 701 (1969).  "A county is but a political subdivision of the State, and it possesses only such powers as are expressly granted to it by the Legislature[.]"  El Dorado at Santa Fe, Inc. v. Board of Cty. Com'rs, 89 N.M. 313, 551 P.2d 1360 (1976).  The State is barred from a second bite of the apple.  It is prohibited from doing so because collateral estoppel is a part of the Fifth Amendment's guarantee against double jeopardy.  Ashe v. Swenson[, 397 U.S. 436, 453 (1970)].

State v. Orosco, 1982-NMCA-181 ¶ 11, 99 N.M. 180, 655 P.2d 1024.

The Court has previously noted, however, that New Mexico courts do not always give so much deference to a Magistrate Judge's decisions, and there may be good reasons not to.  In Mata v. Anderson, plaintiff Juan Mata brought a § 1983 retaliatory-prosecution claim against defendant Ron Anderson, a law enforcement officer who filed a criminal complaint against Mata after Mata criticized the Farmington, New Mexico, police officers.  See 760 F. Supp. 2d at 1076-77.  A Magistrate Court tried Mata for harassment, stalking, and criminal libel, and the magistrate jury convicted him on all three counts; Mata sought a de novo trial in the state district court, at which the district judge dismissed the criminal libel charge, and the jury declared Mata not guilty of the remaining charges.  See 760 F. Supp. 2d at 1077.  Anderson argued that the Magistrate Court's conviction, although reversed by the district court, conclusively established the existence of probable cause; he cited the Restatement (Second) of Torts to support this position, which states: "'The conviction of the accused by a magistrate or trial court, although reversed by an appellate tribunal, conclusively establishes the existence of probable cause, unless the conviction was obtained by fraud, perjury or other corrupt means.'"  760 F. Supp. 2d at 1106 (quoting Restatement (Second) of Torts § 667)).  The Court declined to apply the Restatement rule, relying in part on the Court of Appeals of New Mexico's reasoning in Miera v. Waltemeyer:

> "The Restatement Rule is apparently bottomed on the assumption that the magistrate has upon a full and fair trial proceeded to conviction predicated upon evidence that would convince a prudent and reasonable man of the guilt of the accused.   Therefore there must have been probable cause for the criminal proceeding.  But the difficulty with the rationale is that the assumption may not be true.  If the magistrate erred as a matter of law, should the plaintiff be deprived of his cause of action?  If that trial court had acted correctly there would have been an acquittal.  Then the plaintiff would have been able to maintain the malicious prosecution suit.  The inequity of a rule which in that situation bars the cause of action is obvious."

760 F. Supp. 2d at 1106 (quoting <u>Miera v. Waltemeyer</u>, 1982-NMCA-007, ¶ 15, 97 N.M. 588, 642 P.2d 191).  The Court noted that it saw "good reason to draw a distinction between New Mexico's district courts and its magistrate courts in certain areas . . . where lay people are allowed to serve as magistrates," 760 F. Supp. 2d at 1107, and noted that "[t]he fact that New Mexico provides a de novo trial in the event of a conviction in the magistrate court further supports the wisdom in finding that a conviction in a magistrate court is less than conclusive of the existence of probable cause,"  760 F. Supp. 2d at 1108.  The Court concluded that the Magistrate Court conviction did not provide conclusive evidence of probable cause.  <u>See</u> 760 F. Supp. 2d at 1108.

The Court is not convinced that New Mexico courts would apply collateral estoppel to a Magistrate Court's finding of probable cause at a preliminary hearing, but acknowledges that there are some conflicting statements that could be used to support either conclusion.  The Court of Appeals of New Mexico stated that "the magistrate's conviction raises a rebuttable presumption of probable cause," but refused to apply the <u>Restatement</u> rule that a Magistrate's conviction conclusively establishes probable cause in a malicious prosecution case.  <u>Miera v. Waltemeyer</u>, 1982-NMCA-007 ¶ 15.  The Supreme Court of New Mexico has stated that "a conviction, though reversed, is at least prima facie evidence of probable cause.  Unless there is some evidence to overcome the presumption, the judgment must stand." <u>Vincioni v. Phelps Dodge Corp.</u>, 1930-NMSC-041 ¶ 6, 35 N.M. 81, 290 P. 319.  If New Mexico courts view a Magistrate Judge's conviction as creating only a rebuttable presumption of the existence of probable cause, the Court doubts that New Mexico courts would give more deference to a Magistrate Judge's finding of probable cause at a preliminary hearing, but the Supreme Court of New Mexico has not been entirely clear on this point.  In <u>Weststar Mortgage Corp. v. Jackson</u>,

the plaintiff brought a malicious-abuse-of-process action, arguing that the defendant filed an action against him without probable cause.  The Supreme Court of New Mexico held that the trial court erred by submitting the question of probable cause to the jury:

> The warrant for Jackson's arrest was issued by a magistrate judge after an independent review of the charging document for probable cause.  Subsequently, after a preliminary hearing at which Jackson was represented by his current attorney, the presiding magistrate judge found probable cause to bind Jackson over for trial in district court.  "[T]he fact that a plaintiff has been bound over for trial on the criminal matter constitutes prima facie evidence of the existence of probable cause for the detention."  Roberts v. Goodner's Wholesale Foods, Inc., 50 P.3d 1149, 1152 (Okla.Civ.App.2002), cert. denied, Jul. 2, 2002; Christopher v. Circle K Convenience Stores, Inc., 937 P.2d 77, 79 (Okla. 1997)(stating that a finding of probable cause at a preliminary hearing binding over a defendant for criminal trial precluded a plaintiff in a subsequent civil suit for false arrest from relitigating the issue of probable cause).

Weststar Mortgage Corp. v. Jackson, 2003-NMSC-002, 133 N.M. 114, 123, 61 P.3d 823, 832.  On one hand, the Supreme Court of New Mexico quoted the Oklahoma court's statement that the bind over is prima facie evidence of probable cause, but on the other hand, it also cited a case that applied collateral estoppel to the finding of probable cause at a preliminary hearing.  Weststar Mortgage Corp. v. Jackson, 133 N.M. at 123, 61 P.3d at 832.

Two Restatement provisions also seem to speak to the issue before the Court: § 663[33] states that a Magistrate Judge's determination of probable cause is evidence, but not conclusive

---

[33] Section 663 states:

(1) In the absence of evidence of probable cause, a discharge of the accused by a magistrate upon a preliminary hearing in the criminal proceeding is conclusive of the lack of probable cause unless it appears that the discharge was

    (a) not upon the merits, or

    (b) based upon testimony offered by the accused at the hearing, or

    (c) due to the misconduct of the magistrate.

proof, of the existence of probable cause, and § 665[34] views a public prosecutor's abandonment of criminal proceedings as evidence that the private prosecutor acted without probable cause. The Restatement provisions indicate that a finding of probable cause at the preliminary hearing, and the prosecutor's dismissal of the action, are evidence for and against a finding of probable cause, respectively, but neither determines the issue conclusively.

The Court does not believe that New Mexico courts would apply collateral estoppel to the Magistrate Judge's determination of probable cause at the preliminary hearing, but rather, that New Mexico courts would view the Magistrate Judge's finding of probable cause as evidence of the existence of probable cause, and it would view the district attorney's subsequent *nolle prosequi* as evidence that there was not probable cause.  New Mexico's issue preclusion doctrine is not obligatory, and even when a party makes the prima facie showing, the "trial court must consider the countervailing equities including, but not limited to, prior incentive for vigorous defense, inconsistencies, procedural opportunities, and inconvenience of forum" before deciding whether to apply the doctrine.  Silva v. State, 1987-NMSC-107, ¶ 12, 106 N.M. 472, 745 P.2d

---

(2) The magistrate's commitment of the accused is evidence that the person initiating the proceedings had probable cause.

Restatement (Second) of Torts § 663.

[34] Section 665 states:

(1) The termination of the proceedings in favor of the accused at the instance of the private prosecutor who initiated them, or because of his failure to press the prosecution, is evidence of a lack of probable cause.

(2) The abandonment of criminal proceedings by a public prosecutor acting on his own initiative after the prosecution has passed into his control, is not evidence that the private prosecutor acted without probable cause.

Restatement (Second) of Torts § 665.

380.  The Court thinks that, especially in a situation such as this one -- where the charges were dismissed after the preliminary hearing, rendering Ysasi with no opportunity to challenge the finding of probable cause in the criminal case -- New Mexico courts would not preclude Ysasi from re-litigating probable cause in this case.  The Court thinks it is particularly inappropriate that the decision of a Magistrate Judge -- almost always a non-lawyer in New Mexico -- precludes federal court review; the non-lawyer usually takes the word of the police, thus effectively leaving the police officer's determination of probable cause largely unreviewed in court.  The reason is particularly acute given that neither Judge Black nor the Tenth Circuit cited Miera v. Waltemeyer in the opinions in Angel v. Torrance County Sheriff's Department, although, at the same time, the Court did not see the Tenth Circuit's unpublished opinion and Judge Black's opinion in Angel v. Torrance County Sheriff's Department when its wrote its opinion in Mata v. Anderson.  Despite these serious reservations, the Court does not feel free to make the independent determination what the Supreme Court of New Mexico would do when the Tenth Circuit has affirmed the application of collateral estoppel to nearly identical facts in Angel v. Torrance County Sheriff's Department; both cases involve a Magistrate Judge's determination of probable cause at a preliminary hearing followed by a district attorney's decision to *nolle prosequi* the case.   The Tenth Circuit affirmed -- on de novo review -- Judge Black's determination that collateral estoppel bars the relitigation of the probable cause issue in the subsequent civil case; the Court will thus grant the MSJ on the unlawful arrest claim, because the Tenth Circuit's determination indicates that it would apply collateral estoppel in this situation.[35]

---

[35] Ysasi argues that the Court should not apply issue preclusion, because the Defendants are not in privity with the State of New Mexico from Ysasi's criminal case.  The Court notes that New Mexico law does not require the defendants to be in privity with the State of New Mexico when they are using defensive collateral estoppel.

**III.    THE COURT WILL GRANT THE MSJ IN PART AND DISMISS YSASI'S CLAIM AGAINST THE LEA COUNTY DETENTION CENTER.**

Ysasi asserts in the Complaint that the LCDC "conspired . . . to violate the rights of Mr. Ysasi by holding him incommunicado for a period of three days with[out] access to bail in an attempt to cover up the actions of Deputies Rider and Brown," Complaint ¶ 40, at 9; in the Response, he asserts that the LCDC detained him for four days, without an arraignment and without bail, "in order to conceal the beating he took from Deputy Chris Rider," Response at 12; and, at the hearing, he explained that his claim against the LCDC is an Eighth Amendment claim that "he was not allowed to bond himself out" and that he was "held incommunicado." Tr. at 26:9-12 (Blenden). To support this claim, he cites to his deposition testimony, but he did not attach the deposition testimony to the Response. The Defendants deny that the LCDC held Ysasi "incommunicado," and provided the LCDC Call Records to show that he was able to communicate with his family and friends. The Defendants contend that Ysasi changed his claim in the Response and argue that the new claim is not proper under the Eighth Amendment; rather, as they understand his claim, Ysasi is arguing that a Magistrate Court did not make a timely determination of probable cause.  See Tr. at 72:18-73:9 (Childress). To rebut this claim, the Defendants attached the Criminal Complaint, which shows that a Magistrate Judge made a determination of probable cause one day after Ysasi was arrested and incarcerated, which the

---

        [W]e hold that the doctrine of defensive collateral estoppel may be applied with a defendant seeks to preclude a plaintiff from relitigating an issue the plaintiff has previously litigated and lost regardless of whether defendant was privy to the prior suit; and that the doctrine of offensive collateral estoppel may be applied when a plaintiff seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully regardless of whether plaintiff was privy to the prior action.

Silva v. State, 1987-NMSC-107, ¶ 11.

- 113 -

Defendants assert is within the forty-eight hours that the Supreme Court of the United States requires for the probable cause determination.  See Tr. at 73:11-19 (Childress).

To the extent that Ysasi is alleging that the LCDC held him without a determination of probable cause, the undisputed evidence from the Criminal Complaint indicates that Ysasi was arrested on February 25, 2010, and that a Magistrate Judge made a determination of probable cause on February 26, 2010.  This date is within the forty-eight-hour outer limit that the Supreme Court has prescribed as presumptively reasonable in County of Riverside, and Ysasi has not come forward with any evidence to show that the delay in the determination of probable cause is unreasonable.  Because that determination was made within forty-eight hours, the burden rests on Ysasi, and he did not his burden.  See County of Riverside, 500 U.S. at 57.

To the extent that Ysasi is arguing that the LCDC held him "in communicado" and that the LCDC employees conspired with Brown and Rider to hold Ysasi for four days to allow his wounds to heal, the LCDC has come forward with evidence that Ysasi was allowed to communicate with his family and friends by making telephone calls, and Ysasi has not come forward with any evidence to show anything to the contrary.  He does not provide to the Court the evidence that he asserts supports this claim, including his own deposition testimony, and the Court cannot properly consider evidence that is not before it.  The Court found one statement in the Thompson Aff. that may support Ysasi's assertion that the LCDC prevented him from seeing people for the four days he was detained: Thompson states that she "was not allowed to see MANUEL YSASI from February 25, 2010 until March 1, 2010 as he was incarcerated in the Lea County Detention Center."  Thompson Aff. ¶ 30, at 4.  Although the Court is to make all justifiable inferences in Ysasi's favor, Thompson's statement does not provide any evidence of a conspiracy against Ysasi.

- 114 -

To the extent that Ysasi is alleging that the four days he remained incarcerated at the LCDC without an arraignment and without bail violates his Eighth Amendment rights, the Court does not think that the Eighth Amendment is the proper constitutional provision, and further, does not think that the four days delay, without more, deprived Ysasi of any constitutional rights. In United States v. Hanrahan, No. CR 04-1978 JB, 2005 WL 2312632 (D.N.M. Aug. 2, 2005)(Browning, J.), the criminal defendant moved to dismiss his indictment, because, in the defendant's view, there was an unreasonable delay between the time when he was indicted to when he was arraigned. See 2005 WL 2312632, at *3. The Court concluded that the delay did not violate the defendant's constitutional rights, because he was in state custody on unrelated charges during the delay and he did not challenge the lawfulness of the state custody. See 2005 WL 2312632, at *3. The Court recognized that the Tenth Circuit has

> acknowledge[d] there are instances in which an extended pre-arraignment delay may implicate a defendant's rights and require judicial review." Robertson v. Price City Police Dept., 83 F. App'x 286, 287-88 (10th Cir. Dec. 11, 2003)(citing Strunk v. United States, 412 U.S. 434, 440 (1973)(unreasonable delay between prisoner's indictment and arraignment violated his right to a speedy trial); United States v. Padilla-Mendoza, 157 F.3d 730, 731-32 (9th Cir.1998)(confession given during pre-indictment delay may be suppressed); United States v. Grimmond, 137 F.3d 823, 827 n. 1 (4th Cir.1998)(delay between indictment and arraignment may violate defendant's right to due process where actual prejudice is shown); Oviatt v. Pearce, 954 F.2d 1470, 1475 (9th Cir.1992)(arrestee's rights were violated where arrestee was detained for 114 days before being arraigned, and state statute created liberty interest in being free from incarceration without prompt pretrial and trial procedures); United States v. Comosona, 848 F.2d 1110, 1114 (10th Cir.1988)(pre-indictment delay may provide grounds for speedy trial violation)).

2005 WL 2312632, at *3. In United States v. Grimmond, which the Tenth Circuit cited in Robertson v. Price City Police Department, the defendant contended that a thirty-five-month delay between his indictment and his arraignment violated his Sixth Amendment right to a speedy trial and his Fifth Amendment right to due process. See 137 F.3d at 827 & n.1. The

Fourth Circuit stated that, "in order to establish a due process violation, the defendant must show that the delay caused him actual prejudice in presenting his defense."   137 F.3d at 827 n.1 (internal quotation marks omitted).   The Fourth Circuit rejected the defendant's due-process argument, because he did not show that the delay prejudiced him in presenting his defense.   See 137 F.3d at 827 n.1.

Although not stating that the cause of action arose under the due-process clause, the United States District Court for the District of Nevada applied the same standard in Dunkin v. Lamb, 500 F. Supp. 184 (D. Nev. 1980)(Foley, J.).   In that case, the plaintiff brought a § 1983 action, alleging that "his civil rights were violated because he was not arraigned for thirteen days after his initial incarceration . . . .  500 F. Supp. at 186.   The District of Nevada held that "[m]ere delay in arraignment alone does not amount to a deprivation of constitutional rights" and that "some prejudice to the defendant must exist before a delay in arraignment violates constitutional rights."   Dunkin v. Lamb, 500 F. Supp. 184, at 187.   "Thus, if there is no confession, incriminating statements or interrogation occurring during the delay, the defendant's rights are not violated."   500 F. Supp. at 187.   The District of Nevada dismissed the plaintiff's claim on summary judgment, because the plaintiff did not allege that he was prejudiced by the delay in his arraignment.   See 500 F. Supp. at 187.

The Court believes that Ysasi's claim against the LCDC does not arise under the Eighth Amendment as he has argued, but under the Fourteenth Amendment's due process protections.[36]

_____

[36] Although the Southern District of New York seems to state that an undue delay in arraignment may violate the Fourth Amendment, see Simmons v. Kelly, No. 06 Civ. 6183(RJS), 2009 WL 857410 (S.D.N.Y. March 31, 2009)("[T]here is nonetheless a constitutional right implicated by an undue delay in arraignment: the right of freedom from unreasonable search and seizure created by the Fourth Amendment."), the Court notes that the Southern District of New York relied on Gerstein v. Pugh and County of Riverside v. McLaughlin to explain that the

- 116 -

To establish such a claim, Ysasi needed to show that the four days in which he was incarcerated before his arraignment prejudiced his defense.[37]  Ysasi has alleged that the delay prejudiced him by concealing some of the evidence which he had against Brown and Rider; put another way, because he was held for four days, his bruises and wounds at least partially healed before other people could see him or take pictures of the wounds, making it more difficult for him to prove his damages in this case or make his claim for excessive force.  The problem is that Ysasi has not presented any evidence to support his contention that the delay prejudiced him, and more importantly, this prejudice does not seem to be the prejudice that the courts have recognized.  The Fourth Circuit's articulation of the standard looks to whether the delay caused a defendant "actual prejudice in presenting his defense," United States v. Grimmond, 127 F.3d at 827 n.1, meaning his defense in the criminal trial, and the District of Nevada provides examples of such prejudice, such as a confession, incriminating statements, or interrogation occurring during the delay, see Dunkin v. Lamb, 500 F. Supp. at 187.  Because Ysasi has not come forward with evidence showing that he was prejudiced, either in the criminal trial or in this civil trial, the Court will dismiss Ysasi's claim against the LCDC.[38]

_____

Fourth Amendment requires a timely judicial determination of probable cause.  See 2009 WL 857410, at *6.  It appears that the New York criminal procedures at issue in that case combined the arraignment and probable cause determination; New Mexico's procedure separates the two.

[37] The Court is wary to say that four days is an unreasonable length of time, when the New Mexico rules state that "[a] defendant in custody shall be arraigned on the complaint or citation as soon as practical, but in any event no later than four (4) days after the date of arrest." N.M.R. MAG CT RCRP Rule 6-506.  Ysasi was arraigned within the four days that the rule requires; although the rule may violate the Constitution, Ysasi did not make that argument, and admitted at the hearing that he did not know whether four days was an unreasonable amount of time.  See Tr. at 76:1-3 ("I don't even know if four days is an unreasonable time.  I have to admit to you I have not looked that up.")(Blenden).

[38] Because the Court is dismissing the claim against the LCDC, it will sustain the

## IV.  <u>THE COURT WILL MODIFY YSASI'S PROPOSED JURY INSTRUCTIONS</u>.

The Defendants objected to a number of Ysasi's requested jury instructions.  Ysasi's requested Instruction No. 22 states: "A Plaintiff is not required to prove that a Defendant intentionally deprived him or her of his or her Constitutional rights.  Rather, the Plaintiff only needs to prove that a Defendant intentionally committed acts or omissions, and that such acts or omissions resulted in violations of the Plaintiff's constitutional rights."  Plaintiff's Jury Instructions, filed February 19, 2014 (Doc. 81); Plaintiff's Requested Instruction No. 22, at 22.  The Defendants object to this instruction "as being an inaccurate description of the law and the evidence."  Objections at 3.  The Court will sustain this objection in part, and will modify the instruction to state that Ysasi must prove by a preponderance of the evidence "[t]hat Mr. Brown and/or Mr. Rider, intentionally committed acts that violated one or more Federal constitutional rights . . . ."  Court's Final Jury Instructions (with citations) at 14-15, filed February 19, 2014 (Doc. 85)("Final Instructions").  The Court based this modification on the Fifth Circuit Pattern Jury Instructions (Civil Cases) 10.1, at 123 (2009)(42 USC Section 1983 (Unlawful Arrest -- Unlawful Search -- Excessive Force) Qualified Immunity -- Good Faith Defense).

Ysasi's requested Instruction No. 23 states:

A proximate cause of an injury is that which in a natural and continuous sequence produces the injury, and without which the injury would not have occurred.  It need not be the only cause, nor the last nor nearest cause.  It is sufficient if it occurs with some other cause acting at the same time, which in combination with it, causes the injury.

Plaintiff's Requested Instruction No. 23.  The Defendants object to this instruction "to the extent it contradicts federal law defining proximate cause.  In addition, it is inconsistent with the language of UJI 13-305."  Objections at 3.  The Court will sustain this objection and modify the

---

Defendants' Objections to Ysasi's proposed jury instructions related to the LCDC.

jury instruction to read:

> Mr. Ysasi must also prove by a preponderance of the evidence that the act or failure to act by Mr. Brown and/or Mr. Rider was a proximate cause of the damage Mr. Ysasi suffered.  An act or omission is a proximate cause of Mr. Ysasi's injuries or damages if it appears from the evidence that the injury or damage was a reasonable foreseeable consequence of the act or omission.

Final Instructions at 17-18.  The Court based this modification on the Fifth Circuit Pattern Jury Instructions 10.1, at 125-26.

The Defendants object to Ysasi's requested Instruction Nos. 34-39, which relate to damages, because the Defendants "deny that the Plaintiff is entitled to damages" and that "there is no evidence to support a lost earnings instruction."  Objections at 3.  After the close of the evidence at trial, the Court discussed with the parties the jury instructions relating to damages.  The parties agreed to remove the jury instruction for "the value of lost earnings and the present cash value of earning capacity reasonably certain to be lost in the future," "the reasonable expense of necessary medical care, treatment and services received," and, in the instruction regarding "the nature, extent, and duration of the injury," to remove the words "including disfigurement."  The parties and the Court agreed to remove those instructions, because Ysasi did not present evidence to support those damage calculations.  See Trial Tr. at 141:25-144:4 (Childress, Court, Blenden).  Regarding these damages instructions, the Court will sustain the Defendants' Objections, but the Court will overrule the remaining Objections on damages.

**IT IS ORDERED** that (i) the Defendants' Motion for Partial Summary Judgment, filed December 16, 2013 (Doc. 43), is granted in part and denied in part; and (ii) the Defendants' Objections to Plaintiff's Proposed Jury Instructions, filed February 14, 2014 (Doc. 68), are overruled in part and sustained in part.  The Court will dismiss the state law claims against all the Defendants, will dismiss the unlawful arrest claims under the Fourth Amendment to the

Constitution of the United States of America against Defendants Deputy Sheriff Kelly Brown and Deputy Sheriff Chris Rider, and will dismiss the claim against the Defendant Lea County Detention Center.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Jon C. Fredlund
Fredlund & Bryan
Hobbs, New Mexico

--and--

Max Houston Proctor
Hobbs, New Mexico

--and--

Dick A. Blenden
Blenden Law Firm, P.A.
Carlsbad, New Mexico

      *Attorneys for the Plaintiff*

Ronald J. Childress
Elaine R. Dailey
Klecan & Childress
Albuquerque, New Mexico

      *Attorneys for the Defendants*